**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § | **CASE NO. 18-33836-H1-11** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

| | | |
|---|---|---|
| **INFINITY EMERGENCY MANAGEMENT** | § | |
| **GROUP, LLC, Individually and as Class B** | § | |
| **Non-Voting Members on Behalf of** | § | |
| **Series 114 - Eastside and Series 115 – Zaragoza,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **VS.** | § | **ADV. P. NO. 18-3276** |
| | § | |
| **NEIGHBORS HEALTH SYSTEM, INC., et al,** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON ISSUE OF OWNERSHIP OF BUSINESS**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**A HEARING HAS BEEN SET FOR SEPTEMBER 20, 2019, AT 9:30 A.M. IN COURTROOM 404, U.S. COURTHOUSE, 515 RUSK AVE., 4TH FLOOR, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:

COMES NOW, INFINITY EMERGENCY MANAGEMENT GROUP, LLC, Individually and as Class B Non-Voting Members on behalf of Series 114 – Eastside and Series 115 – Zaragoza (the "Plaintiff"), Plaintiff in the above styled adversary, and files its Plaintiff's Motion for Partial Summary Judgment on Issue of Ownership of Business, and would show as follows:

I.

<u>RELIEF REQUESTED</u>

1.  The Plaintiff, pursuant to Fed. R. Civ. P. 56(a), seeks a partial summary judgment that Series 114 – Eastside, LLC owned the income-generating emergency medicine physician operating  business at the Freestanding Emergency Department ("FED") located at 12101 Edgemere Blvd, El Paso, TX 79938, and Series 115 - Zaragoza, LLC owned the income-generating emergency medicine physician operating business at the FED located at 1540 N Zaragoza Rd, El Paso, TX 79936. To the extent the Court does not grant all the relief requested, the Plaintiff seeks an order under Fed. R. Civ. P. 56(g) stating any material fact that is not in dispute and treating the fact as established in the case.

II.

<u>JURISDICTION AND CONSTITUTIONAL AUTHORITY</u>

2.  The parties do not dispute federal jurisdiction under 28 U.S.C. § 1334; however, the parties different on the question of whether this Court should enter a final judgment in this adversary.  The Plaintiff and Defendants dispute that all the claims constitute "core" matters but are at least "related to" matters.  The claims are state law Article III matters on which the parties are entitled to trial by jury, and all parties have demanded a jury trial.  Defendants Michael Chang,

2

Andy Chen, Quang Henderson, and Hitesh Patel contend that accordingly, trial of these matters must be before an Article III Court. The Plaintiff and Defendants Neighbors Health, LLC, Neighbors GP, LLC (now represented by the Trustee of the Unsecured Creditors Committee), and Setul Patel have filed statements consenting to the Bankruptcy Court's entry of final judgments and orders. To the extent that this Court finds it does not have the constitutional authority to enter a final judgment, the Plaintiff consents to entry of a final judgment in this matter.

## III.

## SUMMARY JUDGMENT EVIDENCE

3. The Plaintiff offers the following summary judgment evidence in support of this motion for partial summary judgment:

| | |
|---|---|
| Exhibit 1  - | Affidavit of Jermaine Bowen |
| Exhibit 2  - | Affidavit of Dr. Samara Bowen, MD |
| Exhibit 3(a)  - | Certificate of Formation of NHS Emergency Centers, LLC dated December 23, 2013 |
| Exhibit 3(b)  - | Certificate of Amendment of NHS Emergency Centers, LLC Series Limited Liability Company dated January 27, 2014. |
| Exhibit 4  - | Operating Agreement of NHS Emergency Centers, LLC dated January 1, 2014 |
| Exhibit 5  - | First Amendment to Operating Agreement of NHS Emergency Centers, LLC dated July 6, 2015 |
| Exhibit 6  - | Second Amendment to Operating Agreement of NHS Emergency Centers, LLC dated August 11, 2015 |
| Exhibit 7  - | Series Agreement by NHS Emergency Centers, LLC for Series 114 – Eastside, LLC dated December 3, 2014 |
| Exhibit 8  - | Series Interest Purchase Agreement between NHS Emergency Centers, LLC and Infinity Emergency Management Group, LLC dated December 3, 2014 for Series 114 – Eastside, LLC |

Exhibit 9   -          Series Management and Administrative Services Agreement between Neighbors Health System, Inc. and Series 114 Eastside, LLC dated December 4, 2014

Exhibit 10   -          Medical Director Agreement between Neighbors Physician Group, LLC and Samara Bowen, MD dated November 21, 2015 - (Filed Under Seal)

Exhibit 11   -          Certificate of Formation of NEC Eastside Emergency Center, LP dated December 1, 2014

Exhibit 12   -          Agreement of Limited Partnership of NEC Eastside Emergency Center, LP dated February 26, 2015 - (Filed Under Seal)

Exhibit 13   -          Management and Administrative Services Agreement between Neighbors Health System, Inc. and NEC Eastside Emergency Center, LP dated February 26, 2015 - (Filed Under Seal)

Exhibit 14   -          Neighbors Health System, Inc. Minutes of a Special Meeting of the Board of Directors held August 5, 2014

Exhibit 15   -          Contribution Agreement of Neighbors Investment Group, LLC for contribution to Eastside Emergency Center between Neighbors Investment Group, LLC and its members dated July 7, 2015 - (Filed Under Seal)

Exhibit 16   -          Management and Administrative Services Agreement dated November 16, 2015 between Neighbors Health System, LLC and NEC Eastside Emergency Center, LP - (Filed Under Seal)

Exhibit 17   -          Medical Director Agreement between Neighbors Physician Group, LLC and Davida Manor, MD dated August 15, 2014

Exhibit 18   -          Series Agreement of NHS Emergency Centers, LLC for Series 115 – Zaragoza, LLC dated December 3, 2014

Exhibit 19   -          Series Interest Purchase Agreement between NHS Emergency Centers, LLC and Infinity Emergency Management Group, LLC dated December 3, 2014

Exhibit 20   -          Series Management and Administrative Services Agreement between Neighbors Health System, Inc. and Series 115 – Zaragoza, LLC dated November 4, 2014

Exhibit 21   -          Medical Director Employment Agreement between Neighbors Health System, Inc. and Davida Manor, MD dated August 15, 2015

Exhibit 22  -      Certificate of Formation of NEC Zaragoza Emergency Center, LP dated November 4, 2014

Exhibit 23  -      Agreement of Limited Partnership of NEC Zaragoza Emergency Center, LP dated February 26, 2015

Exhibit 24  -      Management and Administrative Services Agreement between Neighbors Health System, Inc. and NEC Zaragoza Emergency Center, LP dated November 4, 2014

Exhibit 25  -      Neighbors Health System, Inc. Minutes of a Special Meeting of the Board of Directors Held August 4, 2015

Exhibit 26  -      Contribution Agreement of Neighbors Investment Group, LLC for contribution to Zaragoza Emergency Center between Neighbors Investment Group, LLC and its members dated July 7, 2015

Exhibit 27  -      Management and Administrative Services Agreement between Neighbors Health System, Inc. and NEC Zaragoza Emergency Center, LP dated November 16, 2015

Exhibit 28  -      Amended and Restated Management and Administrative Services Agreement between Neighbors Health Systems, Inc. and NEC Zaragoza Emergency Center, LP dated January 1, 2016

Exhibit 29  -      Certificate of Formation of Neighbors Investment Group, LLC dated July 11, 2013

Exhibit 30  -      Certificate of Formation of Infinity Emergency Management Group, LLC dated August 21, 2014

Exhibit 31  -      Excerpts from Neighbors Health System, Inc. Lender Presentation PowerPoint Slides dated October 13, 2015

Exhibit 32  -      Series 115 – Zaragoza, LLC Profit and Loss and Balance Sheet for August 2014 through December 2015 - (Filed Under Seal)

Exhibit 33  -      Series 115 – Zaragoza, LLC Balance Sheets and Income Statements for Fiscal Years 2016 – 2018 - (Filed Under Seal)

Exhibit 34  -      Series 114 – Eastside, LLC Balance Sheets and Income Statements for Fiscal Years 2016 – 2018 - (Filed Under Seal)

Exhibit 35  -       Email from Patrick Johnson to Jermaine Bowen Dated October 24, 2016, Sending Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC Financial Statements

Exhibit 36  -       Email from Cynthia Mathew to Jermaine Bowen Dated November 23, 2015 Sending RFP to Valuation Firms

Exhibit 37  -       NHS Emergency Centers, LLC Company Information Packet

Exhibit 38  -       Email from Dr. Paul Alleyene to Jermaine Bowen, Dr. Samara Bowen, and Dr. Davida Manor dated September 15, 2014, Explaining Proposed Business Venture

Exhibit 39  -       Emails of John Decker with Brandon Johnson Dated April of 2015 Regarding Business Ownership

Exhibit 40  -       2014 Neighbors Health Investors Brochure

Exhibit 41  -       Federal Income Tax Return of NEC Eastside Emergency Center, LP for 2015 Tax Year - (Filed Under Seal)

Exhibit 42  -       Federal Income Tax Return of NEC Eastside Emergency Center, LP for 2016 Tax Year - (Filed Under Seal)

Exhibit 43  -       Federal Income Tax Return of NEC Zaragoza Emergency Center, LP for 2015 Tax Year - (Filed Under Seal)

Exhibit 44  -       Federal Income Tax Return of NEC Zaragoza Emergency Center, LP for 2016 Tax Year - (Filed Under Seal)

True and correct copies of the foregoing are attached hereto and incorporated herein as if set forth at length.[1]

## IV.

## BURDEN ON SUMMARY JUDGMENT

4.  The Court has asked the parties to skip any discussion of the burden on a motion for summary judgment.

---

[1] Some exhibits are marked confidential but have been used by both parties by consent in previously filed pleadings.  Thus, they are not filed under seal.

