## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § | **CASE NO. 18-33836-H1-11** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

| | | |
|---|---|---|
| **INFINITY EMERGENCY MANAGEMENT** | § | |
| **GROUP, LLC, Individually and as Class B** | § | |
| **Non-Voting Members on Behalf of** | § | |
| **Series 114 - Eastside and Series 115 – Zaragoza,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **VS.** | § | **ADV. P. NO. 18-3276** |
| | § | |
| **NEIGHBORS HEALTH SYSTEM, INC., et al,** | § | |
| | § | |
| *Defendants.* | § | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' CROSS-MOTION
### FOR PARTIAL SUMMARY JUDGMENT
### ON ISSUE OF OWNERSHIP OF BUSINESS

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:

COMES NOW, INFINITY EMERGENCY MANAGEMENT GROUP, LLC, Individually and as Class B Non-Voting Members on behalf of Series 114 – Eastside and Series 115 – Zaragoza (the "Plaintiff"), Plaintiff in the above styled adversary, and files its Plaintiff's Response to Defendants' Cross-Motion for Partial Summary Judgment on Issue of Ownership of Business, and would show as follows:

## I.

## Introduction

1.  This Court asked the parties to try the issue of "who owned the business" of the El Paso freestanding emergency departments so that it could determine whether the Plaintiff had standing to bring the derivative claims against the Defendants.  The Court set a deadline for parties to file dispositive motions.  If the Court is unable to rule on motions for summary judgment, the Court will set a date to conduct an evidentiary hearing on the ownership issue.

2.  On August 29, 2019, the Plaintiff filed its motion for partial summary judgment.  On August 30, 2019, the Defendants filed their cross-motion for partial summary judgment.  The Court has set September 20, 2019, as the deadline for the parties to file responses to the motions for summary judgment, and the Court has set a hearing on the cross-motions for October 3, 2019, at 2:00 p.m.

## II.

## Summary Judgment Evidence

3.  The Plaintiff offers the following summary judgment evidence in support of its response to Defendants' motion for summary judgment.

| | |
|---|---|
| Exhibit 1 - | Email from Thomas Gruenert to Tricia Todd dated November 20, 2014 and from Tricia Todd to Jermaine Bowen dated November 21, 2014, Sending Suggested Revisions to Operating Agreement of Infinity Emergency Management Group, LLC |
| Exhibit 2 - | Lender Presentation of Neighbors Health System, Inc. dated October 13, 2015 |
| Exhibit 3 - | Valuation Services RFP of Neighbors Health System, Inc. October of 2015 |
| Exhibit 4 - | Emails dated September 3, 2015, through November 2, 2015, from Francine Elliot to Jermaine Bowen re Suggested Revisions to |

Operating Agreement of Infinity Emergency Management Group, LLC

Exhibit 5 -    Emails Between Porter Hedges Counsel and Neighbors Health System, Inc. from November 8, 2015, through November 19, 2015 re Revising Terms of Credit Facility

Exhibit 6 -    Credit Agreement dated as of November 19, 2015 Among Neighbors Global Holdings, LLC, as Borrower, The Lending Institutions Named Herein, as Lenders, KeyBank National Association, as an LC Issuer, Swing Line Lender and as the Administrative Agent, KeyBanc Capital Markets, Inc., as a Joint Lead Arranger and a Joint Bookrunner, and Compass Bank, as a Joint Lead Arranger and a Joint Bookrunner and the Sole Syndication Agent, and Legacy Texas Bank, as the Documentation Agent - $150,000,000.00 Senior Secured Credit Facility – (Filed Under Seal)

Exhibit 7 -    Email from Jermaine Bowen to Kellie Keeling dated June 5, 2017, re Use of El Paso FEDs' Funds for Other FEDs and Email from Thomas Gruenert to Jermaine Bowen dated June 6, 2017, re Use of El Paso FEDs' Funds for Other FEDs

Exhibit 8 -    Plaintiff's Motion for Partial Summary Judgment on Business Ownership Issue – (Filed Under Seal)

The Plaintiff hereby incorporates all its arguments and summary judgment evidence in its motion for partial summary judgment (Doc. No. 59) into this response to Defendants' cross-motion for summary judgment as if fully set forth herein.   The Plaintiff's Motion for Partial Summary Judgment on Issue of Business Ownership is attached hereto and incorporated herein as Exhibit 8.

