IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NEIGHBORS LEGACY HOLDINGS, INC., | § | CASE NO. 18-33836-H1-11 |
| | § | (Chapter 11) |
| Debtor. | § | |

| | | |
|---|---|---|
| MARK SHAPIRO, TRUSTEE | § | |
| OF THE UNSECURED CREDITOR TRUST | § | |
| OF NEIGHBORS LEGACY HOLDINGS, | § | |
| INC. AND ITS DEBTOR AFFILIATES | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | ADV. P. NO. 20-03017 |
| | § | |
| NEIGHBORS LEGACY HOLDINGS, INC.; | § | |
| NEIGHBORS GLOBAL HOLDINGS, LLC; | § | |
| NEIGHBORS HEALTH, LLC; | § | |
| NHS EMERGENCY CENTERS, LLC | § | |
| NEIGHBORS GP, LLC; | § | |
| SETUL G. PATEL, M.D., Individually and | § | |
| in his capacity as officer and director; | § | |
| PAUL ALLEYNE, M.D., Individually and | § | |
| in his capacity as officer and director; | § | |
| CYRIL GILLMAN, M.D., Individually and | § | |
| in his capacity as officer and director; | § | |
| MICHAEL CHANG, M.D., Individually and | § | |
| in his capacity as officer and director; | § | |
| ANDY CHEN, M.D., Individually and | § | |
| in his capacity as officer and director; | § | |
| QUANG HENDERSON, M.D., Individually and | § | |
| in his capacity as officer and director; | § | |
| HITESH PATEL, M.D., Individually and | § | |
| in his capacity as officer and director; | § | |
| DHARMESH PATEL, M.D., Individually and | § | |
| in his capacity as officer and Director, | § | |
| GIRISH CAPITAL, LLC | § | |
| | § | |
| *Defendants.* | § | |

**TRUSTEE'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:  COMES NOW, PLAINTIFF MARK SHAPIRO, TRUSTEE OF THE UNSECURED CREDITOR TRUST OF NEIGHBORS LEGACY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES and files this First Amended Complaint,[1] and for cause of action would show as follows:

## I.
## Jurisdiction and Venue

1.     This adversary proceeding is commenced in accordance with Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

2.     This Court has subject-matter jurisdiction over this over this action pursuant to 28 U.S.C. §1334(b) because this adversary proceeding arises in, arises under, and/or relates to the Neighbors Debtor Entities chapter 11 case(s).

3.     This adversary proceeding contains "core" claims pursuant to 28 U.S.C. §157(b)(2).

4.     Pursuant to Federal Rule of Bankruptcy Procedure 7008, the Unsecured Creditor Trustee consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

5.     Venue is proper in this district under 28 U.S.C. §§1409(a).  This adversary proceeding is related to a bankruptcy case under Chapter 11 of the Bankruptcy Code that is pending in this district as consolidated case number 18-33836.

6.     The statutory basis for this complaint is §§547, 458, and 550 of the Bankruptcy Code as well as Texas Business and Commerce Code §24.006.  Additionally, this complaint asserts state common-law claims.

---

[1] This First Amended Complaint is being filed in Adversary Cause No. 20-03017.  The Court has previously indicated that this matter will be consolidated with Adversary Cause No. 18-3276; however, the Court has not yet entered that order.  Because of the nature of the Pacer filing system, the Trustee believes this is the appropriate docket to file this First Amended Complaint until the cases are formally consolidated.

## II.
## Parties

7.     Plaintiff Mark Shapiro, Trustee of the Unsecured Creditor Trust ("Unsecured Creditor Trustee"), brings this action on behalf of the Unsecured Creditor Trust created as a part of the Confirmation Order approving the *First Amended Joint Plan of Liquidation of Neighbors Legacy Holdings, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "Plan").

8.     Defendant Neighbors Legacy Holdings, Inc. ("Neighbors") is a Texas corporation that may be served by and through its counsel of record Clay Steely, Porter Hedges, LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002.

9.     Defendant Neighbors Global Holdings, LLC ("Neighbors Global") is a Texas limited liability company that may be served by and through its counsel of record Clay Steely, Porter Hedges, LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002.

10.     Defendant Neighbors Health, LLC ("Neighbors Health") is a Texas limited liability company may be served by and through its counsel of record Clay Steely, Porter Hedges, LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002.

11.     NHS Emergency Centers, LLC ("NHS Emergency") is a Texas limited liability company that may be served by and through its counsel of record Clay Steely, Porter Hedges, LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002.

12.     Defendant Neighbors GP, LLC ("Neighbors GP") is a Texas limited liability company that may be served by and through its counsel of record Clay Steely, Porter Hedges, LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002.

13.     Defendant Setul G. Patel, M.D. ("S. Patel"), in his capacity as an officer and director, is an individual that may be served by and through his counsel of record Paul D. Flack, Pratt and Flack, LLP, 4306 Yoakum Blvd., Suite 500, Houston, Texas 77006.

