

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
03/18/2021

| | | |
|---|---|---|
| IN RE: | § | |
| NEIGHBORS LEGACY HOLDINGS, INC., | § | CASE NO: 18-33836 |
| *et al*, | § | |
| Debtors. | § | CHAPTER 11 |
| | § | |
| INFINITY EMERGENCY MANAGEMENT | § | |
| GROUP, LLC, | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 18-3276 |
| | § | |
| NEIGHBORS HEALTH SYSTEM, INC., *et* | § | |
| *al*, | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

This dispute centers on standing.  Infinity Emergency Management Group, LLC sued

Defendants Neighbors Health System, Inc. ("Neighbors Health"), Neighbors Investment Group,

LLC ("Neighbors Investment"), and certain individuals associated with the Neighbors.[1]  Since this

suit's inception, Infinity's ability to assert some of its claims has been contested.  At this stage, it

is the Trustee of the Debtors'[2] Unsecured Creditor Trust challenging Infinity's standing.  The

Creditor Trustee contends that Infinity is attempting to assert claims that belong to the Unsecured

Creditor Trust.  Infinity contends that it may bring these claims derivatively on behalf of non-

debtor entities.  Resolution of this dispute turns on whether a debtor or non-debtor entity that

suffered the complained of harm.

---

[1] The individually named defendants are doctors who served as officers and directors of Neighbors Health, including: Dr. Setul G. Patel; Dr. Paul Alleyne; Dr. Cyril Gillman; Dr. Michael Change; Dr. Andy Chen; Dr. Quang Henderson; Dr. Hitesh Patel; and Dr. Dharmesh Patel (collectively, the "Neighbors D&Os")  (ECF No. 80 at 2–4).  In its Fourth Amended Complaint, Infinity also named Mark Shapiro, Trustee of the Unsecured Creditors' Trust, as a defendant (the "Creditor Trustee").  (ECF No. 80 at 2).

[2] The "Debtors" are Neighbors Legacy Holdings, Inc. and its debtor affiliates.  (*See* ECF No. 85 at 1).

Various agreements between Neighbors Health, its affiliate entities, and Infinity define how the revenue of the entity in which Infinity purchased an interest was to be generated. These agreements make clear that Infinity purchased an interest in distributions from certain series limited liability companies within the Neighbors Network. These distributions were funded with revenue (minus operating expenses) from emergency centers that were organized as limited partnerships. The limited partnerships relevant to Infinity's claim were Debtor entities. Contrary to Infinity's argument, Defendants' mismanagement of the limited partnership revenue directly harmed the Debtor limited partnerships. Infinity does not have standing to pursue derivative claims based on harm inflicted on the Debtor limited partnerships. Nevertheless, Infinity may have derivative standing to seek redress for other harms alleged in Infinity's complaint. Yet Infinity must plead these harms more definitely.

## BACKGROUND

The Creditor Trustee attempts to intervene in the prosecution Infinity's derivative claim. The Creditor Trustee contends that this claim belongs to the Unsecured Creditor Trust. In doing so, the Creditor Trustee essentially adopts Defendants' position that Infinity lacks standing to pursue this claim. The Creditor Trustee, as did Defendants, argues that this claim is intended to redress harm inflicted on Debtor entities. The Creditor Trustee contends the Unsecured Creditor Trust succeeded to such claims by operation of this Court's Confirmation of the Debtors' plan. Infinity maintains that it seeks redress on behalf of non-debtor entities alone.

### *Neighbors Relevant Corporate Structure*

Neighbors corporate structure is convoluted. Fortunately, only a small portion of this structure is relevant here. Debtor Neighbors Legacy Holdings, Inc. ("Neighbors Holdings"),

which was formerly known as Neighbors Health System, Inc.,[3] along with its subsidiaries and affiliates, operated a network of freestanding emergency centers (collectively, the "Neighbors Network").  (Case No. 18-33863, ECF No. 16 at 3; *see also* ECF No. 22 at 1).  At the time of its bankruptcy, the Neighbors Network operated 22 freestanding emergency centers.  (Case No. 18-33863, ECF No. 16 at 5).  Each emergency center was owned by a separate limited partnership.  (Case No. 18-33863, ECF No. 16 at 7).  And each limited partnership had one general partner—Neighbors GP, LLC (a Debtor entity)—and one limited partner—NHS Emergency Centers, LLC ("NHS") (a Debtor entity).  (Case No. 18-33863, ECF No. 16 at 7).  NHS established individual series LLCs to operate (but not to own) each emergency center.  (Case No. 18-33863, ECF No. 16 at 7–8).  Each series LLC was owned by two classes of shareholders.  (Case No. 18-33863, ECF No. 16 at 7–8).  The Class A owners of each series LLC were to be founding members of the Neighbors Network.  (Case No. 18-33863, ECF No. 16 at 7–8).  The Class B owners of each series LLC were physicians that "purchased interests in [the] profits and losses [of a] specific series LLC[]."  (Case No. 18-33863, ECF No. 16 at 8).  The management and administration of each emergency center, as well as the entities associated with each center, was carried out by five other Neighbors Network affiliates, all organized under Neighbors Holdings (formerly Neighbors Health).  (Case No. 18-33863, ECF No. 16 at 8, 28).

The parties' dispute concerns two freestanding emergency centers, as well as their affiliate limited partnerships and series LLCs.  Those emergency centers are NEC Eastside Emergency Center, LP and NEC Zaragoza Emergency Center, LP (together, the "Center LPs").  NHS, a Debtor entity, was the sole limited partner of both Center LPs.  (ECF Nos. 59-24 at 2, 10; 61-13 at 2, 10).

---

[3] "Neighbors Holdings" and "Neighbors Health" refer to the same entity and are used interchangeably in this opinion.

Each Center LP is a Debtor.  (ECF No. 80 at 8–9).[4]  The series LLCs associated with the Center LPs were Series 114 – Eastside, LLC and Series 115 – Zaragoza, LLC (together, the "Series LLCs").  Neither Series LLC is a Debtor.  (ECF No. 80 at 8–9).  The Class A shareholder of each Series LLC was Neighbors Investment, which held a 34% "Sharing Ratio" in each Series LLC.  (ECF Nos. 59-8 at 1; 59-19 at 1).  The Class B shareholder was Infinity, which held a 65% "Sharing Ratio" in each Series LLC.  (ECF Nos. 59-8 at 1; 59-19 at 1).  Neighbors Investment and Infinity were the sole members of the Series LLCs.  (ECF Nos. 59-8 at 1; 59-19 at 1).  Neighbors Health provided management and administrative services to the Center LPs, the Series LLCs, and NHS.  (ECF Nos. 62-12; 59-29; 59-10; 62-10; 62-24).

In practical terms, the emergency centers were "brick and mortar" stores for the Neighbors Network.  The Center LPs were created to own these stores.  To that end, the Center LPs provided facilities for Neighbors Network physicians, who provided healthcare services to patients and generated revenue through provision of these services.  NHS was created to hold the majority ownership stake in the Center LPs.  NHS created the Series LLCs to oversee the day-to-day operations of the Center LPs.  While the Series LLCs were created to "operate" the Center LPs, the management and administration of the Center LPs—the "nuts and bolts" of day-to-day operations—was entrusted to Neighbors Health (a Debtor entity).  Infinity, a member of the Series LLCs, was supposed to provide physicians to staff the emergency centers in exchange for a cut of the revenue generated by the "brick and mortar" centers.  Perhaps inevitably, this convoluted structure produced litigation over which entity or successor could sue for the alleged mismanagement of the Center LPs.

---

[4] Notably, the Center LPs were the tenants under the leases of the properties in which the emergency centers were located.  (*See* ECF No. 62-13; 62-14).

*Infinity Buys into Neighbors*

In 2014, four years before the Debtors entered bankruptcy, Infinity purchased 6500 Class B shares in the Series LLCs.  (ECF Nos. 59-9 at 1; 59-20 at 1).  These ownership interests were offered by NHS.  (ECF Nos. 59-9 at 1; 59-20 at 1).  Through its purchase, Infinity acquired a 65% interest in both Series LLCs.  (ECF Nos. 59-9 at 1; 59-20 at 1).  Both Series LLCs were created with the purpose of operating their corresponding free-standing emergency center.  (ECF Nos. 59-8 at 10; 59-19 at 10).