# V.

## <u>INTRODUCTION</u>

5.  There are a number of different ways for this Court to determine who owned the "business."  One way is to simply look to the common definition of the term "business," since the matter is not one defined in any of the agreements.  This motion begins there.  The Plaintiff contends that when viewing the common definition of a "business" as cases in Texas have done, the evidence shows that Series 114 – Eastside, LLC owned the business of operating the Edgemere freestanding emergency department business and Series 115 – Zaragoza, LLC owned the business of operating the Zaragoza freestanding emergency department.  If the Court believes that the agreements do address the term "business" as something of a defined term of art, the Court can construe the agreements between the parties to determine who "owned" the "business."  The Plaintiff contends that when construing the agreements under the rules of construction of Texas law, the agreements show that Series 114 – Eastside, LLC owned the business of operating the Edgemere freestanding emergency department business and Series 115 – Zaragoza, LLC owned the business of operating the Zaragoza freestanding emergency department.  Sadly, the agreements are as clear as mud as to the language addressing who owns the "business."  The Plaintiff has its arguments it offers in this motion as to what the agreements mean, but the Defendants will certainly offer their own interpretation of those same agreements.  Unfortunately, the agreements are in all likelihood ambiguous.  The Court will, in that case, need to look at the parol evidence that demonstrates the parties' intent with respect to ownership of the operating business.  The Plaintiff contends that the parol evidence clearly shows that the parties always intended for Series 114 – Eastside, LLC to own the business of operating the Edgemere freestanding emergency department

business and Series 115 – Zaragoza, LLC to own the business of operating the Zaragoza freestanding emergency department.

6. This motion will address each of these approaches to the question in this order: (1) ordinary meaning of "business," (2) construing the agreements within their four corners to determine who owned the "business," and (3) looking at parol evidence to resolve the ambiguities in construing the agreements. Under any of these methods, there is no genuine issue of material fact, and the Plaintiff is entitled to judgment as a matter of law on the issue of ownership of the operating business (and thus standing to bring the derivative claims). The Court should grant Plaintiff a partial summary judgment.

## VI.

## BACKGROUND FACTS

7. On December 23, 2013, NHS Emergency Centers, LLC was formed. (Exhibit 3(a)). On January 27, 2014, NHS Emergency Centers, LLC amended its legal status to a Texas series limited liability company, pursuant Subchapter M of the Texas Business Organization Code. (Exhibit 3(b)). Section 2.08 of the Operating Agreement of NHS Emergency Centers, LLC provided for the creation of individual series, which were to "have separate rights, power or duties with respect to specified business location, business purpose, property and profits and losses associated with specified business location and operations." (Exhibit 4, p. LT005868). Section 2.09 of the Operating Agreement also states that "The Series Property, or other assets of each Series, together with all income, earnings, profits and proceeds thereof, including all proceeds derived from the business operation, or the sale, exchange or liquidation of the Series Property held by such Series, and any funds or assets derived from any reinvestment of such proceeds, shall be deemed to be Series Property, held by and belonging to such Series". (Exhibit 4, p. LT005868).

Under the terms of its Operating Agreement, NHS Emergency Centers, LLC created multiple series in order to operate multiple FEDs. (Exhibit 4, p. LT005870).[2] The First Amendment to the Operating Agreement of NHS Emergency Centers, LLC created numerous additional series, including Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC, the series at issue here. (Exhibit 5, p. LT006298).[3] NHS Emergency Centers, LLC created a separate series to own and operate the income-generating business of each FED.

8. Dr. Samara Bowen, MD is a physician specializing in emergency medicine services practicing in the El Paso, Texas area. (Exhibit 2, ⁋ 2) Her husband, Jermaine Bowen, runs the financial aspects of her practice. (Exhibit 2, ⁋ 2). In 2013, the Bowens leaned about a new business opportunity in Texas for emergency medicine physicians to own and operate freestanding emergency departments independent of hospitals. (Exhibit 2, ⁋ 2). The Bowens decided to research the FED opportunity. (Exhibit 2, ⁋ 3). After researching the possibilities, the decided to move forward with opening their own FED. Id. They discussed the opportunity with several of Dr. Bowen's physician colleagues and assembled a group of other interested emergency medicine physicians. Id.

9. In mid-2014, the Bowens heard about a separate group of doctors based out of Houston who had already launched several of their own FEDs and were looking to partner with other doctors outside of Houston to launch FEDs in other cities. (Exhibit 2, ⁋ 4). Dr. Paul Alleyene of NHS Emergency Centers, LLC approached the Bowens about a possible business venture with

---

[2]        The first of these series were Series 100-Bellaire, Series 101-Kingwood, Series 101.1-Kingwood Asset Holdings, Series 102-Baytown, Series 102.1-Baytown Asset Holdings, Series 103-Pasadena, Series 104-Pearland, Series 104.1-Pearland Asset Holdings, Series 105-Mueller, Series 106-Beaumont, Series 106.1-Beaumont Asset Holdings, and Series 107-Lakeline.

[3] The amendment was executed on July 6, 2015 but was effective January 1, 2014. On August 11, 2015, NHS Emergency Centers, LLC executed the Second Amendment to Operating Agreement of NHS Emergency Centers, LLC adding still more series. (Exhibit 6). That amendment was effective January 1, 2014 as well.

NHS Emergency Centers, LLC to open several FEDs in El Paso under the "Neighbors Emergency Center" brand.  (Exhibit 1, ₱ 2; Exhibit 2, ₱ 4).  On July 11, 2014, Dr. Paul Alleyne and Setul Patel of NHS Emergency Centers, LLC came to El Paso and made a presentation to the Bowens and several other emergency medicine physicians in their group at the El Paso Coronado Club about the possible business investment.  (Exhibit 1, ₱ 3; Exhibit 2, ₱ 4).

10. At the meeting, the Bowens informed Dr. Alleyene and Dr. Patel about the vast emergency medicine market in the Midland/Odessa and El Paso, Texas areas and that these would be great locations to open FEDs.  The Bowens further informed them that they were looking into opening sites in these two cities. (Exhibit 2, ₱ 5).  Dr. Alleyene and Dr. Patel informed the Bowens that partnering with them would make the process of opening new FEDs easier and quicker, because they already had the experience and the working model in place from their previous four centers in Houston.  Dr. Alleyene and Dr. Patel further stated that since their group had already obtained a $30 million dollar loan, the Bowens would not have to take out personal loans and personally guarantee any of those loans in order to open an FED on their own. (Exhibit 2, ₱ 5). They told the Bowens that once the FED opened, the FED would simply repay the funds from the Neighbors' bank loan that was used to build out the interior of the FED from revenue generated by the FED. (Exhibit 2, ₱ 5).   The Bowens' group would own a percentage of the business and run the business, including staffing the business as owners/operators. Dr. Alleyne and Dr. Patel and their fellow non-active co-owners would own a percentage of the business. (Exhibit 2, ₱ 5). The Bowens' group would then hire their company, for a negotiated monthly fee, to provide all the administrative support services (IT support, maintenance, etc.). (Exhibit 2, ₱ 5).

11. After hearing the live presentation by Dr. Alleyene and Dr. Patel, the Bowens' group decided to move forward and partner with Dr. Alleyene and Dr. Patel's group of eight (8) doctors

in setting up and operating two FEDs in the El Paso area. (Exhibit 2, ⁋ 5).  They began negotiating

the ownership split. (Exhibit 2, ⁋ 5).  The parties ultimately agreed on 65% for the Bowens' group

for a $500,000 capital contribution investment per FED, with the contribution to be used to fund

cashflow of the operation until the FED became profitable. (Exhibit 2, ⁋ 5).  By Dr. Alleyene and

Dr. Patel's account, the FEDs would break-even within 6-months and should start seeing

membership distribution payout at around 3-months after opening.  (Exhibit 2, ⁋ 5).

    12. On August 5, 2014, the Board of Directors of NHS Emergency Centers, LLC met, and

at that board meeting agreed to an expansion of FEDs in the El Paso area.  (Exhibit 14).  NHS

Emergency Centers, LLC and its counsel began working on the transactional documents necessary

to consummate the business venture.

    13. Excited to be opening their own FED, the Bowens' group was intimately involved in

locating and surveying the local sites, along with Dr. Alleyene and Dr. Patel's real estate vendor

Read King. (Exhibit 2, ⁋ 5).  On August 21, 2014, Infinity Emergency Management Group, LLC

was formed with the initial managers being Jermaine Bowen, Dr. Samara Bowen, and Dr. Davida

Manor (Exhibit 30) as a vehicle to own membership interests in the entities that NHS Emergency

Centers, LLC created to own and operate the El Paso FEDs.  (Exhibit 2, ⁋ 5).  NHS Emergency

Centers, LLC formed Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC as the operating

entities. (Exhibit 2, ⁋ 5).  Infinity Emergency Management Group, LLC entered into Series Interest

Purchase Agreements to purchase membership interests in Series 114 – Eastside, LLC and Series

115 – Zaragoza, LLC.  (Exhibit 2, ⁋ 5).  Those Series businesses entered into Series Management

and Administrative Services Agreements with an affiliate of NHS Emergency Centers, LLC that

provided management services.  (Exhibit 2, ⁋ 5).[4]  That management company, Neighbors Health

---

[4] The exact timing of the execution of these various documents is discussed below.

System, Inc., provided the businesses with management support. (Exhibit 2, ⁋ 5). Nevertheless, Infinity Emergency Management Group, LLC participated in and contributed to the Series business operations involved in the real estate development group conferences, interviewed and hired non-medical staff personnel, and participated and contributed to local sales and marketing strategies and contracts. (Exhibit 2, ⁋ 5). Infinity Emergency Management Group, LLC provided the emergency room physician staffing for both FEDs and oversaw all emergency medical services operations on behalf of the Series. The Series' doctors and other non-professional staff provided emergency medicine services to patients 24 hours a day, 7 days a week. (Exhibit 2, ⁋ 5). Within a few months of opening, both FEDs were successful and profitable, and profits were distributed to the owners accordingly. (Exhibit 2, ⁋ 5).