### III.

### __The Defendants' Arguments Are Specious__

4.   The Defendants' argument in support of their cross-motion for summary judgment boils down to this:

    a.   The limited partnerships owned the assets of the El Paso freestanding emergency departments ("FED").

    b.   The operating cash of the El Paso FEDs was deposited into and spent out of bank accounts in the name of the limited partnerships NEC Eastside Emergency Center, LP ("NEC Eastside") and NEC Zaragoza Emergency Center, LP ("NEC Zaragoza").

    c.   Leases, utilities, and vendor accounts of the El Paso FEDs were held in the name of NEC Eastside and NEC Zaragoza.

    d.   Therefore NEC Eastside and NEC Zaragoza owned the "business" of the El Paso FEDs.

As an aside, the Defendants assert that the Plaintiff's membership interests in Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC, means that the Plaintiff owns the "equity" in the El Paso FEDs but not the "business" of the El Paso FEDs and is only entitled to a share of the profits generated by the El Paso FEDs.

5.   First, the fact that NEC Eastside was created to hold the leasehold improvements, leases, and physical assets of the Eastside FED and NEC Zaragoza was created to hold the leasehold improvements, leases, and physical assets of the Zaragoza FED does not mean that those limited partnerships owned the business of the emergency physician services operations of those FEDs.   As the Court knows, in a business venture, a limited partnership is frequently

created to own and hold physical assets with a separate corporation or limited liability company created to own the operations conducted at the location using the assets owned by the limited partnership.  The summary judgment evidence shows this was the case with respect to the El Paso FEDs.  Series 114 – Eastside, LLC owned the emergency physician services business operations of the Eastside FED and Series 115 – Zaragoza, LLC owned the emergency physician services business operations of the Zaragoza FED.

6.  Second, the fact that the cash generated by the operation of the emergency physician services business of Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC was deposited into and paid out of NEC Eastside and NEC Zaragoza bank accounts does not mean that the funds belonged to NEC Eastside and NEC Zaragoza.  And it certainly does not mean that NEC Eastside and NEC Zaragoza owned the "business" of operating the emergency medical services at the Eastside FED and Zaragoza FED.  Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC were parties to management and administrative services agreements with Neighbors Health System, Inc., which was under a contractual and fiduciary obligation to handle the banking and finance of the series' emergency physician services business operation of the FEDs.  The Defendants should have used their positions as officers and directors of Neighbors Health Services, Inc. to establish bank accounts in the name of Neighbors Health System, Inc. for Series 114 – Eastside, LLC's and Series 115 – Zaragoza, LLC's operating cash, pursuant to the management agreement.  Even then, the fact that the operating cash would have been held and paid to vendors out of a bank account under the name Neighbors Health System, Inc. would not have meant the business of operating the FEDs was owned by Neighbors Health System, Inc. The funds would still be those of Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC, simply managed by Neighbors Health System, Inc., and the business of operating the emergency

medicine services at the El Paso FEDs would still be owned by Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC.  The fact that the real estate leases, equipment leases, and vendor agreements were under the limited partnerships' names has no bearing on the ownership of the emergency physician services business operations of the FEDs.  Series 114 – Eastside, LLC owned the emergency physician services business operations of the Eastside FED, and Series 115 – Zaragoza, LLC owned the emergency physician services business operations of the Zaragoza FED.

7.   Lastly, it simply makes no sense to admit that the series owned "equity" in the FEDs and the profits from the business but somehow did not own that business that was generating those profits.  This Court should deny the Defendants' cross-motion for partial summary judgment, and grant the Plaintiff's Motion for Partial Summary Judgment on Issue of Business Ownership.

## IV.

## **Defendants' Arguments Render the Documents Meaningless**

8.   As Texas law dictates, this Court must construe the agreements between the parties in a way that attempts to harmonize them, makes sense of them in a utilitarian fashion, and avoids rendering all or a part of the agreements meaningless.  The Defendants' arguments, if accepted by this Court, would explain none of the documents that gave rise to the business and would render the agreements meaningless.