14.     Defendant Paul Alleyne, M.D. ("Alleyne"), in his capacity as an officer and director, is an individual that may be served by serving his counsel of record Millard A. Johnson, Johnson DeLuca Kennedy & Kurisky, P.C., 1221 Lamar, Suite 1000, Houston, Texas 77002.

15.     Defendant Cyril Gillman, M.D. ("Gillman"), in his capacity as an officer and director, is an individual that may be served by serving his counsel of record Millard A. Johnson, Johnson DeLuca Kennedy & Kurisky, P.C., 1221 Lamar, Suite 1000, Houston, Texas 77002.

16.     Defendant Michael Chang, M.D. ("Chang"), in his capacity as an officer and director, is an individual that may be served by serving his counsel of record Jay Munisteri, Foley Gardere, 1000 Louisiana, Suite 2000, Houston, Texas 77002.

17.     Defendant Andy Chen, M.D. ("Chen"), in his capacity as an officer and director, is an individual that may be served by serving his counsel of record Jay Munisteri, Foley Gardere, 1000 Louisiana, Suite 2000, Houston, Texas 77002.

18.     Defendant Quang Henderson, M.D. ("Henderson") in his capacity as an officer and director, is an individual that may be served by serving his counsel of record Jay Munisteri, Foley Gardere, 1000 Louisiana, Suite 2000, Houston, Texas 77002.

19.     Defendant QSH Family LP is a Texas limited partnership that may be served by its Registered Agent Quang H. Henderson, 10822 Roaring Brook Lane, Houston, Texas 77024.

20.     Defendant Hitesh Patel, M.D. ("H. Patel") in his capacity as an officer and director, is an individual that may be served by serving his counsel of record Jay Munisteri, Foley Gardere, 1000 Louisiana, Suite 2000, Houston, Texas 77002.

21.     Defendant Dharmesh Patel, M.D. ("D. Patel") in his capacity as an officer and director, is an individual that may be served by serving his counsel of record Christina Minshew Lewis, Moyer Patton, 11767 Katy Freeway, Suite 990, Houston, Texas 77079.

22.    Defendant Girish Capital, LLC is a Texas limited liability company that may be served through its registered agent, Setul G. Patel at 12320 Bend Creek Lane, Pearland, Texas 77584.

23.    Neighbors, Neighbors Health, Neighbors Global, NHS Emergency, and Neighbors GP are hereinafter collectively referred to as the "Neighbors Defendants".

24.    Alleyene, Gillman, Chang, Chen, Henderson, S. Patel, H. Patel, and D. Patel are hereinafter collectively referred to as the "Neighbors' O&Ds."

25.    Defendant Infinity Emergency Management Group, LLC is a Texas limited liability company that may be served by its Registered Agent Jermaine Bowen, 11724 Pueblo Fuerte Court, El Paso, TX 79936.

### III.
### Background Facts

#### A.    General Background

26.    On July 12, 2018 (the "Petition Date"), the Neighbors Legacy Holdings, Inc. and certain other affiliates[2] (collectively, the "Neighbors Debtor Entities") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

---

[2] The Neighbors Debtor Entities include Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, NEC Bellaire Emergency Center, LP, NEC Kingwood Emergency Center, LP, NEC Baytown Emergency Center, LP, NEC Pasadena Emergency Center, LP, NEC Pearland Emergency Center, LP, NEC Lakeline Emergency Center, LP, NEC Beaumont Emergency Center, LP, NEC Mueller Emergency Center, LP, NEC Yorktown Emergency Center, LP, NEC Crosby Emergency Center, LP, NEC Orange Emergency Center, LP, NEC Midland Emergency Center, NEC Zaragoza Emergency Center, LP, NEC Tyler Emergency Center, LP, NEC Eastside Emergency Center, LP, NEC Port Arthur Emergency Center, LP, NEC Texas City Emergency Center, LP, NEC Odessa Emergency Center, LP, NEC Harlingen Emergency Center, LP, NEC Amarillo Emergency Center, LP, NEC Porter Emergency Center, LP, NEC Brownsville Emergency Center, LP, NEC McAllen Emergency Center, LP, NEC Wichita Falls Emergency Center, LP, NEC Longview Emergency Center, LP, NEC Texarkana Emergency Center, LP, NEC San Angelo Emergency Center, LP, NEC College Station Emergency Center, LP, NEC Lufkin Emergency Center, LP, NEC West Warwick Emergency Center, LP, NEC Lubbock Emergency Center, LP, NEC Greeley Emergency Center, LP, Next Door Urgent Care, LLC, NEC Paris Emergency Center, LP, NEC Kerrville Emergency Center, LP, NEC Amarillo South Emergency Center, LP, EDMG, LLC, Neighbors Emergency Center, LLC, Neighbors GP, LLC, Neighbors Physician Group, PLLC, Neighbors Practice Management, LLC, Neighbors Physician Group – Colorado, LLC, NEC Pharr Emergency Center, LP, NEC Kingwood Asset Holdings, LLC, NEC Baytown Asset Holdings, LLC, NEC Pearland Asset Holdings, LLC, NEC Beaumont Asset Holdings, LLC.