Infinity purchased its interest in the Series LLCs pursuant to two identical Series Purchase Agreements (individually, the "Purchase Agreement").  The Purchase Agreement reserved the profits and losses of each Emergency Center—which were operated by "NHS and its affiliates"— for the corresponding series owners.  (ECF Nos. 59-9 at 1; 59-20 at 1).  Under the Purchase Agreement, the organizational documents relating to Infinity's status as an owner of the Series LLCs had to contain certain provisions and requirements.  (ECF Nos. 59-9 at 3–4; 59-20 at 3–4).  One such provision required Infinity to provide clinical staffing for the Emergency Centers.  (ECF Nos. 59-9 at 4; 59-20 at 4).  However, the clinical staff members were to be employed as independent contractors of Neighbors Physician Group, PLLC, *not* as employees the Series LLCs or any other Neighbors Network affiliate.  (ECF Nos. 59-9 at 4; 59-20 at 4).  Finally, the Purchase Agreement contained a merger clause, explicitly noting that the Purchase Agreement, "the Operating Agreement and the Series Agreement supersede[d] all prior statements and communications of the parties."  (ECF Nos. 59-9 at 6; 59-20 at 6).

*Infinity's Interest in the Neighbors Network*

While the Purchase Agreement noted that Infinity held an interest in the reserved profits and losses from each emergency center, multiple agreements dictated how Infinity would come to realize those profits and losses.

## The Series Agreement

Infinity executed a Series Agreement for each Series LLC.  (*See* ECF Nos. 59-8; 59-19).[5] The Series Agreement described the basic structure of the Series LLCs and identified the property associated with each Series LLC.  Under the Series Agreement, Infinity acknowledged that the Series LLCs were created to operate the "Series Business[es]."  (ECF Nos. 59-8 at 1; 59-19 at 1). The Series Agreement made clear that the "Series Business[es]" were the Center LPs.  (ECF Nos. 59-8 at 1; 59-19 at 1).  The Series LLCs were to receive "profits, losses, distributions, and other benefits received by NHS" from the Center LPs.  (ECF Nos. 59-8 at 10; 59-19 at 10).  These "profits, losses, [etc.]" were identified as "Series Property."  (ECF Nos. 59-8 at 10; 59-19 at 10). Infinity was entitled to receive distributions derived from the Series Property.  (*See* ECF Nos. 59-8 at 6; 59-19 at 6).  The Series Agreement entrusted the responsibility of making these distributions to Neighbors Health, the manager of the Series LLCs.  (ECF Nos. 59-10 at 1; 59-8 at 4, 6, 9; 59-19 at 4, 6, 9).

## The Operating Agreement

Essentially, Infinity purchased a right to receive distributions of Series Property from the Series LLCs.  Along with the Series Agreement, the NHS Operating Agreement defines the Series Property from which Infinity was to receive distributions.

---

[5] Like the Purchase Agreements, the Series Agreements were substantially identical.  (*See* ECF Nos. 59-8; 59-19).

The Series LLCs were established by the NHS Operating Agreement.  (ECF No.  59-5 at 10).[6]  Under the Operating Agreement, NHS was authorized to acquire interests in Texas limited partnerships.  (ECF No. 59-5 at 12).  NHS was to "allocate or attribute" the "profits, losses, distributions, and allocations" from these limited partnerships to the Series LLCs.  (ECF No. 59-5 at 12).  Once received or "determined" by NHS, the "profits, losses, distributions, and allocations" from the limited partnerships were considered Series Property.  (ECF No. 59-5 at 12).  Hence, the "Series Property"— "the profits, losses, distributions, and other benefits received by NHS" from the Center LPs—was derived from the limited partnership interests allocated by NHS to the Series LLCs.  (*Compare* ECF No. 59-8 at 10 *with* ECF No. 59-5 at 12).[7]

<u>The Center Limited Partnership Agreement</u>

The limited partnerships in which NHS held interests were the Center LPs.  NHS was the Center LPs' sole limited partner.  Under the Center LP Limited Partnership Agreements, the "income, gain, loss, deduction, and credit of the Partnership[s]" were to be allocated 1% to Neighbors GP (as the Center LPs' General Partner) and 99% to NHS.  (ECF Nos. 59-24 at 10; 61-13 at 10).  Additionally, partnership revenues, which included all gross receipts of the partnership and received by the partnership, were to be distributed to Neighbors GP and NHS in accordance with their respective allocations.   (ECF Nos. 59-24 at 2, 10; 61-13 at 2, 10).  Based on the agreements, the Center LPs were the "Series Business[es]" from which NHS was supposed to receive the "profits, losses, distributions, and other benefits," which were to be distributed to the Series LLCs.  (*See* ECF No. 59-8 at 1, 10).

---

[6] The First Amendment to Operating Agreement established the Series LLCs.  (ECF 59-6 at 7).

[7] The Operating Agreement also identified any "proceeds derived from the business operation" as Series Property.  (ECF No. 59-5 at 12).  Based on the Operating Agreement, these "proceeds" seem to be separate from the Series Property derived from the "profits, losses, distributions, and other benefits received by NHS."  (*Compare* ECF No. 59-8 at 10 *with* ECF No. 59-5 at 12).

*Management of the Neighbors Network Entities*

The management and administration of the Center LPs, Series LLCs, and NHS entities was delegated to Neighbors Health.  (*See* ECF Nos. 59-10; 59-21; 62-12; 59-29; 62-24).  Each entity entered into a substantially identical Management and Administrative Services Agreement ("Management Agreement") with Neighbors Health.  (*See* ECF Nos. 59-10; 59-21; 62-12; 59-29; 62-24).  Essentially, the Management Agreement detailed the functions Neighbors Health would perform as manager of these entities.  (*See* ECF Nos. 59-10 at 1–3; 59-21 at 1–3).  Importantly, the Center LP, NHS, and Series LLC Management Agreements entrusted "cash management" to Neighbors Health.  (ECF Nos. 62-12 at 2; 59-29 at 2; 59-10 at 2; 62-10 at 2; 62-24 at 2). Specifically, Neighbors Health was charged with "maintain[ing] [the] bank accounts" of the Center LPs and Series LLCs.  (ECF Nos. 62-12 at 2; 59-29 at 2; 59-10 at 2; 62-10 at 2; 62-24 at 2).  To maintain these accounts, Neighbors Health was granted the "right to make deposits and withdraws from any [Center LP or Series LLC] bank account in connection with operations of the [Center LPs or Series LLCs]."  (ECF Nos. 62-12 at 2; 59-29 at 2; 59-10 at 2; 62-10 at 2; 62-24 at 2). Neighbors Health was not, however, authorized to "borrow money or execute any promissory notes" on behalf of the Center LPs, NHS, or the Series LLCs without consent.  (ECF Nos. 62-12 at 2; 59-29 at 2; 59-10 at 2; 62-10 at 2; 62-24 at 2).[8]

*Neighbors Holdings Files for Bankruptcy*

Four years after Infinity purchased its interests in the Series LLCs, Neighbors Holdings and certain of its affiliates filed for chapter 11 relief.  (*See* Case No. 18-33863, ECF No. 1).  Among

---

[8]In contrast, under the Series Agreement, NHS was authorized to "enter into credit, guaranty, or similar loan agreements."  (ECF Nos. 59-8 at 1; 59-19 at 1).  The Series LLCs' members, by executing the Series Agreement, consented to NHS encumbering Series Property "pursuant to the terms" of these loan agreements.  (ECF Nos. 59-8 at 1; 59-19 at 1).  And the Series LLCs' members expressly "waive[d] [their] right to challenge the making or enforceability of any guaranty by [NHS]."  (ECF Nos. 59-8 at 1; 59-19 at 1).

its affiliate debtors were the Center LPs, NHS, Neighbors GP, and Neighbors Physician Group. (Case No. 18-33836, ECF No. 5 at 1–9). However, Neighbors Investment was not among those entities seeking chapter 11 protection. Nor were the Series LLCs. This Court's Confirmation Order authorized the Creditor Trustee to pursue all causes of action retained by the Debtors' estates. (Case No. 18-33836, ECF No. 847 at 16).[9]

The Debtors' plan also created two trusts to facilitate the Debtors' wind down—the Unsecured Creditor Trust and the Liquidating Trust. (Case No. 18-33836, ECF No. 772 at 28–29). A trustee was appointed to manage each trust. (*See* Case No. 18-33836, ECF No. 772 at 29–31). Marc Shapiro was appointed as trustee of the Unsecured Creditor Trust. Tensie Axton was appointed as the Liquidating Trust's trustee. (Case No. 18-33836, ECF No. 802-1 at 7). The Unsecured Creditor Trust was formed to administer and distribute the Unsecured Trust Assets, which were primarily proceeds from the Debtors' retained causes of action. (Case No. 18-33836, ECF No. 772 at 19, 29). The Liquidating Trust was established to liquidate the Debtors' remaining assets. (Case No. 18-33836, ECF No. 772 at 12, 28). The Plan empowered the Liquidating Trustee, not the Creditor Trustee, to serve as the representative and *"sole manager"* of the remaining Debtor entities (the "Liquidating Debtors"). (Case No. 18-33836, ECF No. 772 at 34).