14. Doctors Setul Patel, Paul Alleyne, Cyril Gilman, Quan Henderson, Michael Chang, Andy Chen, Hitesh Patel, and Dharmesh Patel also had an entity established to purchase the remaining membership interests in the series entities. That entity was formed on July 11, 2013, and was called Neighbors Investment Group, LLC. (Exhibit 29). The series entities would receive the net profits from the operation of the FEDs. (Exhibit 1, ⁋ 4 – 5; Exhibit 2, ⁋ 5). The Bowens' group Infinity Emergency Management Group, LLC and Neighbors Investment Group, LLC would split the profits according to their respective ownership in Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC. (Exhibit 1, ⁋ 4 – 5; Exhibit 2, ⁋ 5). NHS Emergency Centers, LLC caused the formation of separate limited partnerships, NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP, to hold the lease and lease improvements and equipment, in order to limit the exposure against the income-generating operating business from potential risks and liabilities. These limited partnerships held title to the building's interior built out and improvements, the facility long-term leases, furniture, fixtures and office and medical equipment,

and also Neighbors Emergency Center, LLC intellectual property such as branding and logos. (Exhibit 37, LP045798).

15. By late 2014, NHS Emergency Centers, LLC and its counsel had developed the structure and documents needed to consummate the relationships.  (See Exhibit 38).  In November and December of 2014, the venture progressed rapidly.

16. NHS Emergency Centers, LLC's manager, Neighbors Health System, Inc.,[5] worked through a real estate broker named Read King to locate two sites for the FEDs in El Paso. (Exhibit 2, ₱ 5).   Read King, with the help of Plaintiff's group, found two locations on the east side of El Paso.  One was located just off Texas Hwy. 375 at 12101 Edgemere, El Paso, Texas 79938 and one was located on N. Zaragoza Road between I-10 and Hwy. 375 at 1540 Zaragoza Road, El Paso, Texas 79936. (Exhibit 2, ₱ 5). These became known as the "Edgemere Emergency Center" and the "Zaragoza Emergency Center" respectively.

17. The site for the building located at 1540 N. Zaragoza Rd. El Paso, TX 79936 was obtained first, and the parties anticipated that the building located at 1540 N. Zaragoza Rd. El Paso, TX 79936 would be open and operating prior to the building, located at 12101 Edgemere Blvd, El Paso, TX 79938. (Exhibit 31, p. LT084091 – 92).  On August 15, 2015, Dr. Davida Manor-Ward, one of the doctors in the Bowens' group of doctor investors, signed a Medical Director Agreement with Neighbors Health System, Inc. to serve as the Medical Director of the FED located at 1540 Zaragoza Road, El Paso, TX 79936.  (Exhibit 21).  On November 4, 2014, Series 115 - Zaragoza, LLC, soon to be formed, entered into a Series Management and Administrative Services Agreement with Neighbors Health System, Inc. to provide administrative and financial management of Series business operations.  (Exhibit 19).  On November 4, 2014, NEC Zaragoza

---

[5]    Neighbors Health System, Inc. was NHS Emergency Centers, LLC's affiliate that served as a manager for the various series entities that owned and operated the various FEDs.

Emergency Center, LP was formed (Exhibit 22) to serve as the vehicle to lease the property located at 1540 N. Zaragoza Rd. El Paso, TX 79936, obtain the loan for the buildout of the improvements, and purchase and/or lease the office and medical equipment needed for Series 115 - Zaragoza, LLC to operate its FED.  Also on November 4, 2014, NEC Zaragoza Emergency Center, LP entered into a separate Management and Administrative Services Agreement with Neighbors Health System, Inc. to provide NEC Zaragoza Emergency Center, LP with administrative and financial management.  (Exhibit 24).   On November 10, 2014, Neighbors Health System, Inc. on behalf of NEC Zaragoza Emergency Center, LP signed a long-term lease agreement for the property located at 1540 N. Zaragoza Rd. El Paso, TX 79936.

18. On December 1, 2014, NEC Eastside Emergency Center, LP was formed (Exhibit 11) to serve as the vehicle to lease the property for Series 114 – Eastside, LLC's location, obtain a loan for construction of improvements, and purchase and/or lease the office and medical equipment needed for Series 114 - Eastside, LLC to operate its FED.[6]

19. On December 3, 2014, Infinity Emergency Management Group, LLC entered into Series Interest Purchase Agreements with NHS Emergency Centers, LLC for the purchase of series interests in Series 114 - Eastside, LLC and Series 115 - Zaragoza, LLC.  (Exhibits 8 and 19). Under those agreements, Infinity Emergency Management Group, LLC purchased 6,500 Class B Series Shares of Series 114 - Eastside, LLC and Series 115 - Zaragoza, LLC representing 65% of the ownership of those series.  (Exhibit 8, p. LT005584 and Exhibit 19, p. LT005735).  Also on December 3, 2014, NHS Emergency Centers, LLC executed a Series Agreement for Series 114 - Eastside, LLC and for Series 115 - Zaragoza, LLC.  (Exhibits 7 and 18).  Those Series Agreements each contain a series of acknowledgements.  The first acknowledgement is that the series was

---

[6] On February 26, 2015, the Agreement of Limited Partnership of NEC Eastside Emergency Center, LP and the Agreement of Limited Partnership of NEC Zaragoza Emergency Center, LP were signed.  (Exhibits 12 and 23).

"established to operate a free standing emergency center known as NEC Eastside Emergency Center, LP (and NEC Zaragoza Emergency Center, LP) (the "Series Business")." (Exhibit 7, p. LT005597 and Exhibit 18, p. LT005742).   On December 4, 2014, Series 114 - Eastside, LLC entered into a Series Management and Administrative Services Agreement with Neighbors Health System, Inc., to provide Series 114 - Eastside, LLC with administrative and financial management of its business operations.  (Exhibit 9).

20. In early 2015, Neighbors Health System, Inc., with the assistance of Infinity Emergency Management Group, LLC, located a property for the FED located at 12101 Edgemere Blvd, El Paso, TX 79938.  On February 10, 2015, Neighbors Health System, Inc. on behalf of NEC Eastside Emergency Center, LP signed a lease for the FED located at 12101 Edgemere Blvd, El Paso, TX 79938.   On February 26, 2015, NEC Eastside Emergency Center, LP entered into a Management and Administrative Services Agreement with Neighbors Health System, Inc. to provide NEC Eastside Emergency Center, LP with administrative and financial management. (Exhibit 13).[7]

21. On August 15, 2015, the FED located at 1540 N. Zaragoza Rd. El Paso, TX 79936 opened and Series 115 – Zaragoza, LLC began the operating business of that FED. (Exhibit 25, p. LT006439; Exhibit 31, p. LT084074 and LT084088).  On November 15, 2015, the FED located at 12101 Edgemere Blvd, El Paso, TX 79938 opened and Series 114 – Eastside, LLC began the operating business of that FED.  (Exhibit 31, p. LT084074 and LT084092).  On November 21, 2015, Dr. Samara Bowen entered into a Medical Director Agreement with Neighbors Physician

---

[7] On November 16, 2015, both NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP entered into nearly identical Management and Administrative Services Agreements with Neighbors Health System, LLC n/k/a Neighbors Health, LLC, an entity formed on November 6, 2015, apparently as a new management vehicle. (Exhibits 16 and 27).  On January 1, 2016, NEC Zaragoza Emergency Center, LP entered into an Amended and Restated Management and Administrative Services Agreement with Neighbors Health, LLC f/k/a Neighbors Health System, LLC. (Exhibit 28).

Group, LLC, an affiliate of Neighbors Health Systems, Inc., agreeing to serve as the Medical Director of the FED located at 12101 Edgemere Blvd, El Paso, TX 79938. (Exhibit 10).

22. Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC were owner/operators and were responsible for the income-generating emergency medicine physician clinical staffing of the Edgemere and Zaragoza FEDs.  (Exhibit 2, ℗ 5). Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC conducted interviews and hired, with the HR assistance of Neighbors Health Systems, Inc., the non-professional staff for the Edgemere and Zaragoza FEDs. (See Exhibit 2, ℗ 5).  Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC, through its relationship with Infinity Emergency Management Group, LLC, provided the emergency medicine physicians to staff the Edgemere and Zaragoza FEDs. (Exhibit 2, ℗ 5).  Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC conducted all scheduling and all on-site management of personnel at the centers. (See Exhibit 2, ℗ 5).  The Series' doctors and other non-professional staff saw patients in need of emergency services through check-in, treatment, and discharge.  (Exhibit 2, ℗ 5). The Series' manager assisted the Series under the Series Management and Administrative Services Agreement, with its patient/insurance billing, collection of accounts receivable, payment of vendor payables, IT issues, banking and financial accounting. (Exhibits 9 and 20). Neighbors Health Systems, Inc., as manager of these Series, periodically determined from the accounting what net profit there was, and under the terms of the Series Agreement and the management agreement, paid out the Series' net profit to the Series' membership interest owners. (Exhibit 2, ℗ 6).

23. Neighbors Health Systems, Inc., in preparing Series – 114 Eastside, LLC's and Series 115 – Zaragoza, LLC's profit/loss statements, passed the expenses of NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP for interest on the construction loans, rent, and equipment through to Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC.  This can

16

be seen, for instance, on the 2015 financials of Series 115 – Zaragoza, LLC.  The building located at 1540 N. Zaragoza Rd., El Paso, TX 79936 opened in August of 2015, so the months of August – December 2015 show entries on the financials.  Under the Admin Expense category, equipment lease fees, facility lease fees, interest expense, office expenses, telephone expenses, and utility expenses are included.  Under Taxes category, property taxes are included.  The accounting looks like this:

**REDACTED AND UNDER SEAL**

(Exhibit 32, p. LT001316); (See also Exhibit 33, p. LT001207 – 10 and Exhibit 34, p. LT001331 - 34)

24. In addition, the improvements and equipment were accounted for as an asset of Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC on their balance sheets prepared by the manager, Neighbors Health System, Inc.  In addition, the equity owners that were listed on the Series balance sheets were Infinity Emergency Management Group, LLC and Doctors Setul Patel, Paul Alleyne, Cyril Gilman, Quan Henderson, Michael Chang, Andy Chen, Hitesh Patel, Dharmesh Patel (the individual owners of Neighbors Investment Group, LLC).  That balance sheet looks as follows:

## REDACTED AND UNDER SEAL

(Exhibit 32, pp. LT001325 – 26; See also Exhibit 33, p. LT001219 – 24 and Exhibit 34, p. 1343 - 48).  These are the financial statements that Neighbors Health Services, Inc. prepared and sent to Infinity Emergency Management Group, LLC as the financial statements of Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC.  (Exhibit 35).