9.   To start, Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC entered into a management and administrative services agreement with Neighbors Health System, Inc., charging Neighbors Health System, Inc. with substantial, detailed management duties over various aspects of the business operations of the series.  If the series did not own the operation of

the emergency physician services FED businesses and owned only the profits, there would be no reason for these management agreements to exist, and the agreements would be meaningless. The Defendants do not even attempt to address the dilemma their arguments create, stating "While we could ponder why Neighbors had the series sign this agreement as written—being identical to all other management agreements for which the services were actually provided." (Defendants' Cross-Motion, p. 14).   The agreement was not entered mistakenly.   Neighbor Health System, Inc. performed most of the management and administrative functions with which it was charged in the agreement, including creation and management of the financial statements of the Series, which are in summary judgment evidence. (See Plaintiff's MSJ Exhibit 32, 33, and 34).

10. In addition, the Defendants' arguments would render meaningless most all of the documents of the parties, starting with the Operating Agreement of NHS Emergency Centers, LLC.  Under the definitions Article of that operating agreement, "Series" is defined as follows:

> **Series –** a designated Series of Members and Membership Interests established in accordance with the Texas Business Organizations Code and this Agreement having the separate rights, powers or duties with respect to assets and properties specifically identified with such Series, **and/or separate business operations specifically identified with such Series, and the separate obligations, profits and losses associated with such assets, property and business operations (as set forth in the Separate Series Agreement (as defined in Section 3.01)) for such Series.  Each Series shall have a separate business purpose or objective** consistent with Section 2.08 of this Agreement and, as designated in the Separate Series agreement for such series, a separate Manager or Managers.

(Emphasis added)(Plaintiff's MSJ Exhibit 3, p. LT005865).   Section 2.08 of the Operating Agreement of NHS Emergency Centers, LLC provided for the creation of individual series, which were to "have separate rights, power or duties with respect to specified business location, business purpose, property and profits and losses associated with specified business location and operations."   (Plaintiff's MSJ Exhibit 4, p. LT005868).   Section 2.09 of the Operating

Agreement also states that "The Series Property, or other assets of each Series, together with all income, earnings, profits and proceeds thereof, including all proceeds derived from the business operation, or the sale, exchange or liquidation of the Series Property held by such Series, and any funds or assets derived from any reinvestment of such proceeds, shall be deemed to be Series Property, held by and belonging to such Series". (Plaintiff's MSJ Exhibit 4, p. LT005868). The Series Interest Purchase Agreements use the term "Series Business" in section 5(a)(iii) indicating that business is the operation of the emergency physician services business of the FEDs. (Plaintiff's MSJ Exhibit 8, p. LT005586 – 87 and Plaintiff's MSJ Exhibit 19, p. LT005737 – 38). The Series Agreements states that the "Business Purpose" of the Series was "to operate a free standing emergency center."  (Plaintiff's MSJ Exhibit 7, p. LT005606 and Plaintiff's MSJ Exhibit 18, p. LT005751). The Series Management and Administrative Services Agreements, referring to Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC as the "Company" in the first paragraph, state in their first recital that "the Company operates an emergency medical clinic facility (hereinafter the "Company Business")." (Plaintiff's MSJ Exhibit 9, p. LT5616 and Plaintiff's MSJ Exhibit 18, p. 5716).  Further down on the first page, in section 1.b., the agreements state that the services to be provided to the Company will include "such additional services as shall be necessary and appropriate to provide for the operation of the Company's business without interruption."  Id.  The Defendants' argument that the series owned equity and profits but not the business of operating the emergency physician services would render all of these agreements meaningless.  This Court cannot accept the Defendants' construction of the agreements.

11. The Defendants' arguments would also render meaningless the company documents of NHS Emergency Centers, LLC and Neighbors Health System, Inc. used to market the

company brand.  The marketing brochure reads "Each time we open a center, on average 60% of the new center is owned by local practicing doctors in the community the new center is serving." (Plaintiff's MSJ Exhibit 37, p. LT045797).  The marketing material describes how this company structure fits the overall business strategy by having each center owned by a separate series, and having the local physician groups owning an interest in that series:

> Unlike our competitors including Adeptus, once we determine a future site, we simply don't build a center and recruit physicians to do the work.  These businesses always have a shortage of physician workforce, and often settle on substandard physicians to provide services.  This blatantly goes against our mission statement - we will only enter a market where we have quality board certified emergency physicians to provide our service delivery.  Since this caliber physician is usually in high demand, we have found that **sharing ownership of an FEC with these highly specialized physicians solves two challenges:** Finding physician workforce and adhering to our company mission.