27.   On March 22, 2019, the Court entered an Order (the "Confirmation Order") confirming the *First Amended Joint Plan of Liquidation of Neighbors Legacy Holdings, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "Plan").

28.   The Confirmation Order and Plan, among other things, approved the formation of the Unsecured Creditor Trust on the effective date of the Plan, which occurred on April 8, 2019 (the "Effective Date") and the appointment of the Unsecured Creditor Trustee to administer the Unsecured Creditor Trust.

29.   Pursuant to the Plan, the Unsecured Creditor Trust is charged with maximizing value for the benefits of its beneficiaries. As a part of the Plan, the Neighbors Debtor Entities retained certain causes of action, including those asserted in this matter.[3]   Those Retained Causes of Actions were then subsequently assigned to the Unsecured Creditor Trust as a part of the establishment of the trust.[4]

30.   Accordingly, the Unsecured Creditor Trustee now brings the claims asserted below and would show the Court the following:

**B.   Neighbors Emergency Centers Background**

31.   The Neighbors Defendants are a group of entities that owned and operated freestanding emergency centers in and around the State of Texas.  The Neighbors Defendants were formed by the Neighbors' O&Ds identified above, or the "Gang of Eight" or "G8" as they often referred to themselves.

32.   When the Neighbors' O&Ds were focused on their initial mission—providing emergency medical care through emergency centers that they built, owned, and operated—they were

---

[3] *See* the Plan at Cause No. 18-33836, Docket No. 854 at ¶123.
[4] *See* Unsecured Creditor Trust Agreement at Cause No. 18-33836, Docket No. 802-2 at p. 5.

very successful.  Indeed, Neighbors' O&Ds had five locations at the start of 2014, all of which were operated profitably.

33.  Spurred on by this success, the Neighbors' O&Ds undertook a massive expansion campaign fueled by debt.  Initially, this expansion was funded by a $31 million debt transaction with BBVA Compass in 2014, which was later increased to $50 million.  By the end of 2015, Neighbors had opened eighteen locations.

34.  To further fuel the Neighbors' O&Ds massive expansion vision, Neighbors also obtained a $150 million term loan from a syndicate led by Key Bank in late 2015.  By the end of 2016, Neighbors had continued its massive expansion plans, having opened a total of thirty-two locations.

35.  To structure the operation of each of the new facilities, the Neighbors' O&Ds formed separate entities (the "NEC Entities") with respect to each emergency center they opened.  Each NEC Entity was individually licensed by the State of Texas to operate the emergency center at its respective location.[5]

36.  Each NEC Entity was owned 99% by NHS Emergency and 1% by Neighbors GP. However, the "profits and losses" in each of these entities was owned via membership interests in a "Series LLC" that were tied to the profits and losses of each specific emergency center.  These Series LLCs did not own or operate the emergency centers.  Instead, they were intended to be a mechanism to distribute the profits and losses of each center.[6]

37.  These Series LLCs were co-owned by the Neighbors' O&Ds and local emergency physicians who would staff them.  Typically, the Neighbors' O&Ds would own 35% of each new entity (directly or indirectly) and the local emergency physicians would own 65% (directly or

---

[5] *See, e.g.,* Ex. A, State of Texas License for NEC Zargoza Emergency Center, LP and NEC Eastside Emergency Center, LP.
[6] *See,* Defendants Joint Motion for Partial Summary Judgement at Cause No. 18-03276, Docket No. 62 at p. 3.

indirectly).  This was supposed to be the mechanism that the profits and losses for each emergency center would be distributed to the Neighbors' O&Ds and local emergency physicians who staffed them.

38.    Additionally, each NEC Entity entered into a Management and Administrative Services Agreement (the "Management Agreement") with Neighbors Health under which, Neighbors Health agreed to manage the operations and finances of NEC Entity for a fee.  However, these Management Agreements were not negotiated, arms-length transactions.  Rather, they were simply countersigned by Defendant S. Patel for both the NEC Entity and Neighbors Health and gave Neighbors Health and the Neighbors' O&Ds unfettered control over the finances and operations of each NEC Entity.

39.    Both Neighbors GP and NHS Emergency were owned 100% by Neighbors Health, which was in turn owned 100% by Neighbors Global, which in turned was owned 100% by Neighbors Legacy, which was owned by the Neighbors' O&Ds.

40.    Thus, at all relevant times, the Neighbors' O&Ds were the officers and directors of the Neighbors Defendants who made all decisions with respect to the management of each Neighbors' Defendant and each NEC Entity.  As such, the Neighbors' O&Ds owed fiduciary duties (including the duty of loyalty and duty of care) to each Neighbors' Defendant and each NEC Entity individually.