### *Infinity Sues Neighbors and its Officers and Directors*

Shortly before the Debtors entered bankruptcy, Infinity sued Neighbors Health, certain of its affiliates, and the Neighbors D&Os, in Texas state court. (ECF No. 1 at 2). Following the Debtors' bankruptcy filing, the Neighbors D&Os removed the lawsuit to this Court. (*See* ECF No. 1). Defendants filed Rule 12 motions, in which Infinity's standing was challenged. (*See* ECF Nos.

---

[9] A debtor's plan of reorganization may assign the estate's claims to another entity. *See, e.g., Floyd v. CIBC World Markets, Inc.*, 426 B.R. 622, 635 (S.D. Tex. 2009) (acknowledging that a debtor's plan assigned the estate's legal claims to the reorganized debtor entity).

23, 24, 27, 28, 31, 32, 35).  The Court denied the motions to dismiss to the extent they challenged Infinity's standing.  (ECF No. 48 at 47:2–14, 48:14–22, 53:16–54:10).  However, the parties were directed to proceed with discovery and summary judgment practice on the standing issue.  (ECF No. 48 at 47:2–14, 48:14–22, 53:16–54:10).  The parties filed cross-motions for summary judgment and various replies on the standing issue.  (ECF Nos. 59, 60, 61, 62, 68, 69, 70, 71, 73).

After the cross-motions and replies were filed, the Creditor Trustee appeared and asserted that some of Infinity's claims belonged to the Unsecured Creditor Trust.  (ECF No. 76 at 2).  The Court then authorized the Creditor Trustee and Infinity to file amended pleadings and, specifically, allowed the Creditor Trustee to engage in summary judgment practice.  (*See* ECF Nos. 76, 82, 80, 85, 88, 89).

### *Infinity's Fourth Amended Complaint*

After the Creditor Trustee proposed to intervene in this action, Infinity filed its Fourth Amended Complaint.  (*See* ECF No. 80).  Infinity asserts a "Derivative Claim of Breach of Fiduciary Duty, Negligent and Gross Mismanagement, and Abuse of Control."  (ECF No. 80 at 17).  This claim is predicated on Neighbors Health's and the Neighbors D&Os' "breaches of fiduciary duty [*sic*], abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as aiding and abetting of it . . . ."  (ECF No. 80 at 13).  Infinity complains of wrongs stemming from the Neighbors D&Os' alleged failure to "properly oversee the operations and finances of" the Series LLCs.  (ECF No. 80 at 14).  Infinity bases this derivative claim on Defendants' actions that caused:

- the Center LPs to enter into real property leases at above market rates;

- Series LLC funds to be held in Center LP accounts;

- limited partner shares of the Center LPs to be wrongly collateralized;

- fees billed by the Center LPs to be held in Center LP accounts and never "pushed back" to the Series LLCs;

- physician fees billed by the Neighbors Physician Group to be held and distributed to entities other than the Series LLCs; and

- Series LLC funds to be transferred to other "unprofitable series entities."

(ECF No. 80 at 17–18). According to Infinity, these actions resulted in the Series LLCs suffering losses of revenue and profit. (ECF No. 80 at 19). Infinity concedes it holds this claim derivatively, but argues the claim is brought on behalf of the Series LLCs, non-debtor entities. (ECF No. 80 at 13–17).[10] Infinity's standing to assert this derivative claim is in dispute.

The Creditor Trustee, as did Defendants before him, argues that these claims are derivative claims vested in the Debtors' estates, to which the Unsecured Creditor Trust succeeded. (ECF No. 88 at 3 n.1, 5–9). Infinity responds that it owns these claims because the Series LLCs owned the Center LPs' business operations. (*See, e.g.,* ECF No. 89 at 9–12). This ownership, Infinity contends, gives it the right to assert derivative claims on behalf of the Series LLCs because it was the Series LLCs that suffered harm, not the debtor Center LPs. (*See* ECF Nos. 28 at 11; 89 at 9–

---

[10] Infinity also pleads a "Derivative Claim for Breach of Contract" based on Defendants' alleged breach of the Management Agreement between the Series LLCs and Neighbors Health. (ECF No. 80 at 19). Because the Series LLCs are non-debtor entities, derivative claims based on contractual breaches between the Series LLCs and Neighbors Health would not be considered property of the estate. *Cf. In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007) ("If the debtor could have raised these claims at the commencement of its case—that is, in these particular circumstances, if the claims are derivative to the corporation—the claims will belong to the estate."). Nevertheless, Infinity still must demonstrate its statutory standing to assert this claim. *See* Tex. Bus. Orgs. Code Ann. § 101.463(b) (West 2019). As set forth above, the Liquidating Trustee is now the manager of the Series LLCs. No party to the adversary proceedings has alleged any lack of independence by the Liquidating Trustee.

Additionally, Infinity alleges a "Direct Claim for Negligence and Gross Negligence." (ECF No. 80 at 20). Defendants initially argued this claim was, in fact, a derivative claim vested in the Debtors' estates. (ECF No. 24 at 20–22). Defendants, and now the Creditor Trustee, appear to have abandoned this argument. (*See generally* ECF Nos. 62, 88). Given Defendants' and the Creditor Trustee's abandonment and, based on Infinity's allegations and summary judgment evidence, Infinity has at least an "arguable" basis to assert its negligence claim. *See Broyles*, 936 F.3d at 326 (requiring a plaintiff, in response to a summary judgment challenge to its standing, demonstrate an "arguable" basis for standing).

12).  Essentially, Infinity and the Creditor Trustee disagree over which entities—the Center LPs

or the Series LLCs—suffered the harm alleged in their respective complaints.

After extensive briefing and multiple oral arguments addressing the standing question, the

Court took the matter under advisement.  This Memorandum Opinion resolves the narrow dispute

over Infinity's standing.

## JURISDICTION

The District Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.  This

is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).  Pursuant to 28 U.S.C. § 157(a),

this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  FED. R. BANK P. 7056 incorporates FED. R. CIV. P. 56 in adversary proceedings.

A party seeking summary judgment must demonstrate the absence of a genuine dispute of material

fact by establishing an absence of evidence supporting an essential element of the non-movant's

case.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).  A genuine dispute

of material fact is one that could affect the outcome of the action or allow a reasonable fact finder

to find in favor of the non-moving party.  *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165,

170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court always views the facts and evidence in light most favorable to the non-moving

party.  *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).  Nevertheless, the court is not obligated to

search the record for the non-moving party's evidence.  *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d

239, 249 (5th Cir. 2012).  "Summary judgment may not be thwarted by conclusional [*sic*]

allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co*., 805 F.3d 535, 538 (5th Cir. 2015).

A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact.  FED. R. CIV. P. 56(c)(1).  The Court need only consider the cited materials, but it may consider other materials in the record.  FED. R. CIV. P. 56(c)(3).  The Court should not weigh the evidence.  *Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996).  A credibility determination may not be part of the summary judgment analysis.  *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).  However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  FED. R. CIV. P. 56(c)(2).

"The moving party bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact."  *Nola Spice Designs, L.L.C. v. Haydel Enter., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).  The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

In cases involving contract interpretation, summary judgment is only appropriate where the language of the contract is unambiguous.  *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d. Cir. 1996); *Cooper Indus., LLC v. Precision Castparts Corp*., 2016 WL 4939565, at *6 (S.D. Tex. Sept. 14, 2016).

When a plaintiff's standing is challenged on summary judgment, the plaintiff must offer evidence demonstrating that a "genuine issue of fact exists on the standing issue." *Association of*

*Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) (quoting *Cramer v. Skinner*, 931 F.2d 1020, 1025 (5th Cir. 1991)). Showing the existence of a genuine issue of fact on standing requires the plaintiff to point to evidence that shows it was "directly affected" by the alleged harm. *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992)). The plaintiff need not establish the validity of the plaintiff's standing, rather the plaintiff must demonstrate it has a "arguable" basis for standing. *Broyles v. Commonwealth Advisors, Inc.*, 936 F.3d 324, 326 (5th Cir. 2019) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). If, after the plaintiff has submitted its summary judgment evidence, the defendant has not shown that the plaintiff's allegations are a "sham," the plaintiff is entitled to a trial on the merits, where the plaintiff must prove its allegations. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987).