## VII.

## ARGUMENT AND AUTHORITIES

**A.  [Series 114 – Eastside, LLC] and [Series 115 – Zaragoza, LLC] Were the "Business Owners" of the Income-Generating Medical Operation of the El Paso Clinics under the General Definition of What a Business Owner is.**

25. The Court has asked the question "who owned the 'business.'"  The Court sees the answer to that question as determinative of who has standing to bring the claims in this adversary proceeding.  To answer that question, the question that should first be asked is "what constitutes 'the business?'"  In Section B below, the Plaintiff discusses the defined terms in the agreements that bear on what "business" the Series owned – terms and phrases such as Series Business, Series Property, and purpose of the Series.  That section discusses how the Court should construe the various agreements together to decide who owned the "business."  In Section C below, the Plaintiff reviews the parol evidence that bears on and resolves the ambiguities in the agreements regarding who owned the "business."  But before getting to the specific terms used in the agreements and parol evidence, a discussion of the common, ordinary meaning of the word "business" is instructive, as Texas law would look to the ordinary meaning if the term is not a defined term in the agreement.

26. Under Texas law, when dealing with a term that is not defined in the agreement, the court "must give the term its common, ordinary meaning, while reading the term 'in context and in light of the rules of grammar and common usage.'"  See *Anadarko Petroleum Corp. v. Houston*

*Cas. Co.*, 573 S.W.3d 187, 62 Tex. Sup. J. 349 (Tex. 2019)(quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015).[8] The term "business" and "business owner" are common terms. The Law Dictionary, an online legal dictionary powered by Black's Law Dictionary Free Online Legal Dictionary 2nd Ed., defines "business owner" as "An individual who owns and operates a business whether it be small or large. This individual also profits from the net gain of the company." https://thelawdictionary.org/business-owner/. The actual printed version of Black's Law Dictionary, Special Deluxe Fifth Edition (1979), does not contain a definition of "business owner," but defines both "business" and "owner." Its definition of "business" is:

> **Business.** Employment, occupation, profession, or commercial activity engaged in for gain or livelihood. Activity or enterprise for gain, benefit, advantage or livelihood. Union League Club v. Johnson, 18 Cal.2d 275, 108 P.2d 487, 490. Enterprise in which person engaged shows willingness to invest time and capital on future outcome. Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191, 194. That which habitually busies or occupies or engages the time, attention, labor, and effort of persons as a principal serious concern or interest or for livelihood or profit.

Black's Law Dictionary, Special Deluxe Fifth Edition, p. 179 (1979). The definition of "owner" in the Black's Law Dictionary is:

> **Owner.** The person in whom is vested the ownership, dominion, or title of property; proprietor. He who has dominion of a thing, real or personal, corporeal or incorporeal, which he has a right to enjoy and do with as he pleases, even to spoil or destroy it, as far as the law permits, unless he be prevented by some agreement or covenant which restrains his right.
>
> The term is, however, a nomen generalissimum, and its meaning is to be gathered from the connection in which it is used, and from the subject-matter to which it is applied. The primary meaning of the word as applied to land is one who owns the fee and who has the right to dispose of the property, but the term also includes one having a possessory right to land or the person occupying or cultivating it.
>
> The term "owner" is used to indicate a person in whom one or more interests are vested for his own benefit. The person in whom the interests are vested has "title"

---

[8]   Some of the contract construction cases are cases involving the construction of insurance policies. This is because interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994); *Upshaw v. Trinity Cos.*, 842 S.W.2d 631, 633 (Tex. 1992).

> to the interests whether he holds them for his own benefit or for the benefit of
> another. Thus the term "title," unlike "ownership," is a colorless word; to say
> without more that a person has title to certain property does not indicate whether
> he holds such property for his own benefit or as a trustee. Restatement, Second,
> Trusts, § 2, Comment (d); Restatement of Property, § 10.

Black's Law Dictionary, Special Deluxe Fifth Edition, p. 996 (1979).

27. Texas Courts have defined a "business pursuit" as "enveloping two elements: (1) continuity or regularity of activity, and (2) a profit motive, usually as a means of livelihood, gainful employment, earning a living, procuring subsistence or financial gain, a commercial transaction or engagement." *Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 644 (Tex. 2005); *United Services Auto. Ass'n v. Pennington*, 810 S.W.2d 777, 780 (Tex. App. – San Antonio 1991, writ denied)(construing insurance policy provision). The Texas Court of Criminal Appeals, in discussing a prosecution under a liquor statute, recognized the definition of "business" as follows:

> In American and English Encyclopaedia of Law, vol. 5, p. 72, it is said: "In its
> larger sense, 'business' embraces everything about which a person can be
> employed. But in a more ordinary and confined sense 'business' is that which
> occupies the time, attention, and labor of a man for the purpose of a livelihood or
> profit." Again, the author says: "Business is a word of large signification and
> demonstrates the employment or occupation in which a person is engaged in to earn
> a living." Lyons Thomas Hardw. Co. v. Perry Stove Mfg. Co., 86 Tex. 143, 24 S.W.
> 16.

*Cohen v. State*, 53 Tex. Crim. 422, 426, 110 S.W. 66, 68 (Tex. Ct. Crim. App. 1908). In *Thomas v. Creager*, the Eastland Court of Appeals, in construing the term "business" as used in the homestead provision of the Texas Constitution, discussed the definition as follows:

> The suggestion that the above-stated question of construction is involved
> implies, of course, that the word "business" may properly have different meanings.
> That seems to be true. One definition given in Webster's International Dictionary
> is "That which busies or engages time, attention or labor *as a principal, serious*
> *concern or interest.*" (Italics ours.) Corpus Juris, among many definitions,
> including the above, gives two others as follows: (a) "* * * That which * * *
> occupies the time, attention, or labor of one *as his principal concern,* whether for a
> longer or shorter time." (Italics ours.) (b) "* * * that which busies or occupies one's
> time, attention, and [or ?] labor *as his chief concern.* * * *" (Italics ours.) 9 C.J.

1103. Under these definitions it seems clear to us a person could have but one business. Only one occupation or employment would so engage a person's time, attention, or labor as to constitute his "principal serious concern or interest," or his "principal" or "chief" concern. The meaning of the word "business" as so defined would, we think, be synonymous with the terms "principal business," "main business," "chief business," etc. Two of the above definitions were taken from decisions of our Supreme Court in Lyons-Thomas Hardware Co. v. Perry Stove Mfg. Co., 86 Tex. 143, 24 S.W. 16, 22 L.R.A. 802, and Waggener v. Haskell, 89 Tex. 435, 35 S.W. 1. These definitions were given in construing the very same constitutional provision now under consideration. These decisions approving such definition would be deemed conclusive of the question at issue but for the fact that they were given in connection with, and apparently as synonymous with, other definitions of the character next to be noticed.

The standard dictionaries, encyclopedias, and decisions give other definitions under which an individual could have two or more businesses. Such is manifestly the sense in which the word is used in the terms "principal business," "main business," "chief business," etc. An example of such definitions is: "that which occupies the time, attention and [or ?] labor of men for the purpose of a livelihood or profit." Or (if considered as complete) the more general definitions "occupation"; "employment."

*Thomas v. Creager*, 107 S.W.2d 705, 707 (Tex. Civ. App. – Eastland 1937, no writ). The Dallas Court of Appeals accepted the definition of "business" in the context of a restrictive covenant in a deed as "any particular employment, occupation, or profession followed as a means of livelihood; in this sense, the word has been defined in general as meaning calling, employment, trade or avocation." *Hicks v. Loveless*, 714 S.W.2d 30, 35 (Tex. App. – Dallas 1986, no writ)(quoting *Connor v. City of University Park*, 142 S.W.2d 706, 715 (Tex. Civ. App. – Dallas 1940, writ ref'd).

28. The common definition of "business," recognized under Texas law, can be summarized as a continuous or regular activity with a profit motive, for procuring a financial gain in a commercial engagement. With this definition in mind, one can more clearly see that there were two businesses for each of the two El Paso emergency centers: the business that operated the FEDs and the business that held the long-term leases, furniture and intellectual property of those centers. The "Series Business" of Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC was to

*operate* the FED located at 12101 Edgemere Blvd, El Paso, TX 79938 and the FED located at 1540 N. Zaragoza Rd., El Paso, TX 79936 and those series were entitled to the revenue and profits of both "businesses."

29. From this general definition of business alone, the summary judgment evidence establishes as a matter of law that Series 114 – Eastside, LLC owned the business of operation of the FED located at 12101 Edgemere Blvd, El Paso, TX 79938, and Series 115 – Zaragoza, LLC owned the business of operation of the FED located at 1540 N. Zaragoza Rd., El Paso, TX 79936. The Plaintiff is entitled to a partial summary judgment on this issue of the "business ownership."

**B.   Terms in the Agreements Evidence that Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC "Owned" the "Business" of the El Paso Locations' Income-Generating Emergency Medical Clinic Operations.**

30. Although it is instructive to look at the common definition of "business" in determining who "owned" the "business," the Court should look to the agreements, construe the language of those agreements, and at least attempt to find an answer within the four corners of the agreements to the question of who owned the business.  The summary judgment evidence shows, based on the terms and phrases used in the agreements, that there is no genuine issue of material fact, and Plaintiff is entitled to judgment as a matter of law that Series 114 – Eastside, LLC owned the operating business of the FED located at 12101 Edgemere Blvd, El Paso, TX 79938, and Series 115 – Zaragoza, LLC owned the operating business of the FED located at 1540 N. Zaragoza Rd., El Paso, TX 79936.

31. In interpreting the language of the agreements, this Court must follow Texas law of contract construction.  When construing a contract, a Court's primary concern must be to ascertain the true intentions of the parties as expressed in the agreement.  *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980).  The analysis begins with the language of

25

the contract, as it is the best representation of what the parties mutually intended. *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011). To achieve this objective, the Court should examine and consider the entire writing in an effort to harmonize and give effect to all of the provisions of the agreement so that none will be rendered meaningless. *MCI Telecommunications Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 512, 243 S.W.2d, 154, 158 (1951).