> Neighbors has taken this core approach of obtaining these local physician investor partnerships who will be staffing each new facility to serve as the unit model going forward.  **Until we introduced this model, working emergency physicians did not have a way to buy into a medical practice or have an equity stake in participating in the revenues of which they help generate.** Neighbors has created a model where a local working doctor can participate in such equity while not having to start an FEC from scratch or have to deal with the management of the entire organization.

> Each new center is divided into two classes of stock.  Class A stock comprises ~40% of facility ownership, and is held by Class A investors comprising primarily of physician board certified board members and local physicians that were integral to deal culmination.  **Class B stock comprises ~60% of facility ownership,** each with 2% tied to 24 hours of monthly clinical obligation.  This gives 30 x 24 hours or coverage, essentially covering the entire month's physician needs.  **After local expenses and administrative overhead, profits are split with the same rights to class A and B shareholders.**  The only difference between the two classes is that the Class A shareholders have voting rights and control over operations.  **All financials are completely transparent to all parties.  Our intent is to create a working, cohesive, trust filled environment to proliferate both quality healthcare delivery and return on investment via strong positive cash flow.**

(Emphasis added)(Plaintiff's MSJ Exhibit 37, p. LT045802-3).   Dr. Setul Patel, CEO of Neighbors, actually signed a letter and inserted it into a marketing brochure to physicians that represented:

> This is an excellent opportunity for physician investors who wish to be shareholders while also improving the quality of health care in their communities. **The American dream of *business ownership* is available to emergency physicians in a turnkey package to our partners.**

(Emphasis added)(Plaintiff's MSJ Exhibit 40, p. 7).   The brochure continues, stating:

> In addition to providing exceptional patient care, **Neighbors offers physicians equity opportunities to invest in their facilities.** The Neighbor's model has helped grow the pool of quality physicians in the Neighbors organization and led to high-quality patient care in the communities they serve.

(Emphasis added)(Plaintiff's MSJ Exhibit 40, p. 9).   The Defendants are asking the Court to ignore this central theme – that the series owned the emergency physician services business operations of the FEDs and the Plaintiff owned the membership in the Series.

12. The Defendants arguments would also render meaningless express communications that the employees of NHS Emergency Centers, LLC and Neighbors Health System, Inc. had with investors and lenders.  In an email dated April 20, 2015, Brandon Johnson, an equity lender, asked John Decker, the CFO of Neighbors Health Systems, Inc., "Do you have a schedule showing Neighbors % ownership of the various FSEDs? In the meeting, it was mentioned that the doctors own 30 – 60%.  We're just trying to think about what EBITDA is attributable to Neighbors vs that which is attributable to the doctor ownership."  (Exhibit 39, p. LT033052). Mr. Decker answered on April 22, 2015, "We do have complete schedules of ownership but will not share them because we are a private company.  The doctors own 100% as we do not have any outside investors.  Class B owns a certain amount and the Class A doctors (the 8 board members) own the delta depending on the facility."  (Plaintiff's MSJ Exhibit 39, p. LT033050).

13. The Defendants essentially ask this Court to rule that NEC Eastside and NEC Zaragoza owned the business of operating the FEDs simply because those limited partnerships owned the physical assets and took over Neighbors Health System, Inc.'s responsibilities of banking and paying operating expenses out of its own bank account.  The fact that the Defendants used their position as officers and directors to cause the limited partnerships to do these things did not magically transfer ownership of the operation of the FEDs to the limited partnerships.  The Defendants are asking this Court to ignore and render meaningless all the documents that established the series, established the series' business operations, and established the management agreement for the series' business operations.  This the Court should reject the Defendants' arguments deny the Defendants' cross-motion for partial summary judgment, and grant the Plaintiff's motion for partial summary judgment.

## V.

### The Summary Judgment Evidence Supports Plaintiff's Position

14. In its motion for partial summary judgment, the Plaintiff offered summary judgment evidence showing as a matter of law that the Series owned the emergency physician services business operations of the El Paso FEDs.  The summary judgment evidence offered there is only the tip of the iceberg of evidence.  Additional evidence, from Defendants' own communications, shows that Plaintiff is entitled to judgment as a matter of law.  This is parole evidence the Court should consider to determine the intent of the parties in the agreements.