**C.    Neighbors' O&Ds Breach the Fiduciary Duties of Loyalty and Care**

41.    As a result of their ever-growing expansion ambitions, the Neighbors model changed. The Neighbors' O&Ds were no longer focused on providing emergency medical care.  Rather, they perceived themselves as real estate developers who utilized the growing Neighbors empire to fuel their personal real estate developments through agreements with affiliates and related parties.  The Gang of Eight, as they referred to themselves, quickly began focusing their business dealings on real estate development outside of the Neighbors corporate structure.

42.   Instead of Neighbors owning the real property associated with the emergency centers as the Neighbors' O&Ds did with their initial centers, they partnered with Read King Commercial ("Read King") to own, develop, and lease back the underlying real estate to the NEC Entities.  In doing so, their focus shifted away from the practice of providing emergency care and managing a collection of emergency clinics and towards a focus on real estate development.

43.   To accomplish this, Defendant Setul Patel formed Defendant Girish Capital, in which other members of the Neighbors' O&Ds invested.  Then Girish Capital engaged in direct investments in Read King (or an affiliated entity) that ultimately owned many of the emergency centers and would then lease those properties back to the respective NEC Entities.

44.   The utilization of Girish Capital for these transactions was even discussed amongst the Neighbors' O&Ds at their board meetings but outside the presence of any non-owner board members.[7]  These constituted self-dealing transactions that should have been conducted within the Neighbors organization and are a clear violation of the fiduciary duty of loyalty owed by the Neighbors' O&Ds to the Neighbors Defendants and the NEC Entities.

45.   When the real estate was later sold distribute a portion of the proceeds to the Neighbors' O&Ds through their investment in Girish Capital.  The Neighbors' O&Ds scheme was summarized well by Defendant Alleyne in response to complaints by Defendant H. Patel.

46.   Specifically, H. Patel complained that the profits others were making off the resale of the underlying real estate of the emergency centers were too high and did not "sit well" with him.  He "wonder[ed] if [the Neighbors' O&Ds] had real estate development in-house how much more we could net ourselves with these kinds of flips."[8]

---

[7] *See* Ex. B, Email Correspondence dated February 24, 2015.
[8] *See* Ex. C, Email Correspondence dated January 12, 2016.

47.  In response, Defendant Alleyne reminded him that they "have ownership interests in some of these facilities through Giresh [sic] Capital. We don't make any money until they sell.  Let's root for them to succeed."[9]

48.  In order to continue to fuel their growing real estate development ambitions, the Neighbors' O&Ds needed to keep the Neighbors empire operating and growing.

49.  In doing so, Neighbors' O&Ds' engaged in a pattern of breaching their fiduciary duties, abuse of control, grossly negligent mismanagement, and waste of assets.  This widespread pattern of neglect, failing to properly oversee both the operations and finances of the emergency centers, and failing to have even the basic corporate governance systems in place ultimately led to the collapse of Neighbors.

50.  Defendant Alleyne highlighted the Neighbors' O&Ds attitude towards corporate governance in an email to the other Neighbors' O&Ds in which he states:

> The 8 partners believe that we were the only ones qualified to make the best decisions for our Company.  We brought on [non-owner board members] not so much to assist with decisions, but to provide "adult" supervision . . . Although we call ourselves the Board, we really are a bunch of owners who are running the Company under the guise of the Board . . . That's why [the non-owner board members] have no vote . . .We seem to pick and choose what rules we want to follow and which ones we'll just do our own way . . . I have no problem with any of this . . . we could literally throw a couple of million dollars out the window/year and no one would notice or feel the impact (as long as the dividends don't keep getting cut.)[10]

51.  Further acknowledging this cavalier attitude towards corporate funds, there was not even a basic budgeting process in place.  In response to complaints from some of the local emergency physicians about the shifting of money from performing emergency centers to non-performing centers, one of the Neighbors' O&Ds commented that "[w]here there are no budgets, there are no 'expected norms.' I would prefer not to emphasize that there have been no budgets."[11]

---

[9] *Id.*
[10] *See* Ex. B, Email Correspondence dated February 24, 2015.
[11] *See* Ex. D, Draft Letter to Investors with Comments and Redline.

52.   Highlighting this gross breach of the duty of care is a letter from Neighbors' auditors, Grant Thornton, that articulates numerous different internal control deficiencies that were deemed to be material weaknesses such that there is a reasonable possibility that a material misstatement of the Company's financial statement would occur.[12]

53.   Some of these internal control deficiencies include such major failures as having an "Inadequate Accounting System" that does not "meet the needs of a dynamic company."  This results in having material weaknesses in the design and operation of the Control Environment and the internal controls related to Revenue and Receivables.[13]

54.   Moreover, Grant Thornton noted other significant deficiencies in accounts receivable reconciliation, accounting for capital asset purchases that were not actually made, cash management, record retention, accounts payable, leasehold and sale leaseback transactions, and expense reimbursement (including "items charged on Executive Credit Cards that appeared to be . . . not normal business purchases").[14]

55.   In short, the Neighbors' O&Ds were engaged in grossly negligent mismanagement of the Neighbors Defendants and NEC Entities in complete violation of their fiduciary duties of care and loyalty, abusing their structure of power and control, wasting of corporate assets, and with no regard of their massive conflicts of interest and competing duties of loyalty to all of the different NEC Entities under their control, the Neighbors' Defendants, and their own personal self-dealings through Girish Capital.