## ANALYSIS

Infinity and the Creditor Trustee fundamentally disagree over which entity suffered the harm alleged in Infinity's complaint. In reality, a deeper dispute divides the parties: which entity owned the profits that were diminished by Defendants' alleged mismanagement. Infinity claims that the non-debtor Series LLCs owned the business operations of the emergency centers; thus, it was the Series LLCs' profits that were impaired by Defendants' mismanagement and neglect. The Creditor Trustee contends the Center LPs associated with the emergency centers owned the centers' operations. Based on the Trustee's position, the Center LPs would have suffered the loss of profits resulting from damaged business operations; thereby, vesting claims for redress in the debtor Center LPs. Despite their chasmic disagreement, both parties contend their respective positions are correct beyond material dispute.

One principal is clear.  A claim for lost profits must be brought, directly or derivatively, by the entity sufferings the loss of profits.  *See Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990). An entity with an interest in the profits of another entity may not bring a suit on its own account. *See Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 360 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *Hall v. Douglas*, 380 S.W.3d 860, 873–74 (Tex. App.—Dallas 2012, no pet.)) ("[A] limited partner does not have standing to sue for injuries to the partnership that merely diminish the value of partnership interests or a share of partnership income . . . ."); *Goeth v. Craig, Terrill & Hale, L.L.P.*, 03-03-00125-CV, 2005 WL 850349, at *5 (Tex. App.—Austin Apr. 14, 2005, no pet.) (citing *Eye Site, Inc. v. Blackburn,* 796 S.W.2d 160, 161 (Tex. 1990) ("[A shareholder lacks standing] even where the wrong has depreciated the value of the shareholder's investment in the corporation, impaired or destroyed its business, or otherwise harmed the shareholder.")); *see also, e.g., In re Educators Grp. Health Tr.*, 25 F.3d 1281, 1285 (5th Cir. 1994) (holding that trust beneficiaries lacked standing to assert claims based on injury to the trust).

Generally, shareholder derivative standing arises from injury to a business entity's operations or property.  Within the Neighbors Network's convoluted corporate structure, revenue (*i.e.,* corporate property) from the emergency centers funded distributions to the Series LLCs (but only after the emergency centers deducted expenses).  Infinity would have been entitled to the bulk of any distributable funds.  However, Infinity bases its derivative claim, in part, on damage inflicted on revenue, which, at the time the damage was inflicted, was owned by Debtor entities and managed by Neighbors Health.  Nevertheless, Infinity may have the right to assert derivative claims based on harm inflicted by the Series LLCs' managers on Series Property.  Yet Infinity's Fourth Amended Complaint fails to plead viable derivative claims based on Neighbors Health's mismanagement.

## I.   THE DEBTORS' RIGHT TO ASSERT DERIVATIVE CLAIMS

Infinity's standing to assert the derivative claim alleged in its complaint turns on whether the alleged claim belongs to the Debtors' estates.  Whether a claim belongs to a bankruptcy estate is a question of law.  *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 583 (5th Cir. 2008) (citing *Educators Grp. Health*, 25 F.3d at 1285).  Derivative claims that could have been asserted prepetition by the debtor (or the debtor's owners) belong to the bankruptcy estate.  *Educators Grp. Health*, 25 F.3d at 1284.  State law dictates whether a claim could have been asserted prepetition. *Id.*  In Texas, claims arising from damage to an entity's property or business operations belong to the entity.  *Wingate*, 795 S.W.2d at 719 (quoting *Massachusetts v. Davis,* 168 S.W.2d 216, 221 (Tex. 1942)).

Individual owners or shareholders do not have standing seek redress for damage to business operations or property directly.  *Id.*  (quoting *Davis,* 168 S.W.2d at 221).  A loss of share value alone does not imbue a shareholder with standing because the shareholder has not suffered a direct injury.  *Floyd*, 426 B.R. at 635 (quoting *Educators Grp. Health*, 25 F.3d at 1284).  Rather, a shareholder is only indirectly injured when the value of its equity interest is reduced because of damage to the entity in which the interest is held.  *See Educators Grp. Health,* 25 F.3d at 1284–86 (classifying the harm suffered by trust claimants, whose claims could not be paid due to the trust's insolvency, which resulted from mismanagement, as claims for indirect harm).  Where an entity has suffered a direct injury, that entity has the right to seek redress for the harm inflicted, while the entity's shareholders may (at the most) pursue redress for the harm derivatively on behalf of the entity.  *Neff v. Brady*, 527 S.W.3d 511, 521 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quoting *Webre v. Sneed*, 358 S.W.3d 322, 329–30 (Tex. App.—Houston [1st Dist.] 2011), *aff'd*, 465 S.W.3d 169 (Tex. 2015) ("[T]o recover for wrongs done to the corporation, the shareholder

must bring the suit derivatively in the name of the corporation so that each shareholder will be made whole if the corporation obtains compensation from the wrongdoer." (internal quotation marks omitted)).

In bankruptcy, however, all claims arising from harm inflicted on the debtor are vested in the bankruptcy estate.  When a bankruptcy case is commenced, claims held by the pre-petition debtor become estate property.  11 U.S.C. § 541(a) (2020).  An entity that might have had the ability to bring a derivative claim on behalf of the pre-petition debtor is no longer empowered to bring the derivative claim.  *Educators Grp. Health*, 25 F.3d at 1284.  Instead, the estate (acting through a trustee or another estate representative) must bring the claims on behalf of the estate.  *In re Black Elk Energy Offshore Operations, LLC*, 15-34287, 2016 WL 4055044, at *2 (Bankr. S.D. Tex. July 26, 2016).  Such claims are vested in the estate because their successful prosecution results in a benefit to the estate, which in turn benefits all creditors.  *Id.*  Allowing the trustee (or debtor-in-possession), rather than creditors, to pursue claims based on harm suffered by a Debtor entity ensures that the estate's distribution will remain orderly.  *Id.*

The parties disagree over whether Debtors or non-debtors suffered the complained of harm. Ownership of the damaged property dictates the answer to this dispute.  *See Wingate*, 795 S.W.2d at 719; *see also Swank v. Cunningham*, 258 S.W.3d 647, 661 (Tex. App.—Eastland 2008, pet. denied) (quoting PRINCIPLES OF CORP. GOVERNANCE: ANALYSIS AND RECOMMENDATION § 7.01 cmt. c (AM. LAW. INST. 2005) ("[A] wrongful act that depletes corporate assets and thereby injures shareholders only indirectly, by reason of the prior injury to the corporation, should be seen as derivative in character.").  In large part, the property allegedly damaged is revenue generated by the Center LPs.

## II.   INFINITY'S STANDING

A web of agreements defines what the Series LLCs owned.  However, the parties disagree over the meaning of these agreements.  Infinity contends the agreements clearly establish that the Series LLCs owned the emergency centers' business operations, and, by implication, owned the profits from those business operations.  The Creditor Trustee argues that the Series LLCs only had an interest in distributions from Center LP profits.  The agreements make clear that certain property identified in Infinity's complaint was, at the time it was damaged, owned by Debtor entities.  Because this alleged damage occurred while the property was owned by Debtor entities, the Trustee is vested with the exclusive right to seek redress for this damage.

Dispute over the meaning of an agreement is resolved by determining what the agreement was intended to mean.  *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763–64 (Tex. 2018) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)).  When an agreement spans multiple documents, those documents are read together to discern the parties' intent.  *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (citing *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex.1984)).  The words of the agreement are presumed to represent that intent.  *URI, Inc.*, 543 S.W.3d at 764 (quoting *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010)).  An agreement must be considered in its entirety to ensure the contract is enforced as the parties intended.  *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) (citing *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex. 1987)).  Parol evidence cannot be used to aid the interpretation of an agreement unless the agreement is ambiguous as a matter of law.  *Charles R. Tips Family Tr. v. PB Com. LLC*, 459 S.W.3d 147, 153 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (citing *Pitts*

*& Collard, L.L.P. v. Schechter,* 369 S.W.3d 301, 313 (Tex. App.—Houston [1st Dist.] 2011, no

pet.)).

### A.     The Pleaded Bases on Which Infinity Does Not Have Derivative Standing

Infinity's standing necessarily depends on the ownership of the allegedly damaged

property.  The agreements between Infinity and the Neighbors Network establish ownership of

certain property Infinity contends was damaged.  To establish its derivative standing, Infinity had

to demonstrate that it seeks to redress harm Defendants inflicted on Series LLC property or

operations *while Defendants were managing the Series LLCs*.  *See Black Elk Energy*, 2016 WL

4055044, at *2 (confirming that derivative claims are vested in the estate if they are based on harm

to a debtor entity).  That is, if Defendants' mismanagement damaged the Center LPs' or NHS's

property, thereby reducing the Series LLCs' distributions, Infinity would not have standing to seek

redress because Defendants harmed Debtor entities.  *See Educators Grp. Health,* 25 F.3d at 1284–

86 (explaining that an entity harmed indirectly, through harm inflicted on an entity in which it has

an interest, does not hold a direct claim for relief based on the direct harm).