32. When an agreement defines a term, that definition controls. *Gastar Expl. Ltd. v. U.S. Spec. Ins. Co.*, 412 S.W.3d 577, 583 (Tex. App. – Houston [14th Dist.] 2013, pet. Denied). Where the contract does not dictate a definition for a term or use the term in a technical sense, the court must give words and phrases their ordinary and generally accepted meaning, reading them in the context and in light of the rules of grammar and common usage. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). No single provision by itself should be given any controlling effect; rather, all of the provisions should be considered with reference to the whole contract. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex. 1962). "No one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)(quoting *Guardian Trust Co. v. Bauereisen*, 132 Tex. 396, 121 S.W.2d 579 (Tex. 1938)). Finally, in harmonizing these provisions, terms stated earlier must be favored over subsequent terms. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983).

33. The contract must be interpreted within its four corners, *Houston Lighting & Power Co. v. Tenn-Tex Alloy Chemical Corp.*, 400 S.W.2d 296, 300 (Tex. 1966), but the court may consider the circumstances present when the parties entered the contract. *Friendswood Development Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996). The court must construe

the agreement against its drafter. *Temple-Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex. 1984) (Court will construe contract strictly against its drafter); *SMB Partners, Ltd. v. Osloub*, 4 S.W.3d 368, 371 (Tex. App. – Houston [1st Dist.] 1999, no pet.).

34. The court can determine as a matter of law whether multiple documents comprise a single written contract when they relate to the same transaction, and if so construe those documents together as one contract. *Shell W. E&P, Inc. v. PEl-State Bulk Plant, LLC*, 509 S.W.3d 581, 587 – 588 (Tex. App. – San Antonio 2016, no pet.). *see Halliburton Co. v. KBR, Inc.*, 446 S.W.3d 551, 564 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (concluding master service agreement and tax sharing agreement had to be harmonized and construed together as one contract when the agreements were signed five days apart and were facets of the same transaction entered into for the purpose of effectuating a corporate separation). Similarly, if several instruments, whether executed at the same or different times, pertain to the same transaction, them must be read together even if they do not refer to each other. *Board of Ins. Comm'rs v. Great So. Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 809 (Tex. 1951); *See also Veal v. Thomason*, 138 Tex. 341, 159 S.W.2d 472, 475 (Tex. 1942) ("It is the settled rule in this  State, as well as the rule generally, that written contracts executed in different instruments whereby a single transaction or purpose is consummated are to be taken and construed together as one contract.").

35. Additionally, a court must construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served. *Reilly v. Rangers Management, Inc.* 727 S.W.2d 527,530 (Tex. 1987); *Neece v. AAA Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 602 (1959). The court should avoid a construction which creates results that are unreasonable, inequitable or oppressive. *Reilly v. Rangers Management, Inc.*, *Id.*  The Court should not declare a forfeiture

unless compelled to do so by language that can be construed in no other way. *Reilly v. Rangers Management, Inc.*, *Id.*

36. This Court should construe the Operating Agreement of NHS Emergency Centers, LLC and its First Amendment, the Series Interest Purchase Agreements, the Series Agreements, the Series Management and Administrative Services Agreements, and the Business Associate Agreements, together as one, as all of these agreements were executed nearly contemporaneously and all pertain to the establishment and operation of the two El Paso Freestanding Emergency Departments.   The Contribution Agreement of Neighbors Investment Group, LLC, although executed later, clearly forms a part of the transaction and should be considered as well.

37. The term "Series Business" is used on the first page of the Series Agreements that created Series 114 – Eastside, LLC and Series 115 - Zaragoza, LLC.  The term is capitalized and in quotes and comes after the phrase "The Series has been established to operate a free standing emergency center known as <u>NEC Eastside Emergency Center, LP (NEC Zaragoza Emergency Center, LP)</u>."  (Exhibits 7 and 18).  In section 5 of the Series Agreement, "Series Property" is a defined term:

> The Series Property of the Series shall consist of the profits, losses, distribution and other benefits received by NHS Emergency Centers, LLC from the Series Business. NHS Emergency Centers, LLC is the sole limited partner of the Series Business.

(Exhibit 7, p. LT005606 and Exhibit 18, p. LT005751).  NHS Emergency Centers, LLC was the sole limited partner of NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP, which suggests, without further analysis, that the term Series Business means NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP.  But if "Series Business" means NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP, then by this same paragraph Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC own the

profits, losses, and other benefits from the rental income from leasebacks of the buildings to the Series that comes into NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP.  Other documents show that although NHS Emergency Centers, LLC was the 99% limited partner of these limited partnerships, it considered the limited partnership interests to be owned by Series 114 – Eastside, LLC and Series 115 – Zaragoza, LP respectively.  (Exhibit 36, p. 3 and 7)[9]; (Exhibit 37, p. LT045803); (Exhibit 35, p. 4 showing limited partnership assets on Series financials); (Exhibit 39, p. LT033050); (Exhibit 38, p. LT017452 stating "within this there are many series' within – one for each center.  The interests represent 99% of each center, which is 99% of "NEC El Paso Emergency Center, LP").  Perhaps most compelling are the federal income tax returns of these limited partnerships, which reflected in 2015 and 2016 that 99% of the limited partnership interests were owned by Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC respectively.  (Exhibit 41 – 44).  Thus, the income streams taken into those limited partnerships is not the property of those limited partnerships – it is the property of the Series.  The term "Series Business" is also used in section 5(a)(iii) of the Series Interest Purchase Agreements, which reads in pertinent part:

**Section 5. Class B Member Organizational Documents and Agreements**

(a) . . . The Class B Documents shall include, without limitation, the following provisions and requirements applicable to all of Purchaser's shareholders, members, managers, partners or other equity owners (collectively the "Purchaser Equity Owners" and each individually a "Purchaser Equity Owner")

* * *

---

[9] "*Neighbors Health System, Inc.* and subsidiary companies function as exclusive managers and also 1% shareholders in the various individually owned emergency centers that *Neighbors* operates. The other 99% interest of each center are comprised of various classes of physician shareholders, including the original founders. This setup allows centralized management and control of the entire enterprise, while keeping each center as a virtual independent business. Each center's stock is put into a series of stock within a "series LLC" to allow a single investor to invest in multiple centers through one tax ID. Each center's operating entity has a lease with a landlord, and in some instances the landlord shell entity is wholly owned by the operating entity."

> (iii) Provisions requiring that there shall be a Purchaser Equity Owner on duty at the Series Business whenever reasonably possible.

(Exhibit 8, p. LT005586 – 87 and Exhibit 19, p. LT005737 – 38). This provision seems to indicate that the "Series Business" is not the actual entity NEC Eastside Emergency Center, LP or NEC Zaragoza Emergency Center, LP, but the income-generating emergency medicine physician services offered by the Series operation.   This is further bolstered by section 4 of the Series Agreements, which states that the "Business Purpose" of the Series was "to operate a free standing emergency center."  (Exhibit 7, p. LT005606 and Exhibit 18, p. LT005751).  This specific purpose stands in stark contrast to the defined purpose of NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP which is set out in the Limited Partnership Agreements:

> . . . the object of the Partnership is to engage in any lawful business activities in which a limited partnership formed under the Texas Code may engage or participate; to manage, protect and conserve **all assets** of the Partnership; and to make such additional investments, engage in such additional business endeavors and to do any and all acts that may be necessary, incidental or convenient to carry on the Partnership's business as contemplated by this Agreement.

(Exhibit 12, p. LT005636 and Exhibit 23, p. 5636).  There is no other more specific description in the partnership agreements of the partnership's purpose.  In construing an agreement, the specific terms control over general terms.  Thus, the specific business purposes described for the series – to operate a free standing emergency center – controls over the general purpose described for the limited partnership.

38. The Operating Agreement of NHS Emergency Centers, LLC speaks to the definition of "Series" and of "Series Creation."  Under the definitions Article of the Operating Agreement, "Series" is defined as:

> **Series –** a designated Series of Members and Membership Interests established in accordance with the Texas Business Organizations Code and this Agreement having the separate rights, powers or duties with respect to assets and properties specifically identified with such Series, **and/or separate business operations**

**specifically identified with such Series, and the separate obligations, profits and losses associated with such assets, property and business operations (as set forth in the Separate Series Agreement (as defined in Section 3.01)) for such Series.   Each Series shall have a separate business purpose or objective** consistent with Section 2.08 of this Agreement and, as designated in the Separate Series agreement for such series, a separate Manager or Managers.

(Emphasis added)(Exhibit 3, p. LT005865).  Section 2.08 of the Operating Agreement provides that "As established from time to time in accordance with this Agreement, the additional Series shall have separate rights, power or duties with respect to specified business location, business purpose, property and profits and losses associated with specific business location and operations." (Exhibit 4, p. LT005868).   This language indicates that the Series was to have "business operations" and have the income and earnings from the patient emergency medicine physician services operations from the Series business and the income and earnings from the rental income (leaseback income) from the at the business  locations, the LPs. If the Series has profit from the income and earnings of the operation and income and earnings from the rental income from a specific location, it logically follows that it "owned" two (2) separate "businesses," with two (2) separate income streams..

39. In the First Amendment to Operating Agreement, Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC were created with the following language:

3.28   Series 114-Eastside.   The Company hereby creates a separate Series of membership interests to be designated as "Series 114-Eastside."   The Separate Series Agreement of Series 114-Eastside is attached to this Agreement as Schedule 3.28.   The Series Members, Series Manager, **Series Property and purpose of Series 114-Eastside are set forth in the Separate Series Agreement**.

3.29   Series 115-Zaragoza.   The Company hereby creates a separate Series of membership interests to be designated as "Series 115-Zaragoza."   The Separate Series Agreement of Series 115-Zaragoza is attached to this Agreement as Schedule 3.29.   The Series Members, Series Manager, **Series Property and business purpose of Series 115-Zaragoza are set forth in the Separate Series Agreement**.