15. In November of 2014, when the parties were drafting the initial corporate documents to establish the Series Agreements provide for Plaintiff's investment in the Series, Thomas Gruenert, corporate counsel for NHS Emergency Centers, LLC and

Neighbors Health System, Inc., made suggested revisions to the Plaintiff's Operating Agreement. Most significantly, Mr. Gruenert added a provision to section 6.3 of the Operating Agreement reading:

> **6.3 Member Agreements and Requirement.** The members agree and accept The Certificate of Formation, The Company Agreement, all organizational documents, and the terms of those certain Series Agreements to which the Company is a party with NHS Emergency Centers, LLC regarding the operation of free standing emergency centers in El Paso, Texas and surrounding area (each a "Series Agreement"). Additionally, each Member agrees to be bound by the following provisions and requirements:

> (i)     Member agrees to be either a board certified or board eligible licensed physician or a licensed physician reasonably experienced in the practice of emergency medicine.

> (ii)    Member agrees to be subject to formal credentialing and to be an independent contractor of Neighbors Physician Group, PLLC.

> (iii)   Member agrees to provide clinical shift coverage and to work a reasonably equitable share of night, weekend and holiday shifts, as scheduled, at any of the Freestanding Locations; a Member is to be on duty at each Freestanding Location whenever reasonably possible.

> (iv)   Members agrees not to participate as owners or managers in any emergency medicine business that is (1) licensed by the applicable Department of Health as a Freestanding emergency medical facility and (2) is located within twenty-five (25) miles in any direction of any Freestanding Location operated or managed by The Company or any Affiliate of the Manager.

> (v)    Member agrees not to disclose to any Person any Confidential Information (as defined below) of The Company except upon the The Company's advance written consent. For purposes of this Agreement, "Confidential Information" means any information relating to The Company's professional staff and/or the business plans, facilities, equipment, financial results, assets, liabilities, practice and, agreements and business operations of any Freestanding Location.

(Emphasis added)(Exhibit 1, p. 1, 3, and 4). In this language, NHS Emergency Centers, LLC's and Neighbors Health System, Inc.'s counsel is recognizing that the series is the owner of the business of the emergency physician services operation at these two FEDs and

that the Plaintiff's doctors will be operating and managing the centers with their professional staff.  This is reiterated in a later email sent by Mr. Gruenert's associate, Francine Elliot, asking if the Plaintiff had made the revisions to its Operating Agreement.  In her October 2, 2015 email, Ms. Elliot states:

> Your restrictive covenants provision again references 25 miles in any direction of "any Freestanding Location" but only includes those operated or managed by IEMG or an affiliate of the Manager.  Section 2(J)(v) of the Series Agreements specifically requires that the restrictive covenant provision mirror the language contained in Section 6(A) of the Series Agreements which defines "Excluded Location" to mean any facility located within 25 files of a FSED operated or managed "by the Series or any Affiliate of the Manager" (which is Neighbors Health System, Inc.).

(Emphasis added)(Exhibit 4, p. 3).  Here, Ms. Elliot is quite clear that the freestanding emergency departments, or FSED as she refers to them, are operated or managed "by the Series."

16. This is consistent with how Neighbors Health System, Inc. described the structure to its potential lender in late 2015.  In its October 13, 2015 "Lender Presentation," Neighbors Health System, Inc. represented to its prospective lender:

(Highlights added)(Exhibit 2, p. LT083009). This slide note only describes ownership of the "facility" as owned by the Series but paints a visual image of that ownership. Only the series were divided into the Class A and Class B owners – not the limited partnerships. This one slide, a representation to lenders, is perhaps the most powerful evidence that the Plaintiff has standing to bring the claims against the Defendants, because the series owned the emergency physician services business operations of the FED facilities.