56.   For example, Neighbors Health, by and through its officers and directors, the Neighbors' O&Ds, managed the finances of each NEC Entity, including maintaining the bank accounts,

---

[12] *See* Ex. E, July 1, 2016 Grant Thornton Internal Control Deficiencies Letter.
[13] *Id.*
[14] *Id.*

depositing funds from operations into their bank accounts, and paying expenses from their bank accounts.

57.   The Neighbors' O&Ds had knowledge of the finances of all of the NEC Entities owned by NHS Emergency, including knowledge that a number of those emergency centers were suffering losses and needed capital to continue operations. To provide the needed infusions of capital into these emergency centers that were experiencing financial losses, the Neighbors' O&Ds, in their capacity as officers and directors of Neighbors Health, caused Neighbors Health to transfer large sums of money out of the bank accounts of profitable NEC Entities into the bank accounts of the other unprofitable emergency centers for no consideration.

58.   The Neighbors' O&Ds knew that they were obligated to hold and distribute each NEC Entity's net profits for their respective Series LLC owners. The diversion of these funds by the Neighbors' O&Ds, stripped the performing emergency centers of their profits, causing substantial damage to them in breach of the Neighbors' O&Ds fiduciary duties.

59.   And as noted above, the Neighbors' O&Ds also obtained massive bank loans to finance the massive expansion of Neighbors and the operations of the non-performing centers.  These loans were secured/guaranteed not by the Neighbors' O&Ds individually, but by all of the assets of all of the NEC Entities, thereby causing substantial damages to the performing emergency centers and ultimately causing the financial collapse of the entire Neighbors organization.

60.  In doing so, the Neighbors' O&Ds kept the Neighbors' empire afloat by violating fiduciary duties owed to the performing NEC Entities to prop up the nonperforming NEC Entities.

61.   As a result, the Neighbors' O&Ds personally benefited in numerous ways, highlighting the massive conflicts of interest in serving in so many roles with competing interests.  They simply wore too many hats with competing interests, including making all of the management decisions for all of the Neighbors' Defendants and all of the NEC Entities, even though they had competing

interests at times.  This is in addition to the massive conflict of interest involved in making direct investments through Girish Capital into the underlying real estate.

62.   For example, by keeping nonperforming emergency centers afloat, Neighbors' Health continued to receive its payments from each center for management under the Management Agreements and the Neighbors' O&Ds continued to make massive distributions to themselves through the myriad of entities that they owned interests in including the Neighbors' Defendants and the NEC Entities.  Additionally, the Neighbors' O&Ds had a continuing interest in the real estate through investments from Girish Capital that would trickle down to them individually in violation of their duty of loyalty.  By keeping the Neighbors empire afloat, the Neighbors' O&Ds were able to borrow massive amounts of additional funds to fuel their thirst for expansion and to allow them to continue to replicate their scheme over and over again without regard for the profitability or performance of the emergency centers.

### D.   Fraudulent Transfer Allegations

63.   As noted above, starting in 2014, Neighbors undertook a massive expansion campaign fueled by debt.  Initially, this expansion was funded by a $31 million debt transaction with BBVA Compass in 2014, which was later increased to $50 million.  By the end of 2015, Neighbors had opened eighteen locations.  Neighbors subsequently obtained a $150 million term loan from a syndicate led by Key Bank in late 2015.  By the end of 2016, Neighbors had opened a total of thirty-two locations.

64.   Each of the Neighbors' O&Ds, LLC and/or Defendant QSH Family LP received transfers of funds ("Transfers") from the Neighbors Debtor Entities in 2016 and 2017.  Summaries of those transfers are listed below and total more than $37 million.

|  | **2016** | **2017** | **Total** |
|---|---|---|---|
| Setul Patel | $4,512,900.75 | $1,211,766.82 | $5,724,667.57 |
| Dharmesh Patel | $4,512,722.75 | $1,211,766.82 | $5,724,489.57 |
| Andy Chen | $4,478,290.75 | $1,205,440.81 | $5,683,731.56 |
| Chang, Michael | $4,378,891.75 | $1,170,401.21 | $5,549,292.96 |
| Quang Henderson | $3,688,464.75 |  | $3,688,464.75 |
| QSH Family LP |  | $1,090,429.21 |  |
| Paul Alleyne | $2,732,989.75 | $685,493.72 | $3,418,483.47 |
| Cyrill Gillman | $2,560,831.75 | $653,868.68 | $3,214,700.43 |
| Hitesh Patel | $2,495,864.75 | $578,981.58 | $3,074,846.33 |
|  | **$29,360,957.00** | **$7,808,148.85** | **$37,169,105.85** |

65.     In addition, from 2016 through 2018, Infinity Emergency Management Group, LLC received Transfers totaling approximately $2,213,610.23.