Infinity does not have standing to seek redress for lost profits or revenues that were

damaged in the Center LPs.  Specifically, Infinity does not have standing to seek redress for

Defendants' actions that caused: (1) the Center LPs to enter into real property leases at above

market rates; (2) Series LLC funds to be held in Center LP accounts; and (3) fees billed by the

Center LPs to be held in Center LP accounts and never "pushed back" to the Series LLCs.  These

harms were suffered by Debtor entities directly, meaning that claims for their redress belong to the

estate.

1.    Infinity's Ownership Interest Under the Agreements

The agreements defining Infinity's relationship with the Neighbors Network demonstrate the indirect nature of the injuries suffered by the Series LLCs.  In reality, Infinity purchased a right to receive a cut of the revenue generated by the Neighbors Network's provision of healthcare services to patients. This reality is reflected in the Purchase Agreement, which provides: "the profits and losses of the Emergency Center are reserved for the owners of the Series."  (ECF No. 59-9 at 1).  The Purchase Agreement defines the "Emergency Center[s]" as the "free-standing emergency center[s] known as [the Center LPs]." (ECF No. 59-9 at 1).  According to the Purchase Agreement, the "profits and losses" of the Center LPs were reserved, in part, for Infinity, a Series member.[11]

Infinity's cut of the Center LPs' "profits and losses" was distributed to Infinity through the Series LLCs.  The Series Agreement required the Series Manager—Neighbors Health—to "distribute to the Members the amount by which *cash on hand* exceed[ed] the amount necessary or appropriate to meet current costs, expenses, and liabilities of the Series . . . ."  (ECF No. 59-8 at 6, 9 (emphasis added)).  The "*Profit and Loss of the Series* [was also to] be allocated to the Members in their Sharing Ratios."  (ECF No. 59-8 at 15 (emphasis added)).  Additionally, the Series Agreements required the Series LLCs to "make distributions of *operating profits*, at such times and intervals as . . . reasonably determined by [Neighbors Health]," to the Members (*i.e.,* Infinity).  (ECF No. 59-8 at 16 (emphasis added)).  The Series Agreement makes clear that Infinity's distributions were derived from the Series LLCs' "cash on hand," "Profit and Loss," and "operating profits."

---

[11] Neighbors Investing, as the Class A Series member, also had a right to receive distributions from the reserved "profits and losses" of the Center LPs.  (*See* ECF No. 59-9 at 1).

The "cash on hand," "Profit and Loss," and "operating profits" distributed by the Series LLCs were, at least in part, derived from Series LLC property. The Series Agreement specifically attributed to the Series LLCs "[Series Property consisting of] the profits, losses, distributions, and other benefits received by [NHS] from the Series Business[es]." (ECF No. 59-8 at 10). The Center LPs were the Series Businesses from which NHS was receiving "profits, losses, distributions, and other benefits." (ECF No. 59-8 at 1, 10). Importantly, this "Series Property" is the only source of the Series LLCs' "cash on hand," "Profit and Loss," and "operating profits" identified in the Series Agreement. That is, based on the Series Agreement, the only apparent source of the funds the Series LLCs could have distributed to Infinity were the "profits, losses, distributions, and other benefits received by [NHS] from the [Center LPs]." (ECF No. 59-8 at 10).

Notwithstanding the reference to "Profit and Loss" and "operating profits," nothing in the Series Agreement explains how the Series LLCs would generate "Profit and Loss" or "operating profits" independent of the "Series Property" (*i.e.,* property that originated as Center LP revenue). This observation is undisturbed even though the Series LLCs were purportedly established to operate "free standing emergency center[s] known as the [corresponding Center LP]." (ECF No. 59-8 at 1). Nothing in the Series Agreement grants the Series LLCs a property interest in the revenue[12] generated by the Center LPs. Instead, the only Series LLC property interest identified in the Series Agreement is the "Series Property." This is not to say that the Series LLCs did not

---

[12] Notably, the Series Agreement references the property interest the Series LLCs had in the "profits [and] losses" of the Center LPs, not the revenue of the Center LPs. *Compare Profit,* BLACK'S LAW DICTIONARY (11th ed. 2019) ("The excess of revenues over expenditures in a business transaction."), and *Net Loss,* BLACK'S LAW DICTIONARY (11th ed. 2019) ("The excess of all expenses and losses over all revenues and gains."), *with Revenue,* BLACK'S LAW DICTIONARY (11th ed. 2019) ("Income from any and all sources; gross income or gross receipts."); *see also Kachina Pipeline Co., Inc. v. Lillis,* 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Dynegy Midstream Services, Ltd. P'ship v. Apache Corp.,* 294 S.W.3d 164, 168 (Tex. 2009)) ("We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." (internal quotation marks omitted)). Nothing in the Series Agreement granted the Series LLCs ownership of the money patients paid to the Center LPs for healthcare serviced rendered (*i.e.,* the Center LPs' revenue). Instead, the Series LLCs had an interest in net funds derived from the Center LPs' revenue, which was distributed to NHS.

have operations that generated independent "Profit and Loss" or "operating profits."  However, the Series Agreement contains no provision suggesting the Series LLCs independently generated revenue.[13]

The Operating Agreement confirms that the source of the "Series Property" was an interest in the net profits of the Center LPs, not a direct interest in the Center revenues.  The Operating Agreement authorized NHS to:

> *acquire in its name from time to time limited partnership interests in one or more Texas limited partnerships* and such limited partnership interests . . . shall . . . be held by [NHS], *provided that, [NHS] shall allocate or attribute to one or more Series the profits, losses, distributions, and allocations associated with such limited partnership interests* if and when determined or received . . . , and such profits, losses, distributions, and allocations shall, when determined or received (as applicable), be the Series Property of such series.

(ECF No. 59-5 at 12).  The relevant limited partnerships in which NHS acquired interests were the Center LPs.  Under their Limited Partnership Agreements, the Center LPs were to allocate "all items of income, gain, loss, deduction, and credit . . . among the Partners" in accordance with the Partners' interests.  (ECF No. 61-13 at 10).  The Center LPs were also to distribute the Center LPs' revenues to the Partners, but only after the Center LPs made required overhead payments.  (ECF

---

[13] The Operating Agreement also suggests that the Series LLCs *may* have had an independent means of generating revenue.  Unlike the Series Agreement, which references funds derived from the "Series Business[es]," the Operating Agreement identifies "proceeds derived from the business operation" as "Series Property."  (ECF No. 59-5 at 12).  The Operating Agreement also incorporates the definition of "Series Property" from the Series Agreement by noting that "Series Property" is made up of "all real, personal, and intangible property owned by any Series of the Company.  The Series Property initially allocated to each Series shall be listed in the Separate Series agreement for such Series."  (ECF No. 59-5 at 9).  Essentially, the Series Agreement expressly allocated "the profits, losses, distributions, and other benefits received by [NHS] from the [Center LPs]" to the Series LLCs.  (ECF No. 59-8 at 10).  The Operating Agreement then appears to expand on the definition by incorporating the "Series Property" identified the Series Agreement, plus any "proceeds derived [not from the 'Series Business[es],' but from] the business operation."  (*Compare* ECF No. 59-5 at 9, 12 *with* ECF No. 59-8 at 10).  While the use of different terms suggests the Series LLCs may have been authorized to have revenue-generating business operations independent of the Center LPs revenue streams, the Operating Agreement does not clarify how the Series LLCs would have generated that revenue.

No. 61-13 at 10).[14] NHS was to receive 99% of the partnership allocations and distributions.  (ECF No. 61-13 at 10).  The distributions and allocations received by NHS were "the profits, losses, distributions, and allocations associated with such limited partnership interests" NHS was to allocate to the Series LLCs pursuant to the Operating Agreement.  (ECF No. 59-5 at 12).  Consistent with the definition of "Series Property" in the Series Agreement, the Operating Agreement and Limited Partnership Agreement confirm that the Series LLCs did not have an interest the Center LPs' revenues.  Instead, the Series LLCs' interests were in whatever was left *after* the Center LPs covered their overhead and operating expenses from the revenues they generated.