31

(emphasis added)(Exhibit 5, p. LT006298).  What is interesting in this is the specific reference to the business purpose of these series entities being in the separate series agreement.  As has been shown, those separate series agreements identify the business purpose of the series as "to operate a free standing emergency center."  (Exhibit 7, p. LT005606 and Exhibit 18, p. LT005751).

40. The Series Management and Administrative Services Agreements between Neighbors Health System, Inc. and Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC speak to the issue of who owns the business as well.  The very existence of the management agreements evidences the parties' intent that these series would be engaged in and own an operating business. The management agreements contemplate the manager providing to the series' operating businesses staffing and human resources functions, accounting supervision and management including tax return preparation, financial planning and forecasting, cash management, banking and treasury, insurance administration, executive operations management, marketing, branding, information technology, facilities management, policies and procedure, licensure, and compliance. (Exhibits 9, p. LT005616-5617 and Exhibit 18, p. LT005716-17).  If Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC did not have some "business" that they "owned," they would have no need for any of the services described in the management agreements, much less all of the services described in the management agreements.

41. More specifically though, the Series Management and Administrative Services Agreements, referring to Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC as the "Company" in the first paragraph, state in their first recital that "the Company operates an emergency medical clinic facility (hereinafter the "Company Business")."  (Exhibit 9, p. LT5616 and Exhibit 18, p. 5716).  Further down on the first page, in section 1.b., the agreements state that the services to be provided to the Company will include "such additional services as shall be

necessary and appropriate to provide for the operation of the Company's business without interruption." Id. Again, this language indicates that the Series owned a business, and the business the Series owned was the operation of the two El Paso FEDs at 12021 Edgemere Blvd, El Paso, TX 79938 and 1540 N. Zaragoza Rd., El Paso, TX 79936.

42. With these provisions in the various agreements, we can begin to see how the parties intended the entities and businesses of those entities to interact and apply the rules of construction to the agreements.

43. As discussed above, the agreements should be read as a whole, as they all pertain to the same transaction – establishment of the relationship with the Series to operate the two El Paso FEDs. Since terms used earlier in an agreement should be favored over terms used later, the terms and phrases used in NHS Emergency Center, LLC's initial Operating Agreement, executed on January 1, 2014 immediately after NHS Emergency Center, LLC's formation, should be favored over all later terms and phrases in the various agreements. As discussed above, the Operating Agreement, in discussing the creation of Series, states that each Series shall have "rights, power or duties with respect to specified business location, business purpose, property and profits and losses associated with specific business location and operations." (Exhibit 4, p. LT005868). This presupposes that each Series would "own" some "business" and that the "business" it would own would be an operating business associated with a specific business location and a specific business operation. In the case of Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC, the business was operating the FEDs located at 12101 Edgemere Blvd, El Paso, TX 79938 and 1540 N. Zaragoza Rd., El Paso, TX 79936.

44. The Contribution Agreement of Neighbors Investment Group, LLC, the other investors in the Series composed of the officers and directors of NHS Emergency Center, LLC, supports this

reading of the agreements.  The recitals of the Contribution Agreements of Neighbors Investment Group, LLC states that "NHS Emergency Centers, LLC and its affiliates intend to open an emergency center to be known as NEC Zaragoza Emergency Center, LP (NEC Eastside Emergency Center, LP)" and gives this the defined term "Emergency Center."  (Exhibit 15, p. LT005540, Exhibit 26, p. LT005771).  The recitals continue stating that "in connection with the Emergency Center, NHS Emergency Centers, LLC has determined to offer a series of limited liability company ownership interests known as the Series 115 – Zaragoza, LLC Membership Interests (the "Series") . . . the profits and losses of the Emergency Center are reserved for the owners of the Series." (id.).  Finally, the recitals state that "the Parties have agreed to capitalize the Emergency Center in accordance with the terms and conditions set forth herein." (id.).  Section 1.1 of those agreements sets the contribution amount at $5,000 per member and states that the "Contributed Amount shall be utilized exclusively to purchase the Class Series Shares."  (Exhibit 15, p. LT005541, Exhibit 26, p. LT005772).  In this document, the directors of NHS Emergency Centers, LLC who are also, through Neighbors Investment Group, LLC, owners of the Series, recognize the different roles and purposes of NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP as opposed to Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC.  The limited partnerships own the long-term lease agreements, improvements, furniture, intellectual property (e.g. branding, logo…) of the FEDs.  The Series, however, operated the FEDs, generate the income/revenue by providing patient emergency medicine physician services, owned the revenues and profits from this income stream, and thus owned the separate operating business of the FEDs.[10]

---

[10]  This is particularly apparent given the financial statements prepared by Neighbor Health System, Inc. for Series 114 – Eastside and Series 115 – Zaragoza, which included the assets of the emergency center on the Series balance sheets because NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP were having the Series shoulder those expenses.

45. The Court should attempt to harmonize all of the provisions of the agreement and give effect to all of the provisions of the agreement so that none will be rendered meaningless, *MCI Telecommunications Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999), and avoid a construction which creates results that are unreasonable, inequitable or oppressive. *Reilly v. Rangers Management, Inc.* 727 S.W.2d 527,530 (Tex. 1987); *Neece v. AAA Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 602 (1959). The only way to harmonize all of the agreements is to accept Plaintiff's construction of the agreements that the "business" of operating the Edgemere and Zaragoza FEDs was "owned" by Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC.

46. Perhaps the most troubling aspect of harmonizing these agreements is the existence of a limited partnership coupled with each Series: NEC Eastside Emergency Center, LP coupled with Series 114 – Eastside, LLC and NEC Zaragoza Emergency Center, LP coupled with Series 115 – Zaragoza, LLC. The NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP and the Series have identically worded management and administrative services agreements that recite that the "Company operates an emergency medical clinic facility (hereafter the "Company Business")." (Exhibit 9, p. LT005616, Exhibit 13, p. LT005651, Exhibit 20, p. LT005716, and Exhibit 24, p. LT005706). Taken on their face without placing the overall intent arising from all of the documents together, these agreements would seem to say that the operation of the Edgemere and Zaragoza FED locations was the business of the series and the limited partnerships. And why would both the limited partnerships and the Series need a manager conducting management and administrative services if only one of them owned the business?

47. The answer, already posited above, is simple – NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP and Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC "owned" separate and distinct "businesses." NHS Emergency Centers, LLC

35

structured the overall operation of the network of FEDs to have the long-term lease agreements, intellectual property (branding, logos…) and equipment held in NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP and the income-generating emergency medicine physician business operations owned by Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC.  With this in mind, the identical agreements are easily explained.  NHS Emergency Centers, LLC used Neighbors Health System, Inc. as the manager for all of its affiliates and required all of the limited partnerships and Series to use that entity as their manager as well.  NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP needed their lease, equipment procurement, and other functions managed, and Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC needed certain of their operations functions managed (billing, HR, banking, finance, IT).  NHS Emergency Centers, LLC required the same form of management and administrative services agreement for each entity.  The phrase reciting that these entities both operate the emergency medical clinic is correct in the sense that NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP held the physical lease agreements, intellectual property (branding, logos…) and equipment of the FEDs, and Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC owned the income-generating **operations of** the FEDs.

48. The Court must construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served.  *Reilly v. Rangers Management, Inc.* 727 S.W.2d 527,530 (Tex. 1987); *Neece v. AAA Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 602 (1959).  In this case the particular business activity served by these agreements was the separate operation of two FEDs.  The overall operation of these clinics required two components – (1) leasing of a physical location, construction of improvements, and lease/purchase of the equipment and (2) income-generating emergency medicine physician services.   The limited partnership would

contract for construction of the centers and own the improvements, and enter the leases and contracts necessary to obtain the office and medical equipment for the locations. NHS Emergency Centers, LLC needed local doctors willing to invest both the money and the labor needed to provide the income-generating emergency medicine physician services at each location. NHS Emergency Centers, LLC created the Series to own the operational aspect of the FED and the local doctors would invest in and run the Series.

49. The Court should avoid a construction which creates results that are unreasonable, inequitable or oppressive and should not declare a forfeiture unless compelled to do so by language that can be construed in no other way. *Reilly v. Rangers Management, Inc.*, *Id.* If this Court were to hold that Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC did not own the income-generating emergency medicine physician business of operating the Edgemere and Zaragoza FSEDs, the Court would be declaring a forfeiture of that interest, which would create an inequitable or oppressive result. If the Series did not own the operating business, Plaintiff would not have standing to bring the claims against the manager of the Series and directors of NHS Emergency Center, LLC. Who would then own the emergency medicine physician operating business? Would NHS Emergency Centers, LLC own the medical operating business? This would be wildly inequitable. If NHS Emergency Centers, LLC owned the operating business, then Neighbors Health Systems, Inc.'s successor, the Trustee of the unsecured creditors committee, would have the standing to bring the claims. If successful, the lost profits damages of the Series 114 – Eastside, LLC and Series 115 - Zaragoza, LLC would be distributed to all of the unsecured creditors of all of the consolidated debtors. This would cut against the very nature of NHS Emergency Centers, LLC's Operating Agreement and the Series Agreements, which expressly states that the profits and losses and the assets and liabilities of each series were separate from the

other series – and separate from NHS Emergency Centers, LLC. (Exhibit 4, p. LT005867 – 68; Exhibit 7, p. LT005599; Exhibit 18, pp. LT005743, LT005744, and LT005747).

50. The summary judgment evidence shows that there is no genuine issue of material fact and the Plaintiff is entitled to judgment as a matter of law that Series 114 – Eastside, LLC owned the emergency medicine physician business of operating the FED located at 12101 Edgemere Blvd, El Paso, TX 79938, and Series 115 – Zaragoza, LLC owned the emergency medicine physician business of operating the FED located at 1540 N. Zaragoza Rd., El Paso, TX 79936. This Court should grant a partial summary judgment in favor of Plaintiff on this issue.

C. **Parol Evidence Shows the Parties Intent Was for Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC to "Own" the Income-Generating Emergency Medicine Physician "Business" of the El Paso Locations' Emergency Medical Clinic Operations.**

51. Although the Plaintiff would love nothing more than summary judgment based on this Court's construction of the agreements read together within the four corners of those instruments, the agreements appear to be ambiguous. The Defendants caused the structure of the entities to be confusing at best. This leads to ambiguity in the interpretation of the agreements when asking the question "who owned the businesses?" Thus, the Court needs to consider parol evidence in order to resolve the ambiguities in the agreements on this issue.