17. There is no question that Neighbors Health System, Inc. had its eye on eliminating the series and consolidating ownership into one enterprise. Neighbors Health System, Inc. negotiated a provision in the credit agreement that Neighbors Global Holdings, LLC eventually entered into with its lenders in November of 2015 that allowed for amendment of NHS

14

Emergency Centers, LLC's organizational documents to eliminate the series without triggering a change of ownership that would constitute a default.  (Exhibit 7, pp. Neighbors_Infinity000012, Neighbors_Infinity000095 and Neighbors_Infinity000096); (See also Exhibit 5, pp. LT01742, LT017444, LT017445, and LT017447).  Although contemplated as a possible transaction under the credit agreement, NHS Emergency Centers, LLC never amended its organizational documents, never obtained the series' or the series members' approval of such a transaction, and never consummated any elimination of the series membership interests.

18. Neighbors Health System, Inc. did take steps to attempt to consolidate ownership of the separate FEDs into one enterprise.  In October of 2015, Neighbors Health System, Inc. issued a Valuation Services RFP calling for bids to conduct a valuation of the facilities.  The idea was to determine what equity interest each of the series membership owners would receive in the consolidated entity based on the value of that series' FED's business operations.  In the RFP, Neighbors Health System, Inc. stated the purpose of the project:

> At this time juncture, Neighbors wishes to individually valuate each emergency center's operating entity, as well as the real estate shell entities in those centers where we own the real estate, to allow internal consolidation of all entities for the shareholders. This valuation will then allow a liquidation sale of a TBD amount of the company for outside investor infusion. The mechanics of the deal will be disclosed to the winning bidder once engaged. For purposes of this scope, we will need individual values for each center, as well as an individual value for the entire corporate management entities.

(Exhibit 3, p. 2).  Neighbors Health System, Inc. recognized the ownership structure of the facilities lie with the Series.  It stated in the RFP:

> Neighbors Health System is comprised of multiple individually licensed and operating free standing emergency centers located throughout the state of Texas. Each facility operates as a separate and distinct entity, with its own financial and operational tracking. The entire enterprise is depicted in the organizational chart included in Appendix A.
>
> Neighbors Health System, Inc. and subsidiary companies function as exclusive managers and also 1% shareholders in the various individually owned emergency

15

centers that Neighbors operates. ==The other 99% interest of each center are comprised of various classes of physician shareholders, including the original founders.== This setup allows centralized management and control of the entire enterprise, while keeping each center as a virtual independent business. ==Each center's stock is put into a series of stock within a "series LLC" to allow a single investor to invest in multiple centers through one tax ID.==

(Emphasis added)(Exhibit 3, pp. 2 and 3).  The document describes the "center" as "comprised of various classes of physician shareholders, including original founders."  It goes further to say that the "center's stock is put into a series of stock within a "series LLC."  On the face of this description, Neighbors Health System, Inc. is recognizing that the Series owns the "center."

19. The elimination of the series interests and transfer of FED ownership into one enterprise never happened.  Nevertheless, Neighbors Health System, Inc. began treating the organization as a consolidated one.  As the Plaintiff discovered in 2017, Neighbors Health System, Inc. was using Series 114 – Eastside, LLC's and Series 115 – Zaragoza, LLC's operating funds to prop up other FEDs that were losing money and needed cash.  When Mr. Bowen confronted Neighbors Health System, Inc.'s counsel, Thomas Gruenert, about this looting of the series' operating cash, Mr. Gruenert replied, recognizing that the Series owned the emergency physician services business operations and the cash generated by those operations, but claimed that Neighbors Health System, Inc. had the unfettered authority to transfer the cash between series, creating inter-company accounts:

**From:** Thomas Gruenert [TGruenert@neighborshealth.com]
**Sent:** Tuesday, June 6, 2017 3:58 PM
**To:** Jermaine; Kellie Keeling
**CC:** Setul G. Patel; Francine Elliot; Cynthia Mathew
**Subject:** Re: Infinity Emergency Management Group, LLC

Jermaine,

As you have seen, the issue of inter-company advances is not specifically addressed in the Series Agreement.

Neighbors Health, as Series Manager and under the express authority granted under the Series Agreement, manages the cash revenue of all of the emergency centers. Series 114-Eastside has either borrowed money or executed a promissory note simply based on the fact that some of the Manager's revenue management activities include short term advances for the benefit of newer centers. The Manager's discretion to manage the cash revenue is not restricted in any way.