66.     At the time the Transfers were made, the Neighbors Debtor Entities were insolvent when it made the Transfers as the fair market value of their assets exceeded their liabilities.  The Neighbors Debtor Entities were engaged in business or transactions for which any property remaining after the Transfer was an unreasonably small capital.  Additionally, at the time of the Transfers, the Neighbors Debtor Entities could not make payments on its debts as they became due.

**IV.**
**Claims and Causes of Action**

**A.     Derivative Allegations**

67.   The Unsecured Creditor Trustee brings this action on behalf of the Unsecured Creditor Trust asserting the claims assigned to the trust by the Neighbors Debtor Entities.  To the extent that those claims are determined to be derivative claims brought in the right and for the benefit of the Neighbors Debtor Entities to redress injuries suffered, and to be suffered, by them as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as aiding and abetting of it, by the Neighbors Defendants and the

Neighbors' O&Ds, the Neighbors Debtor Entities are named as nominal defendants solely in a derivative capacity.

68.    The Unsecured Creditor Trustee will adequately and fairly represent the interests of the Neighbors Debtor Entities in enforcing and prosecuting their rights.

69.    The manager of the Neighbors Debtor Entities was Neighbors Health, which was in turn controlled by the Neighbors' O&Ds. The Unsecured Creditor Trustee has not made any demand on the Neighbors Defendants or the Neighbors' O&Ds to institute this action because such a demand would be futile, wasteful, and useless. Demand would be futile for the following reasons:

a.      As a result of their access to and review of internal corporate documents; conversations and connections with corporate officers, employees, and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the false and misleading financial statements;

b.      The Neighbors Defendants are insiders of the Neighbors Debtor Entities and they have received substantial monetary compensation and other benefits. Accordingly, they are legally incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

c.      The Neighbors' O&Ds are insider directors of the manager of the Neighbors Debtor Entities and their principal professional occupation was their employment with the Neighbors Defendants, pursuant to which they have received substantial monetary compensation and other benefits. Accordingly, the Neighbors' O&Ds are legally incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

d.      The Defendants are entrenched and have multiple conflicts of interest and entangling business relationships that preclude them from being disinterested and vigorously prosecuting the wrongdoing alleged in this complaint;

e.      The Neighbors' O&Ds are not disinterested or independent and served on the Board of the Neighbors Debtor Entities manager during the time of the wrongdoing and participated in the wrongs complained of here. Pursuant to their specific duties as Board members, each was charged with directing the management of the Neighbors Debtor Entities and their business affairs. Each breached the fiduciary duties that they owed to the Neighbors Debtor Entities and its members in that they failed to properly supervise the Neighbors Debtor Entities' finances and operations, failed to protect and preserve the funds of the Neighbors Debtor Entities, and transferred or allowed the transfer of the funds of the Neighbors Debtor Entities. The majority of the directors have served on the Board for several years and are, therefore, well aware of the Neighbors Debtor Entities' finances and operations and the transfers and decisions to transfer funds. Yet, the Neighbors' O&Ds either knew and caused the transfers of funds to be made or ignored the fact that the transfers were being

made. Further, the Neighbors' O&Ds either knew of the inflated operations expenses paid to affiliate companies or ignored the fact that the payments were being made. Because they abdicated their oversight responsibilities, these directors are personally liable for the conduct alleged here. the Neighbors Debtor Entities, therefore, cannot exercise independent objective judgment in deciding whether to bring this action, or whether to vigorously prosecute this action, because its members are interested personally in the outcome, as it is their actions that have denuded the Neighbors Debtor Entities of millions of dollars in funds and assets.

f.      Each of the Neighbors' O&Ds knew or directly benefited from the wrongdoing alleged in this complaint;

g.      The Neighbors' O&Ds participated in efforts to conceal or disguise these wrongs from the Neighbors Debtor Entities' members or recklessly or negligently disregarded the wrongs alleged in this complaint and are, therefore, not disinterested parties;

h.      In order to bring this suit, all of the directors of the manager of the Neighbors Debtor Entities and the voting member Neighbors Investment would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thus excusing demand;

i.      The acts alleged in this complaint constitute violations of the fiduciary duties owed by the Neighbors Debtor Entities manager's officers and directors, and these acts are incapable of ratification;

j.      Each of the Neighbors' O&Ds authorized or permitted the issuance and making of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged here, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

70.   The Neighbors' O&Ds have failed and refused to seek to recover for the Neighbors

Debtor Entities for any of the wrongdoing alleged by the Unsecured Creditor Trustee even though

the Neighbors' O&Ds know of the claims and causes of action raised in this complaint.