2.    Infinity's Allegations Regarding Center LP Revenue

By alleging that Defendants' actions damaged profits derived from revenues generated by the Center LPs, Infinity alleges indirect harm to the Series LLCs.  For instance, Infinity alleges that Defendants' injured the Series LLCs by "entering into leases of real property for the [Center LPs] at above market rates."  (ECF No. at 80 at 17).  Infinity claims that Defendants' entry into these leases led the Series LLCs to lose revenue and profits.  Yet, based on the agreements defining the entities' relationships, entry into above-market leases would have only had an indirect effect on the Series LLCs' profits and revenues.  The Center LPs were the tenants responsible for paying the allegedly above-market rent under the leases.  (*See* ECF Nos. 62-13 at 14).  The Limited Partnership Agreement makes clear that the Center LPs' revenues were to be used to pay rent before any distributions were made to NHS.  Because Center LP revenues were used to pay rent,

---

[14] The Limited Partnership Agreement expressly defined Center LP "Revenues" as "all Partnership gross receipts, all gross receipts received by the Partnership, and the reduction of any reserves if such reduction is approved by the General Partner."  (ECF No. 59-24 at 2).  Notably, revenues were only distributed to NHS after the Center LPs used the revenues to make "Required Payments."  (ECF No. 59-24 at 10).  "Required Payments" was defined as including "all amounts payable with respect to operating expenses and capital costs of the Partnership on behalf of the Partnership . . . ."  (ECF No. 59-24 at 10).

it is the Center LPs' profits that would have been impacted directly.  In contrast, NHS, and by extension the Series LLCs, would have suffered indirect injuries through reduced distributions.

This harm is analogous to the indirect harm identified in *Educators Group Health Trust*, 25 F.3d 1281.  The plaintiffs in *Educators Group Health*, seven school districts, sued the managers of the Educators Group Health Trust, alleging mismanagement of the trust.  *Id.* at 1283.  The alleged mismanagement caused the trust to become insolvent, thereby depriving the plaintiffs of trust benefits.  *Id.*  Infinity complains of the same type of harm.

Infinity contends that Defendants' mismanaged *the Center LPs* by entering above-market leases, thereby increasing the Center LPs' operating expenses, which reduced distributions to the Series LLCs.  As explained above, Infinity's claim is a claim against "net" profits.  Accordingly, this reduction in distributions is an indirect harm.  *See, e.g., id.* at 1284–86 (concluding that trust beneficiaries complained of a harm that affected them indirectly—the trust's inability to satisfy the beneficiaries' claims due to the trust's insolvency); *accord Swank*, 258 S.W.3d at 661 ("[A] wrongful act that depletes corporate assets and thereby injures shareholders only indirectly . . . ." (internal quotation marks omitted)); *Siddiqui*, 504 S.W.3d at 360 (recognizing that a limited partner has no direct right to action based on a diminution in the partner's share of the partnership income).  By alleging that Defendants' actions led to the mismanagement of the Debtor-Center LPs, Infinity attempts to assert a claim based on harm inflicted on the Center LPs directly.  *Cf. Educators Grp. Health*, 25 F.3d at 1284 ("Several of the causes of action allege a direct injury to the debtor . . . For example, the plaintiffs school districts allege . . . that the defendants negligently managed the [debtor entity] . . . .").  Claims based on such harm are vested in the Debtors' estates.  *See id.* at 1286 (holding that claims based on injuries that are derived from a direct injury to the estate "belong solely to the estate"); *accord Siddiqui*, 504 S.W.3d at 360.

Similarly, Infinity complains of indirect harm to the Series LLCs by alleging that Defendants failed to route the Series LLCs' share of Center LP revenue to the Series LLCs. Specifically, Infinity alleges that Defendants (1) caused Series LLC funds to be held in Center LP accounts, and (2) caused fees billed by the Center LPs to be held in Center LP accounts and never "pushed back" to the Series LLCs. Like the plaintiffs in *Educators Group Health*, Infinity complains that Defendants' deprived the Series LLCs of their property interests in profits generated by the Center LPs. *Cf. id.* at 1284–85 ("For example, the plaintiffs school districts allege. . . that the defendants negligently managed [the debtor-trust], causing [the debtor-trust] to become insolvent and thus unable to pay the claims of employees of the plaintiff school districts."). However, just as the trust beneficiaries' rights to receive trust benefits did not confer direct standing on the beneficiaries, the Series LLCs' right to distributions of Center LP revenue does not confer direct, post-petition standing on the Series LLCs. *See id.* at 1286 (explaining that claims based on direct harm to a debtor entity are vested in the bankruptcy estate). Instead, Infinity's allegations identified harm suffered by the Center LPs directly.

The Agreements confirm that Infinity complains of injuries suffered by the Series LLCs indirectly. The Limited Partnership Agreement acknowledges that the Center LPs had revenues comprised of their gross receipts. These revenues were to first be used to pay the Center LPs' operating expenses, then the remainder of the revenue was distributed to the partners—including NHS. Under the Operating Agreement, NHS was then to allocate whatever it received from the Center LPs to the Series LLCs. Infinity alleges that Defendants failed to distribute the Series LLCs' full share of Center LP revenue as required by the Limited Partnership Agreement and Operating Agreement. By complaining that Series LLC funds never left the Center LPs, Infinity alleges that Defendants' failure occurred while Defendants were managing the Center LPs, not the

Series LLCs.[15]   Consequently, it was the Center LPs that suffered from Defendants' failings directly, while the Series LLCs only suffered indirectly through a reduction in their distributions. Infinity does not have standing to seek redress for these harms on behalf of the Series LLCs because the Series LLCs' own standing to pursue relief is derived from an injury to Debtor entities. *See id.* at 1284 ("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor) . . . then the cause of action belongs to the estate.").

In sum, Infinity's derivative claim of fiduciary breach, mismanagement, and abuse of control is partially based on harm Defendants inflicted on the Debtors—specifically, the Center LPs.  The Unsecured Creditor Trust, as successor to the claims of the Debtors' estates, is the proper party to seek redress for these harms.  *Black Elk Energy*, 2016 WL 4055044, at *2.  The Unsecured Creditor Trust may properly pursue the claim because the claim's successful prosecution will benefit all Center LP creditors.  *See Educators Grp. Health*, 25 F.3d at 1285 ("general harm to creditors *necessarily follows* from the fact that the debtor has been injured." (emphasis in original)); *see also Black Elk Energy*, 2016 WL 4055044, at *2 ("In bankruptcy, it is the estate's fiduciary (ordinarily, a trustee or debtor-in-possession) that pursues derivative claims for the benefit of the estate.  This procedure ensures that interests are aligned to reflect the priority scheme established by the Bankruptcy Code.").  Recovery from the successful prosecution of such a claim could be used to satisfy the claims of all Center LP creditors and equity owners, not just the Series LLCs.  *See Black Elk Energy*, 2016 WL 4055044, at *2 (explaining that claims belonging to the estate must be prosecuted in a way that maximizes the estate's recovery and ensures "an appropriate water fall distribution . . . between holders of claims and owners of a company").

---

[15] Defendants were charged with managing the Center LPs' bank accounts in connection with Center LP operations.  (*See* ECF No. 61-14 at 3).

3.    Infinity's Beneficial Interest Does Not Give Infinity Standing

Infinity's interest in property held by NHS does not give Infinity standing to pursue its claim for fiduciary breach, mismanagement, and abuse of control.  (*See* ECF No. 92).  While the Operating Agreement expressly grants Infinity a beneficial interest in "Series Property" held by NHS,[16]  it is beyond dispute that NHS held "Series Property" for all the series entities in the Neighbors Network.  Allowing Infinity to assert direct claims based on its interest would produce an inequitable result.  *Cf. In re Contractor Tech., Ltd.*, 343 B.R. 573, 585 (Bankr. S.D. Tex. 2006) (explaining that it would be inequitable to deprive some trust claimants of benefits to which they were entitled because other trust claimants received payments before those claimants who were deprived).  If allowed to proceed, Infinity's successful prosecution of the claim would almost certainly reduce funds that would otherwise be available to pay other series' members with similar beneficial interests.  Allowing the Creditor Trustee to instead pursue the claims will ensure an orderly distribution of the NHS's bankruptcy estate.  *See Black Elk Energy*, 2016 WL 4055044, at *2 ("In bankruptcy, it is the [trustee] that pursues derivative claims for the benefit of the estate. This procedure ensures that interests are aligned to reflect the priority scheme established by the Bankruptcy Code.").