52. Parol evidence of the parties' intent may be considered by the court to resolve ambiguities in the contract. *Baldandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). A contract is ambiguous when it is subject to two or more reasonable interpretations. *National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *Daniel*, 243 S.W.2d at 157. In evaluating the issue of ambiguity, the Court is required to consider whether the agreement contains patent ambiguities or latent ambiguities; either type of ambiguity compels consideration of extrinsic evidence of the parties'

intentions.  *CBI Industries, Inc.*, 907 S.W.2d at 520.  A definition of latent ambiguity was provided

by the Texas Supreme Court in *Murphy v. Dilworth*:

> It is true that, even though a written contract be unambiguous on its face, parol
> evidence is admissible for the purpose of applying the contract to the subject with
> which it deals; and if by reason of some collateral matter ambiguity then appears,
> proof of the facts and circumstances under which the agreement was made is
> admissible, in order that the language used in the contract may be read in the light
> thereof for the purpose of ascertaining the true intention of the parties as expressed
> in the agreement.  In other words, if the meaning of the language used in a written
> contract becomes uncertain when an attempt is made to apply it to the subject matter
> of the contract, though not otherwise uncertain, parol evidence is permissible to aid
> in making the application. (Citations omitted).   This does not mean, however, that
> the parties may prove the making of an agreement different from that expressed in
> the written contract, nor that the unambiguous language used in the contract may
> be violated or the legal effect thereof changed.  It merely permits proof of the then
> existing circumstances, in order to enable the court to apply the language used
> therein to the facts as they then existed. (Citations omitted).  (emphasis supplied).

151 S.W.2d 1004, 1005 (1941).  An ambiguity does not arise simply because the parties advance

conflicting interpretations of the contract. *Forbau,* 876 S.W.2d at 134. A court may not consider

extrinsic evidence to contradict or to vary the meaning of unambiguous language in a written

contract in order to create an ambiguity. *Sears, Roebuck & Co. v. Commercial Union Ins. Corp.,*

982 S.W.2d 151, 154 (Tex. App. - Houston [1st Dist.] 1998, no pet.). A court may consider the

parties' interpretations of the contract through extrinsic or parol evidence *only* after a contract is

first determined to be ambiguous. *See Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280,

283 (Tex.1996). An "ambiguity must become evident when the contract is read in context of the

surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity."

*CBI Indus.,* 907 S.W.2d at 521.

53. To the extent that the Court finds that the agreements are ambiguous as to who "owns"

the "business," the Court may consider parol evidence to assist it in construing the intent of the

parties in the agreements.   If the Court considers the parol evidence, it should consider the

affidavits of Jermaine Bowen and Dr. Samara Bowen, the financial statements that Neighbors
Health System, Inc. as manager of Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC
prepared for those entities' operations (Exhibit 32 - 35), the federal income tax returns of NEC
Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP (Exhibits 41 - 44), the
investors brochure of NHS Emergency Centers, LLC (Exhibit 40), the excerpts from Neighbors
Health System, Inc.'s PowerPoint presentation describing the structure of the series businesses
(Exhibit 31), the Valuation Services RFP prepared by Neighbors Health System, Inc. (Exhibit 36),
the company information materials prepared by NHS Emergency Centers, LLC (Exhibit 37), the
email communications of Dr. Alleyene to Jermaine Bowen, Dr. Samara Bowen, and Dr. Davida
Manor-Ward explaining the proposed structure of the FEDs in El Paso (Exhibit 38), and the email
communications of John Decker, CFO of Neighbors Health Systems, Inc., regarding the ownership
of the business (Exhibit 39). All of these documents evidence that Series 114 – Eastside, LLC
owned the income-generating emergency medicine physician business of the Edgemere FED and
Series 115 – Zaragoza, LLC owned the income-generating emergency medicine physician
business of the Zaragoza FED.

54. First, the affidavits.  In the Affidavit of Dr. Samara Bowen, without making any
conclusory statements about ownership of the business, Dr. Bowen describes how NHS
Emergency Center, LLC's representative Dr. Paul Alleyene represented to her how the business
venture would be structured and would work and how the clinics were actually set up and operated.
Mr. Jermaine Bowen, in his affidavit, described this as well.  The affidavits mirror how Dr. Paul
Alleyene, a director of NHS Emergency Centers, LLC and part owner of Neighbors Investment
Group, LLC, which was an owner of membership interests in the El Paso Series, represented the
structure and the ownership of the businesses.  These explanations were that the Series would own

the operating business of the FEDs in El Paso and would own 99% of the limited partnerships associated with those businesses.  The limited partnership would be a tool to hold the physical assets of the FEDs, and the Series would own the business operations.  This structure followed the entire business model that NHS Emergency Centers, LLC developed and touted not only to potential investors in the Series, but to lenders and others.  NHS Emergency Centers, LLC believed it had found the solution to the industry-wide problem that FEDs suffered from - how to find and keep qualified emergency medicine physicians staffing the operation. (Exhibit 37, p. LT045802 - LT045803). The solution was to find the qualified local emergency medicine physicians in a given geographical location and have those physicians enter as owners in the Series that would own and operate the local FED.  (Exhibit 37, p. LT045802 -LT045803). With the ownership interest, the physicians had the incentive to join and operate the business venture and provide quality service to the operating business.  This is how the operating business was sold to Infinity Emergency Management Group, LLC, and this is how the operating business was structured in the formation documents.

55. In addition to the testimony in the Bowens' affidavits, there is the email by Dr. Paul Alleyene, a director of NHS Emergency Centers, LLC, explaining to the Bowens how the operating business would be structured and owned.  On September 14, 2014, Dr. Paul Alleyene sent an email to "Team El Paso," which included Jermaine Bowen, Dr. Samara Bowen, and Davida Manor-Ward.  He attached to that email a number of the transaction documents that ultimately established the business relationship, including the Operating Agreement of NHS Emergency Centers, LLC, the Series Agreement for the Series 114 - Eastside, LLC and Series 115 - Zaragoza, LLC, the management and administrative services agreement, the business association agreement and the Independent Contractor Agreement with Neighbors Physician Group, PLLC.  In his email,

Dr. Alleyene recognizes that he had previously presented a slideshow to the "Team El Paso." The first numbered paragraph contains Dr. Alleyene's explanation of the series as a business, stating "This is the operating agreement that governs the whole series structure (all NEC Centers). Within this, there are many series' within -- one for each center. The series interests represent 99% of each center, which is 99% of 'NEC El Paso Emergency Center, LP'." (Exhibit 38, p. LT017452). The second numbered paragraph of this email gets deeper into the series agreement explanation. Dr. Alleyene explains "This is the actual document that will govern the relationship between our two parties." (Exhibit 38, p. LT017452). Dr. Alleyene continues, saying "We are basically saying you guys will manage the schedule (ensuring 24 hour staffing) and physicians (in terms of investment, dividends, retirement, disability, death, etc.). . . . Having an owner on site is the whole reason we have this arrangement and is the basis of our entire business model." Id.

56. This discussion by Dr. Alleyene was consistent with the NHS Emergency Center, LLC promotional/marketing material. In the "Company Structure" section of that material, NHS Emergency Center, LLC stated:

> Fourth in the group is Neighbors GP, LLC - this entity is the General Partner of all our FEC facilities. Each of our emergency centers is a Texas based Limited Partnership. Neighbors GP serves as 1% owner of each limited partnership, while 99% is owned by our other chief legal entity, NHS Emergency Centers, LLC.
>
> NHS Emergency Centers, LLC is a Texas based "Series LLC" which legally allows different series of stock for different sub-entities. Each of our centers is represented in the Series LLC by an individual series of stock, and an individual set of financial bookkeeping. **Each time we open a center, on average 60% of the new center is owned by local practicing doctors in the community the new center is serving.** All owners have stock certificates for NHS Emergency Centers, LLC, as this is the main entity that houses 99% of all company assets. Neighbors Health System, Inc. serves as management while NHS Emergency Centers, LLC serves as an asset vehicle.

(Exhibit 37, p. LT045797).  The marketing material describes how this company structure fits the overall business strategy by having each center owned by a separate series, and having the local physician groups owning an interest in that series:

> Unlike our competitors including Adeptus, once we determine a future site, we simply don't build a center and recruit physicians to do the work.  These businesses always have a shortage of physician workforce, and often settle on substandard physicians to provide services.  This blatantly goes against our mission statement - we will only enter a market where we have quality board certified emergency physicians to provide our service delivery.  Since this caliber physician is usually in high demand, we have found that **sharing ownership of an FEC with these highly specialized physicians solves two challenges:** Finding physician workforce and adhering to our company mission.

> Neighbors has taken this core approach of obtaining these local physician investor partnerships who will be staffing each new facility to serve as the unit model going forward.  **Until we introduced this model, working emergency physicians did not have a way to buy into a medical practice or have an equity stake in participating in the revenues of which they help generate.** Neighbors has created a model where a local working doctor can participate in such equity while not having to start an FEC from scratch or have to deal with the management of the entire organization.

> Each new center is divided into two classes of stock.  Class A stock comprises ~40% of facility ownership, and is held by Class A investors comprising primarily of physician board certified board members and local physicians that were integral to deal culmination.  **Class B stock comprises ~60% of facility ownership,** each with 2% tied to 24 hours of monthly clinical obligation.  This gives 30 x 24 hours or coverage, essentially covering the entire month's physician needs.  **After local expenses and administrative overhead, profits are split with the same rights to class A and B shareholders.** The only difference between the two classes is that the Class A shareholders have voting rights and control over operations.  **All financials are completely transparent to all parties.  Our intent is to create a working, cohesive, trust filled environment to proliferate both quality healthcare delivery and return on investment via strong positive cash flow.**

(Exhibit 37, p. LT045802-3).  From these materials, it is clear that the limited partnerships were created merely to hold assets, that the series for each FED was intended to be the owner of the limited partnership interest of the limited partnership established for each FED, and that the series

owned the business of operating the FED and generated the revenue from the operation of the FED.  In short, each series owned its FED operating business.