We hope to engage all of the investor physicians as early as the next sixty days in a deeper conversation about consolidating the various series interests into a single parent company. As part of that consolidation, the short terms advances will be credited as assets of the series generating same, and so the value of a series that has made short term advances will be greater than the value of a similarly situated series that has received advances that are still outstanding. TGG

**Thomas Gruenert, J.D.**
General Counsel

address 10800 Richmond Ave. Houston, TX 77042
office 713.436.5200 | fax 713.436.5210
cell 713.253.3036 | NEC24.COM

---

**From:** Jermaine <jb@unyglobe.com>
**Sent:** Monday, June 5, 2017 9:15 AM
**To:** Kellie Keeling
**Cc:** Setul G. Patel; Thomas Gruenert; Francine Elliot; Cynthia Mathew
**Subject:** RE: Infinity Emergency Management Group, LLC

Good Morning Thomas,

Thank you for the memo explaining the corporate structure and your analysis as to why the corporate structure permits NH the discretion to allocate the operating revenue from one center in order to support other centers, inter-company advances. However, after reviewing the provided documents, I was still unable to locate language that specifically authorizes the use of center's funds in order to support other centers, inter-company advances. As a matter of fact, the referenced section 2.D. Cash Management, Banking and Treasury, of the Management and Administrative Services Agreement states "... Manager, as agent of the Company... has the right to make deposits and withdrawals from any such bank account in connection with the operations of the Company. Manager will not have the authority to borrow money or execute any

LT019161

(Exhibit 6, pp. LT019160, LT019161).   Surely Mr. Gruenert, as an original architect of the corporate documents that created NHS Emergency Centers, LLC, Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC, and all of the other companies and limited partnerships, would have known to tell Mr. Bowen that the series did not own the businesses and did not have any rights to the cash, and that the businesses and operating cash were owned by NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP instead.   He did not say this in his responsive email, because it was not and is not true.

## VI.

### Conclusion

20. The summary judgment evidence is undisputed – Series 114 Eastside, LLC owned the emergency physician services business operations of the Eastside FED and Series 115 – Zaragoza, LLC owned the emergency physician services business operations of the Zaragoza FED.  The Plaintiff is entitled to a partial summary judgment on this issue, and a summary judgment that it has standing to bring the derivative claims against the Defendants.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, Infinity Emergency Management Group, Inc., respectfully requests that this Court deny the Defendants' cross-motion for partial summary judgment and grant the Plaintiff's motion for partial summary judgment.

Respectfully submitted,

**WAUSON | PROBUS**

By: \_\_\_\_/s/ Matthew B. Probus\_\_\_\_
      **Matthew B. Probus**
      TBA# 16341200
      Fed. I.D. # 10915
      **John Wesley Wauson**
      TBA # 20988200
      Fed. I.D. # 1866

One Sugar Creek Center Blvd., Suite 880
Sugar Land, Texas 77478
(281) 242-0303 telephone
(281) 242-0306 facsimile

*ATTORNEYS FOR PLAINTIFF,*
*INFINITY MANAGEMENT GROUP, LLC*

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing has been forwarded by electronic delivery through the ECF/PACER system and via United States regular mail, first class postage prepaid, to the parties listed below on this the 20th day of September, 2019:

      Staton M Childers
      Adams and Reese, LLP
      LyondellBasell Tower
      1221 McKinney, Suite 4400
      Houston, Texas 77010
      Staton.childers@arlaw.com

      Paul D Flack
      Pratt and Flack LLP
      1331 Lamar Street, Suite 1250
      Houston, TX 77010
      pflack@prattflack.com

      Jarrod B. Martin
      McDowell Hetherington LLP
      1001 Fannin Street Suite 2700
      Houston, TX 77002
      Jarrod.Martin@mhllp.com

Millard A Johnson
Johnson DeLuca Kennedy & Kurisky, P.C.
1221 Lamar, Suite 1000
Houston, TX 77010
mjohnson@jdkglaw.com

James G Munisteri
Foley Gardere
1000 Louisiana, Suite 2000
Houston, TX 77002
jmunisteri@foley.com

Christina Minshew Lewis
Moyer Patton
11767 Katy Freeway, Suite 990
Houston, TX 77079
clewis@moyerpatton.com

Felice R. Yudkin
Warren Usatine
Cole Schotz, P.C.
25 Main Street
Hackensack, NJ 07601
fyudkin@coleschotz.com
wusatine@coleschotz.com


    *__/s/ Matthew Probus_____*
    Matthew Probus