**B.   Breach of Fiduciary Duty Against Neighbors Defendants and Neighbors' O&Ds**

71.   The Unsecured Creditor Trustee repeats the above numbered allegations as if fully set

forth herein.

72.   At all relevant times, the Neighbors' O&Ds were the officers and directors of the

Neighbors Defendants who made all decisions with respect to the management of each Neighbors'

Defendant and each Neighbors Debtor Entities.   As such, the Neighbors Defendants and the

Neighbors' O&Ds owed fiduciary duties (including the duty of loyalty and duty of care) to each Neighbors' Defendant and each Neighbors Debtor Entity individually.

73.   The Neighbors' O&Ds, directly and indirectly through their roles as officers and directors of all of the Neighbors Defendants and the Neighbors Debtor Entities, breached their fiduciary duties of care and loyalty in at least the following ways:

a.   Violations of duties of loyalty in engaging in self-interested real estate transactions through Girish Capital;

b.   Violations of duties of loyalty transferring funds and other assets from performing NEC Entities to non-performing NEC Entities;

c.   Violations of duties of loyalty in abuse of their ability to control and influence all of the Neighbors Debtor Entities in operating them in their own personal best interest rather than the best interest of each individual entity when conflicts of interests arose between the entities, including but not limited to securing massive debt obligations with all of the assets of all of the Neighbors Debtor Entities;

d.   Violations of duties of loyalty and care by failing to properly consider the interests of each Neighbors Debtor Entity individually causing the entities to waste valuable corporate assets by paying inflated operations expenses to affiliates;

e.   Violations of duty of care in the gross mismanagement of their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Neighbors Debtor Entities in a manner consistent with the operations of a prudently run closely-held company as outlined, in part, by the issues identified in the Internal Control Deficiencies Letter issued by Grant Thornton;

f.   Violations of duty of care in undertaking a massive expansion campaign financed by huge debt obligations without any degree of reasonable care or diligence

highlighted by the complete lack of budgeting and basic principles of corporate governance;

g.        Violations of their duty to act fairly and equitably with respect to its management of each of Neighbors Debtor Entity's finances and operations and preserve its profits for distribution,

h.        Violations of their duty to act in the utmost good faith and exercise the most scrupulous honesty toward the Neighbors Debtor Entities; and

i.        Violations of their duty to place the interests of the Neighbors Debtor Entities before their own and not use the advantage of its position to gain any benefit for themselves at the expense of the Neighbors Debtor Entities.

74.    Because of the above alleged breaches of duty of loyalty, the Neighbors Defendants and the Neighbors' O&Ds loose the presumption and benefit of the business judgment rule.

75.    The breaches of their fiduciary duties owed to the Neighbors Debtor Entities was the proximate direct and consequential cause of significant harm to the Neighbors Debtor Entities and ultimately led to the financial collapse of the entire Neighbors organization.

**C.    Negligence and Gross Negligence Against Neighbors Defendants and Neighbors' O&Ds**

76.    The Unsecured Creditor Trustee repeats the above numbered allegations as if fully set forth herein.

77.    The Neighbors Defendants and Neighbors' O&Ds had a duty to the Neighbors Debtor Entities to exercise reasonable care in performing their duties as officers and directors. The breaches of fiduciary duty outlined above were negligent and rise to the level of gross negligence. Further, the breaches were committed knowingly and with conscious disregard for the rights and welfare of the

Neighbors Debtor Entities.  Therefore, the Plaintiff is entitled to recover exemplary damages from the Neighbors Health and the Neighbors' O&Ds, which it now seeks.

78.   The breaches of their duty of care owed to the Neighbors Debtor Entities was the proximate, direct, and consequential cause of harm to the Neighbors Debtor Entities.  The Unsecured Creditor Trustee, therefore, seeks recovery of exemplary and punitive damages.

**D.     Conspiracy to Breach Fiduciary Duties Against Neighbors Defendants and Neighbors' O&Ds**

79.   The Unsecured Creditor Trustee repeats the above numbered allegations as if fully set forth herein.

80.   The Neighbors Defendants and Neighbors' O&Ds, in their capacity as officers and directors, conspired with each other to breach their fiduciary duties to the Neighbors Debtor Entities as outlined above.   The breaches of their duty of care owed to the Neighbors Debtor Entities was the proximate direct and consequential cause of harm to the Neighbors Debtor Entities, for which the Unsecured Creditor Trustee now brings suit.

**E.     Aiding and Abetting Breach of Fiduciary Duties Against Neighbors Defendants, Neighbors' O&Ds, and Girish Capital**

81.   The Unsecured Creditor Trustee repeats the above numbered allegations as if fully set forth herein.

82.   At all relevant times, the Neighbors' O&Ds were the officers and directors of the Neighbors Defendants who made all decisions with respect to the management of each Neighbors' Defendant and each Neighbors Debtor Entities.   As such, the Neighbors Defendants and the Neighbors' O&Ds owed fiduciary duties (including the duty of loyalty and duty of care) to each Neighbors' Defendant and each Neighbors Debtor Entity individually.