Based on Infinity's allegations and the parties' summary judgment evidence, Infinity's lack of standing to assert a derivative claim based on the following alleged harms cannot be genuinely disputed: (1) the Center LPs' entry into above-market-rate lease; (2) the Center LPs' holding of Series LLC funds in Center LP accounts; and (3) the failure to forward facilities fees billed by the Center LPs to the Series LLCs.  *See Fowler*, 178 F.3d at 357 (quoting *Cramer*, 931 F.2d at 1025) ("When the defendant moves for summary judgment because of lack of standing, however, the

---

[16] The Operating Agreement provides that "Series Property . . . held by [NHS] shall be held by [NHS] and the Manager in trust for the benefit of the Series Members." (ECF No. 59-5 at 12).

plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact

exists on the standing issue." (internal quotation marks omitted)).  These allegations identify harm

inflicted on Debtor entities.  The Creditor Trustee is proper party to seeks redress for these alleged

harms.  *Educators Grp. Health*, 25 F.3d at 1284.

### B.    Infinity's Insufficiently Pleaded Bases for Derivative Standing

It is unclear whether Infinity pleads a viable derivative claim for fiduciary breach,

mismanagement, and abuse of control based on the three remaining alleged harms: (1) Defendants

caused physician fees billed by the Neighbors Physician Group to be held and distributed to entities

other than the Series LLCs; (2) Defendants caused Series LLC funds to be transferred to other

"unprofitable series entities;" and (3) Defendants caused limited partner shares of the Center LPs

to be wrongly collateralized.  These allegations do not identify a direct harm to the Series LLCs.

### 1.    Infinity's Pleading Lacks a Redressable Injury

First, Infinity claims Defendants' actions caused "physician fees billed by the Neighbors

Physician Group" to be held and distributed to entities other than the Series LLCs.  (ECF No. 80

at 18).  By this allegation, Infinity complains that the Series LLCs did not receive a full distribution

of funds to which they were entitled.  However, to state a viable claim for relief, Infinity had to

establish that the Series LLCs directly suffered the harm on which Infinity based its derivative

claim.  *See Educators Grp. Health*, 25 F.3d at 1284–86 (holding that an estate creditor has standing

to assert claims based on harms inflicted directly on the creditor, but lacks standing to assert claims

based on indirect harm derived from harm inflicted on a debtor); *see also Fowler*, 178 F.3d at 357

(recognizing that it is the plaintiff's burden to demonstrate standing on summary judgment).

Nothing in the summary judgment evidence establishes that the Series LLCs had a direct

ownership interest or property right in the "physician fees billed by Neighbors Physician Group."

*See Wingate*, 795 S.W.2d at 719 (recognizing that claims based on damage to an entity's corporate property or business operations belong to the entity).   Without evidence of an ownership or property interest, the validity of Infinity's derivative claim based on this harm cannot determined.

Second, Infinity alleges Defendants caused Series LLC funds to be transferred to other "unprofitable series entities."  Again, it was Infinity's burden to demonstrate that the Series LLCs suffered a direct injury from the harm alleged for which Infinity could derivatively seek redress. *See Educators Grp. Health*, 25 F.3d at 1284–86; *see also Fowler*, 178 F.3d at 357.   And again, nothing in the summary judgment evidence establishes Series LLC property or operations were damaged.  Specifically, Infinity complains that Defendants transferred Series LLC funds to other entities, but Infinity does not clarify whether the Series LLCs had a direct ownership interest or property right in these funds.  *See Wingate*, 795 S.W.2d at 719.  Because Infinity does not identify whether the Series LLCs had a property right in the funds Defendants allegedly transferred to "unprofitable series entities," the validity of a claim based on this harm cannot be determined.

Nevertheless, Infinity *may* have standing to assert a derivative claim on behalf of the Series LLCs to redress any (1) wrongful withholding and transfer of fees billed by Neighbors Physician Group, and (2) the wrongful transfer of funds to "unprofitable series entities."  If the fees billed by the Neighbors Physician Group were Series LLC property upon receipt by Neighbors Physician Group, Defendants' improper withholding or transfer of those fees would be a direct injury to the Series LLCs.  *See Ritchie v. Rupe*, 443 S.W.3d 856, 887 (Tex. 2014) (recognizing that a corporation can bring a direct claim for fiduciary breach based on management's misappropriation or wrongful diversion of corporate funds).  If, however, these physicians' fees, like the facilities fees billed by the Center LPs, belonged to a Debtor entity[17] and the Series LLCs only had a right

---

[17] Such as Neighbors Physician Group itself.  (*See* Case No. 18-33836, ECF No. 5 at 1–9).

to receive distributions from the fees, Infinity would not have standing to seek redress. Although this remains a possibility, it is *not* possible to determine from Infinity's complaint whether the Series LLCs actually owned the physicians fees.

Similarly, the Series LLCs would not have suffered a direct injury, and Infinity could not assert a derivative claim, if the Series LLCs did not own the funds Infinity alleges were wrongfully transferred. *See Wingate*, 795 S.W.2d at 719 (quoting *Davis*, 168 S.W.2d at 221) ("[T]he cause of action for injury to the property of a corporation, or the impairment or destruction of its business, is vested in the corporation.").[18] Yet the Series LLCs would have direct standing, and Infinity would have derivative standing, if the wrongfully transferred funds were Series LLC property (*e.g.*, money distributed to the Series LLCs that was then transferred away from the Series LLCs by Neighbors Health).[19]

Infinity must amend its Complaint to more definitely allege the harms on which its derivative claim of fiduciary breach, mismanagement, and abuse of control is based. *See* FED. R. CIV. P. 12(e).[20]

### 2.   Infinity's Pleading Insufficiently Identifies the Cause of Harm

Finally, Infinity complains that Defendants falsely claimed that NHS owned Center LP shares that were actually owned by the Series LLCs. This falsehood, Infinity alleges, caused these shares to be "wrongly collateralized." However, Infinity fails to specify whether Defendants were

---

[18] For example, if Defendants caused NHS to only distribute the funds it received from the Neighbors Network limited partnerships to the unprofitable series entities—contrary to NHS's duties under the Operating Agreement—Infinity would not have standing to seek redress for these wrongful transfer. Defendants' actions would instead have directly injured NHS, a Debtor entity.

[19] As discussed above, *see supra* note 13, at 22, the Series LLCs may have had other direct ownership interests in revenues damaged by Defendants' mismanagement. At present, nothing in the record establishes the existence of such a direct ownership interest.

[20] Rule 12 is applicable to this adversary proceeding under FED. R. BANKR. P. 7012(b).

30 / 36

acting as managers of the Series LLCs or as the manager of NHS when Defendants "wrongly collateralized" Center LP shares.  Though Infinity generally complains of Defendants' failure to fulfill their managerial and fiduciary duties to the Series LLCs, the allegation of wrongful collateralization, as pleaded, suggests Defendants were acting on behalf of NHS.  Specifically, Infinity contends that Defendants falsely claimed NHS owned the Center LP shares.  This alleged misrepresentation suggests Defendants, as managers, were attempting to secure credit for NHS, not the Series LLCs.

This capacity distinction matters as the Series Agreement appears to insulate Defendants from liability arising from the collateralization of Series LLC property.  The Series Agreement provides: "[NHS] and/or the Series may from time to time enter into credit, guaranty or similar loan agreements with one or more commercial lenders . . . . The Members *hereby consent* to the imposition of liens, security interests, mortgages or other encumbrances upon the Series Property[21] . . . ."  (ECF No. 59-8 at 1 (emphasis added)).  This provision appears to grant NHS an unconditional right to encumber Series Property, including Center LP shares acquired by NHS and allocated to the Series LLCs.  Under this provision, the Series LLCs are precluded from challenging any actions taken by, or carried out on behalf of, NHS that resulted in the collateralization of Center LP shares owned by the Series LLCs.  The Series Agreement precludes Infinity from asserting a derivative claim based on Defendants' actions, taken on behalf of NHS, that resulted in the collateralization of Series Property.  *See* Fed. R. Civ. P. 12 (b)(6) (authorizing the dismissal of claims on which relief cannot be granted).

Nevertheless, Infinity may have a derivative *contractual* claim based on Defendants' "wrongful collateralization."  The Management Agreement between the Series LLCs and

---

21 "[Series Property] shall consist of the profits, losses, distributions, and other benefits received by [NHS] from the [Center LPs]."  (ECF No. 59-8 at 10).

Neighbors Health restricted Neighbors Health's ability to "borrow money or execute any promissory notes on" the Series LLCs' behalf.  (ECF No. 62-10 at 2).  Had Defendants, acting as the Series LLCs' manager and without consent, caused the collateralization of Center LP shares, the Series LLCs would have a claim for breach of contract.[22] Assuming it could establish the requisite elements for derivative standing,[23] Infinity could assert the claim on behalf of the Series LLCs.

Infinity's allegations do not establish Infinity's standing to pursue a derivative claim based on Defendants' alleged "wrongful collateralization" of Center LP shares.  *See Fowler*, 178 F.3d at 357.  Infinity must replead its allegations relating to the alleged "wrongful collateralization."  *See* FED. R. CIV. P. 12(e).