57. The brochure that NHS Emergency Centers, LLC used to attract physician investors also evidences the clear intent that the Series would own the operating business.  In that brochure, the CEO, Dr. Setul Patel, signed a personal portion reading:

Neighbors has changed the way we look at healthcare.

We have developed a successful business model that assures quality medical care from board-certified physicians in a lean operational setting while maximizing value for our patients. Neighbors is happy to offer career opportunities to qualified physicians, leading to shareholder status within the greater Neighbors organization.

If you would like to be a part of the Neighbors expansion, please contact us to see how you can be one of *The Best Neighbors Ever*. Our leadership is comprised of physicians who understand the service and dedication that patients deserve. This is an excellent opportunity for physician investors who wish to be shareholders while also improving the quality of health care in their communities. The American dream of business ownership is available to emergency physicians in a turnkey package to our partners.

I challenge any of our competitors to provide the same level of commitment and opportunity that Neighbors offers our physician shareholders. By contacting us, you will have taken the first step toward a very rewarding career change and investment opportunity. Neighbors has become a leader in the freestanding emergency center industry and a true physician-centric, patient-focused company.

To learn more, please contact our Corporate Office at 713.436.5200 or email invest@nec24.com.

We look forward to you joining the Neighbors team as we continue our journey.

Sincerely,

Setul G. Patel, MD, MBA Chief Executive Officer

(Exhibit 40, p. 7).  The brochure continues, stating:

> **As President and CEO, Setul has helped grow the company with simple philosophies—take care of the patient and take care of the people who deliver their care.** In addition to providing exceptional patient care, Neighbors offers physicians equity opportunities to invest in their facilities. The Neighbor's model has helped grow the pool of quality physicians in the Neighbors organization and led to high-quality patient care in the communities they serve.

(Exhibit 40, p. 9)(Highlighting added).   The plain English used in this brochure shows the NHS Emergency, LLC's intent was to have local physicians buy into a stand alone facility that they would operate independently.

58. The financial statements generated by Neighbors Health System, Inc., the contracted manager of Series 114 - Eastside, LLC and Series 115 - Zaragoza, LLC, support this business ownership structure, as well.  As seen in the financial statements, these Series generated revenue and paid the operating expenses, including the rent and improvement construction costs.  (Exhibits 32, 33, 34, and 35). This made sense given that Series 114 - Eastside, LLC owned the limited partnership interest of NEC Eastside Emergency Center, LP and Series 115 - Zaragoza, LLC owned the limited partnership interest of NEC Zaragoza Emergency Center, LP as reflected in the federal income tax returns of the limited partnerships:

# REDACTED AND UNDER SEAL

(Exhibits 41 and 43).  The 2016 federal income tax returns also reflect that Series 114 – Eastside, LLC owned 99% of the limited partnership interests of NEC Eastside Emergency Center, LP and Series 115 – Zaragoza, LLC owned 99% of the limited partnership interests of NEC Zaragoza Emergency Center, LP.  (Exhibits 42 and 44).

59. The evidence supporting Plaintiff's argument is not merely confined to communications by officers of NHS Emergency Centers, LLC to the Plaintiff, but is also found in communications by NHS Emergency Centers, LLC to third party lenders.  In an email dated April 20, 2015, Brandon Johnson, an equity lender, asked John Decker, the CFO of Neighbors Health Systems, Inc., "Do you have a schedule showing Neighbors % ownership of the various FSEDs? In the meeting, it was mentioned that the doctors own 30 – 60%.  We're just trying to think about what EBITDA is attributable to Neighbors vs that which is attributable to the doctor ownership." (Exhibit 39, p. LT033052).  Mr. Decker answered on April 22, 2015, "We do have complete schedules of ownership but will not share them because we are a private company.  The doctors own 100% as we do not have any outside investors.  Class B owns a certain amount and the Class A doctors (the 8 board members) own the delta depending on the facility."  (Exhibit 39, p. LT033050). In an October 13, 2015, PowerPoint presentation provided by Neighbors Health Systems, Inc. to its lenders, NHS Emergency Centers, LLC represented that the physicians owned 100% of the Series entities and that the Series entities owned 99% of the limited partnership interests in the LPs that held the assets of the FEDs.  (Exhibit 31, p. LT084068).

60. Finally, the nature of the Series filling the role of "health care providers" and "covered entities" evidences that they owned the business of operating the FEDs.  Series 114 - Eastside, LLC and Series 115 - Zaragoza, LLC were both recognized as the "health care provider" in the Business Associate Agreement between those series and their manager Neighbors Health System,

Inc.  In that agreement, the series were recognized as the "Covered Entity" and Neighbors Health System, Inc. was recognized as the "Business Associate."  (Exhibit 9, p. LT005621; Exhibit 20, p. LT005721).  In the agreement, "Covered Entity" (the defined term for the series) is defined as having "the meaning set forth in the introductory paragraph above, which in turn states that "the Covered Entity is a covered entity, as such term is defined under HIPAA, and as such is required to comply with the requirements thereof regarding the confidentiality and privacy of Protected Health Information." Id.  Under 45 C.F.R. § 160.103 (the Code of Federal Regulations governing HIPAA), a "Covered Entity" is defined as "(3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter."  Under that same section, a "Business Associate" is defined to include "A person that offers a personal health record to one or more individuals on behalf of a covered entity." Thus, in the Business Associate Agreement, the Series entity is recognized as a "health care provider" by virtue of being a "Covered Entity."  This squares with the Series being the owner of the FED operating business, which was the business of providing emergency health care services at a FED by individual emergency medicine physicians (health care providers).

61. All of the communications and documents outside of the agreements clearly evidence that the parties always intended for the business of operating the FEDs to be owned by the Series entities.  This Court should, if it considers parol evidence to resolve ambiguities in the agreements, find that there is no genuine issue of material fact and the Plaintiff is entitled to judgment as a matter of law that the Series owned the operating businesses.

## VIII.

## <u>CONCLUSION</u>

62. Notwithstanding which approach this Court chooses to rely on – ordinary meaning of "business," construction of the agreements, or review of parol evidence – the summary judgment evidence establishes as a matter of law that the Series owned the business of operating the FEDs in El Paso.  A "business" is a continuous or regular activity with a profit motive, for procuring a financial gain in a commercial engagement.  The business owner is the one who is entitled to receive the profits of the activity.  Under this common definition of "business," the Series certainly owned the business of operating the FEDs.  Even the Defendants have recognized that the Series were entitled to the net profits of the operations.  The agreements, when read together, also evidence that the Series owned the business of operating the FEDs.  This operating business was separate and distinct from the business of the limited partnerships set up to hold the leases, the leasehold improvements and equipment for the FEDs.  Perhaps most instructive though is the parol evidence, should this Court consider it.  In the parol evidence, the officers of NHS Emergency Centers, LLC and Neighbors Health Systems, Inc. explain in emails that the Series will own the business operation of the FEDs and the limited partnerships associated with these Series will hold the leases, the leasehold improvements and equipment.  In addition, the communications and the financial statements indicate that the Series were intended to be the owners of the limited partnership interests of the limited partnerships and the assets.  These emails describe how this ownership structure was at the very heart of the business model that NHS Emergency Centers, LLC created.

63. The question the Court should be asking is why the Defendants are arguing against the Plaintiff on this point.  The Defendants, after all, own membership interests in Neighbors

Investment Group, LLC, which owns the Class A membership interests in the Series.  Further, the Trustee of the unsecured creditors committee is a party to this adversary proceeding now and is investigating (or so its counsel has said) what derivative claims the committee has against the Defendants.  If this Court should for whatever reason find that the Series did not own the operating business and therefore does not have standing to bring the derivative claims, the Trustee of the unsecured creditors committee will step into those claims.  Either way, the claims will stand against the Defendants.  It seems that the Defendants are not the proper parties with standing to challenge Plaintiff's standing – only the Trustee of the unsecured creditors committee should have that standing.

64. Nevertheless, the Plaintiff's summary judgment evidence shows that there is no genuine issue of material fact, and the Plaintiff is entitled to judgment as a matter of law on the issue of ownership of the business.  The Court should grant Plaintiff's motion and enter a partial summary judgment in favor of the Plaintiff.

Respectfully submitted,

**WAUSON | PROBUS**

By:     /s/ Matthew B. Probus
    **Matthew B. Probus**
    TBA# 16341200
    Fed. I.D. # 10915
    **John Wesley Wauson**
    TBA # 20988200
    Fed. I.D. # 1866

One Sugar Creek Center Blvd., Suite 880
Sugar Land, Texas 77478
(281) 242-0303 telephone
(281) 242-0306 facsimile

*ATTORNEYS FOR PLAINTIFF,*
*INFINITY MANAGEMENT GROUP, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been forwarded by electronic delivery through the ECF/PACER system and via United States regular mail, first class postage prepaid, to the parties listed below on this the 29th day of August 2019:

Staton M Childers
Adams and Reese, LLP
LyondellBasell Tower
1221 McKinney, Suite 4400
Houston, Texas 77010
Staton.childers@arlaw.com

Paul D Flack
Pratt and Flack LLP
1331 Lamar Street, Suite 1250
Houston, TX 77010
pflack@prattflack.com

Jarrod B. Martin
McDowell Hetherington LLP
1001 Fannin Street Suite 2700
Houston, TX 77002
Jarrod.Martin@mhllp.com

Millard A Johnson
Johnson DeLuca Kennedy & Kurisky, P.C.
1221 Lamar, Suite 1000
Houston, TX 77010
mjohnson@jdkglaw.com

James G Munisteri
Foley Gardere
1000 Louisiana, Suite 2000
Houston, TX 77002
jmunisteri@foley.com

Christina Minshew Lewis
Moyer Patton
11767 Katy Freeway, Suite 990
Houston, TX 77079
clewis@moyerpatton.com

Felice R. Yudkin
Warren Usatine
Cole Schotz, P.C.
25 Main Street
Hackensack, NJ 07601
fyudkin@coleschotz.com
wusatine@coleschotz.com

                                                */s/ Matthew Probus*
                                                Matthew Probus