83.   Girish Capital was founded by Defendant Setul Patel and other members of the Neighbors' O&Ds invested in Girish Capital for the purpose of conducting related party transactions

with Neighbors Debtor Entities.  Girish Capital made direct investments in Read King and affiliated entities into the underlying real estate.

84.   The knowledge, duties, and obligations of the Neighbors Defendants and the Neighbors' O&Ds is imputed to Girish Capital through its founder, Defendant Setul Patel and the other members of the Neighbors' O&Ds invested in Girish Capital.

85.   The Neighbors Defendants, Neighbors' O&Ds, and Girish Capital all aided and abetted the Neighbors Defendants and the Neighbors' O&Ds in breaching their fiduciary duties to the Neighbors Debtor Entities as outlined above.  The breaches of their duty of care owed to the Neighbors Debtor Entities was the proximate direct and consequential cause of harm to the Neighbors Debtor Entities, for which the Unsecured Creditor Trustee now brings suit.

F.      **Recovery of Transfers Pursuant to 11 U.S.C. §§544, 548 & 550 and Texas Business and Commerce Code §24.006**

86.   The Unsecured Creditor Trustee repeats the above numbered allegations as if fully set forth herein.

87.   The Unsecured Creditor Trustee seeks to avoid the Transfers as fraudulent pursuant to 11 U.S.C. §§544, 548, and applicable state law, including Texas Business and Commerce Code §24.006(a).

88.   The Neighbors Debtor Entities made the Transfers to or for the benefit of the Neighbors' O&Ds, QSH Family LP, and/or Infinity Emergency Management Group, LLC.  Specifically, the cash from Neighbors Debtor Entities bank account was sent directly to the Neighbors' O&Ds, QSH Family LP, and/or Infinity Emergency Management Group, LLC.  Each of the Neighbors' O&Ds, QSH Family LP, and/or Infinity Emergency Management Group, LLC.  received transfers of funds from the Neighbors Debtor Entities in 2016, 2017, and/or 2018.  Summaries of those transfers are listed above.

89.     The Transfers were made from funds in the Debtor's bank account and was a transfer of an interest in property of the Neighbors Debtor Entities.  The Neighbors Debtor Entities received less than reasonably equivalent value for the Transfers.

90.     The Neighbors Debtor Entities were insolvent when it made the Transfers as the fair market value of their assets exceeded their liabilities. The Neighbors Debtor Entities were engaged in business or transactions for which any property remaining after the Transfer was an unreasonably small capital.  Additionally, at the time of the Transfers, the Neighbors Debtor Entities could not make payments on its debts as they became due.

91.     Therefore, the Transfers are avoidable as a fraudulent transfer under 11 U.S.C. §§544 & 548 and applicable state law, including Texas Business and Commerce Code §§24.006.

92.     Section 550 of the Bankruptcy Code provides that if a transfer is avoided under §§544 and 548 of the Bankruptcy Code, the Unsecured Creditor Trustee may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfer was made, or any immediate or mediate transferee of the initial transferee.

93.     The Transfers or the value of the Transfers that are avoidable under §§544 or 548 of the Bankruptcy Code are recoverable for the Unsecured Creditor Trust under §550 of the Bankruptcy Code.

**V.**
**Jury Demand**

94.   The Plaintiff demands a trial by jury as to all issues in this case.

## VI.
## <u>Prayer</u>

**WHEREFORE**, the Unsecured Creditor Trustee demands judgment against the Transfer

Defendants:

    A.  Actual damages, including direct and consequential damages;

    B.  Exemplary or punitive damages;

    C.  Prejudgment and post-judgment interest as allowed by law; and

    D.  Costs of court.

    E.  Determining that the Transfers are avoidable as fraudulent transfers under 11 U.S.C. §§544 and 548 and Texas Business and Commerce Code §24.006(a).

    F.  Directing the Transfer Defendants to pay the Unsecured Creditor Trustee the value of the Transfers in the amount determined at trial, but not less than the amount set forth above in Exhibit A, plus interest and costs of suit under 11 U.S.C. §550(a).

    G.  To the extent that the Trustee recovers under 11 U.S.C. §544 and Texas Business and Commerce Code §24.006(a), attorney fees pursuant to Texas Business and Commerce Code §24.013.

    H.  For such other and further relief as the Court deems just and proper.

Respectfully Submitted,

**WALSTON BOWLIN, LLP**

*/s/ Clifford H. Walston*
CLIFFORD WALSTON
cliff@walstonbowlin.com
State Bar No. 24037666
4299 San Felipe Street, Suite 300
Houston, Texas 77027
(713) 300-8700
(713) 583-5020 Fax
**ATTORNEY FOR PLAINTIFF**