### C.    Infinity's Derivative Standing as a Member of a Closely Held LLC

Infinity basis its standing to assert a derivative claim against Defendants on section 101.463 of the Texas Business Organizations Code.  Generally, to assert a derivative claim, a limited liability company's member must comply with sections 101.452 through 101.460.  *See* TEX. BUS. ORGS. CODE ANN. § 101.463(b).  However, under section 101.463, "[s]ections 101.452-101.460 do not apply to a claim or a derivative proceeding by a member of a *closely held* limited liability company against a *governing person, member, or officer* of the limited liability company.  *Id.* § 101.463(b) (emphasis added).  If a member's derivative claim is asserted "against a person *who*

---

[22] NHS also entered an identical Management Agreement with Neighbors Health.  That Agreement restricted Neighbors Health's ability to enter promissory notes on behalf of NHS.  (ECF No. 62-24 at 2).  Based on that Agreement, NHS would have a contractual claim against Neighbors Health, if Neighbors Health, as NHS's manager, caused the collateralization Center LP shares without NHS's consent.  That claim, however, would belong to the Unsecured Creditor Trust, as NHS is a Debtor.  *See Black Elk Energy*, 2016 WL 4055044, at *2 (citing *Educators Grp. Health*, 25 F.3d at 1284) (explaining that derivative claims based on harm to a debtor entity belong to the estate).

[23] *See* TEX. BUS. ORGS. CODE ANN. § 101.463(b) (West 2019) (conferring derivative standing on members of "closely held limited liability companies" in certain circumstances).

*is not* a governing person, member, or officer," sections 101.452 through 101.460 still apply. *Id.* § 101.463(b) (emphasis added).

Section 101.463 also allows courts to treat derivative claims asserted by members of closely held limited liability companies as direct claims "if justice requires." *Id.* § 101.463(c). To further enable members to vindicate their derivative claims, any recovery from such a proceeding "may be paid directly to the plaintiff or [company] if necessary to protect the interests of creditors or other members." *Id.* This authorization does not, however, "transform the derivative action into a direct action." *Gill v. Grewal*, 4:14-CV-2502, 2020 WL 3171360, at *4 (S.D. Tex. June 15, 2020); *Black Elk Energy*, 2016 WL 4055044, at *2. Moreover, the Court retains the authority to direct any recovery to the entity that suffered the injury rather than to the derivative plaintiff. *Swank*, 258 S.W.3d at 665 (holding that, under the corporate analog to section 101.463(c), "the trial court has *discretion* to award damages in a derivative proceeding directly to the shareholder." (emphasis added)).

At bottom, section 101.463 "offers procedural benefits to members of limited liability companies, allowing them to pursue derivative actions for their own benefit." *Black Elk Energy*, 2016 WL 4055044, at *2; *see also In re LoneStar Logo & Signs, LLC*, 552 S.W.3d 342, 349–50 (Tex. App.—Austin 2018, no pet.) (quoting *Sneed v. Webre*, 465 S.W.3d 169, 181 (Tex. 2015)) (Section 101.463 authorizes "a shareholder of a closely held corporation [to] bring a derivative proceeding . . . free of the statutory standing, demand, and mandatory-dismissal requirements that would otherwise apply . . . ." (internal quotation marks omitted, brackets in original)). In enacting these procedural benefits, the Texas Legislature removed the ability of independent directors "to decide whether continuing the derivative proceeding is in the best interest of the corporation." *See Sneed*, 465 S.W.3d at 185–87 (examining the predecessor statute to the statute authorizing

shareholder derivative proceedings against closely held corporations); *see LoneStar Logo*, 552 S.W.3d at 349–50 (relying on the Texas Supreme Court's opinion in *Sneed* to interpret section 101.463). Section 101.463 enables members of closely held limited liability companies to bring derivative litigation without the impediments that burden other derivative suits.[24]

However, plaintiff-members must qualify for access to this fast-tracked derivative relief under section 101.463. Specifically, the derivative action must be asserted against "a governing person, member, or officer." TEX. BUS. ORGS. CODE ANN. § 101.463(b). Only then are the procedural benefits of section 101.463 unlocked.

Infinity's standing to assert its purported derivative claim turns on the applicability of section 101.463(b). That is, whether Infinity was required to comply with sections 101.452 through 101.460 in asserting a derivative claim against Defendants on behalf of the Series LLCs. *See id.* § 101.463(b). Central to Infinity's asserted standing under section 101.463(b) is the Defendants' status in relation to the Series LLCs.

At the time Infinity initiated this proceeding in state court, it was an action against "governing person[s], member[s], or officer[s]." (*See* ECF No. 1-23 at 1–4). Since then, however, the Neighbors D&Os resigned their positions as officers and directors of all Neighbors entities. (*See* Case No. 18-33836, ECF Nos. 772 at 34; 862 at 1). The Liquidating Trustee took over management of Neighbors Health and NHS. (*See* Case No. 18-33836, ECF No. 772 at 8, 11, 34).[25]

---

[24] For instance, before members of a limited liability company that is not closely held bring a derivative action, the members must first demand that the limited liability company itself take suitable action to redress actionable conduct. *See* Tex. Bus. Orgs. Code Ann. § 101.453(a).

[25] Infinity's Fourth Amendment Complaint names the Creditor Trustee, as the successor-in-interest to Neighbors Health, as a defendant. (ECF No. 80 at 1). However, nothing in the Plan or Confirmation Order suggests the Creditor Trustee succeeded to the management role of Neighbors Health or assumed any liability Neighbors Health may have incurred in its role as the Series LLCs' manager. Rather, the Liquidating Trustee, Tensie Axton, assumed the role of representative and "sole manager" of the remaining Debtor entities. (Case No. 18-33836, ECF Nos. 772 at 34, 802-1 at 7). Notably, the Series LLCs are not Debtor entities and the Plan does not clarify whether the Liquidating

And Neighbors Health rejected all unassumed executory contracts, which may have included the Management Agreement between Neighbors Health and the Series LLCs.  (Case No. 18-33836, ECF No. 772 at 36).  As it stands, Infinity's derivative claim is no longer asserted against "governing person[s], member[s], or officer[s]."  (ECF No. 80 at 1–4).[26]

However, based on Infinity's pleadings, it remains unclear whether the Series LLCs suffered injuries for which Infinity could seek derivative relief.  Whether Defendants' changes in status divested Infinity of its ability to rely on section 101.463 is a question that is not yet ripe.

It would also be premature to reach Infinity's request under section 101.463 that, should Infinity recover on its derivative claim, any recovery be paid directly to Infinity under section 101.463(c)(2).  First, Infinity has yet to plead a viable derivative claim, accompanied by the requisite showing standing.  Second, it is not clear whether justice will require Infinity to be paid directly should it recover on its derivative claim.  *See* TEX. BUS. ORGS. CODE ANN. § 101.463(c). The appropriate relief, if any, will be determined at a future date.  It is sufficient that Infinity is aware that its efforts may not result in any direct recovery.

## CONCLUSION

There is no genuine dispute of material fact that Infinity lacks standing to pursue claims for harms inflicted on Debtor entities.  Infinity cannot seek redress for Defendants' alleged breach of fiduciary duty, negligent and gross mismanagement, and abuse of control based on the following harms: (1) the Center LPs' entry into above-market-rate leases of real property, (2) the Center LPs' retention of funds in Center LP bank accounts, and (3) the retention of facility fees billed by the

---

Trustee was also substituted as the Series LLCs' manager.  Either way, it appears Infinity mistakenly named the Creditor Trustee as a defendant but intended to name the Liquidating Trustee.

[26] Neighbors Investment is named as a defendant in Infinity's complaint.  Neighbors Investment is a member of the Series LLCs.  However, Infinity does not assert its derivative claim against Neighbors Investment.

Center LPs to be held in Center LP accounts.  Instead, only the Creditor Trustee may seek redress for these alleged injuries.

Infinity has not sufficiently pleaded its basis for standing to assert its claim for fiduciary breach, mismanagement, and abuse of control based on the remaining injuries: (1) the improper retention and distribution of fees billed by Neighbors Physician Group, (2) the improper transfer of Series LLC funds to other "unprofitable" series entities; and (3) the wrongful collateralization of Series LLC shares.

Accordingly, the Trustee's Motion for Summary Judgment is Granted in Part and Denied in Part.  Infinity's Motion for Summary Judgment is Denied.  The Court will issue a separate Order.

SIGNED 03/18/2021

Marvin Isgur
United States Bankruptcy Judge